IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC.<br>105 Westpark Drive<br>Suite 200<br>Brentwood, Tennessee 37027<br><br>           Plaintiff,<br><br>     5.<br><br>EMRE UMAR<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426<br><br>     AND<br><br>CORRECTIONAL MEDICAL CARE, INC.<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426<br><br>           Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br><br><br><br><br><br>No. |

## COMPLAINT

Plaintiff Prison Health Services, Inc. ("PHS"), by its undersigned counsel, files this Complaint against Emre Umar ("Umar") and Correctional Medical Care, Inc. ("CMC") (collectively referred to as "Defendants") seeking injunctive relief against defendants enjoining Umar from breaching provisions of a Non-Competition Agreement ancillary to the sale of a majority of his business to plaintiff PHS, and damages from Umar's newly formed company, CMC, for its intentional interference with Umar's contractual obligations to plaintiff PHS. In support hereof, Plaintiff avers as follows:

## THE PARTIES AND JURISDICTION

6. Plaintiff, Prison Health Services, Inc. ("PHS") is a Delaware corporation with its principal place of business in Tennessee. PHS is engaged nationwide in the business of providing healthcare services to inmates of correctional facilities. PHS is a wholly owned subsidiary of America Service Group, Inc., which is also a Delaware corporation with its principal place of business in Tennessee.

7. Defendant Emre Umar resides at 818 Hidden Forrest Drive, Collegeville, PA B the same address as defendant CMC. Defendant Umar manages, operates, controls, consults and participates in the ownership, management, operation and control of defendant CMC. More specifically, defendant Umar is the President and Chief Executive Officer of defendant CMC, is responsible for corporate operations and administration, controls the company, and, through his wife, indirectly owns the company. On information and belief, Umar's wife, Maria Carpio, has no significant role or function in the operation of CMC, and is a nominal owner for the purpose of disguising Umar's true ownership and control.

8. Defendant Correctional Medical Care, Inc. ("CMC") is a newly formed Pennsylvania corporation with its principal place of business at 818 Hidden Forrest Drive, Collegeville, PA B the same address as defendant Umar. Like plaintiff, defendant CMC is engaged in the business of providing healthcare services to inmates of correctional facilities in the United States.

9. Non-party Correctional Physician Services (ACPS@) was a corporation in which defendant Umar was previously a principal and one of two sole shareholders, the other being his father, Dr. Kenan Umar. Like plaintiff, non-party CPS was engaged in the business of providing

healthcare services to inmates of correctional facilities.  Defendant Umar's position with CPS was Vice President of Operations.

10. At issue in this lawsuit is Umar's breach of a Noncompetition Agreement he entered into with plaintiff, ancillary to his sale of most of CPS' business to plaintiff.  CMC, knowingly and deceptively, has aided and assisted Umar B and continues to aid and assist Umar B in his breach of contract, to the great detriment and irreparable harm of plaintiff.

11. This Court has jurisdiction in this Civil Action by virtue of diversity of citizenship, pursuant to 28 U.S.C. ' 1332.  The amount in controversy exceeds $150,000.

## RELEVANT FACTS

### Plaintiff's Purchase of Defendant Umar's Business

12. As of March 2000, and prior thereto, defendant Umar operated, managed, controlled and had an ownership interest in CPS, which provided healthcare services to inmates of correctional facilities in many states, including Pennsylvania, New York, Virginia and Florida.

13. Prior to March 2000, plaintiff PHS entered into negotiations with Umar and CPS, and their respective lawyers for PHS to purchase most of CPS' assets and CPS contracts for prison health services in Pennsylvania and New York.  Umar retained ownership of other affiliated businesses and excluded CPS contracts under the agreement, and was not barred from earning a living through these other established business operations.

14. On March 29, 2000, PHS, CPS, Umar and his father, Dr. Kenan Umar, closed the deal for PHS to purchase certain CPS assets and contracts for $14,000,000 (Fourteen Million Dollars).  This purchase included not only prison health services contracts, but also the goodwill

3

of CPS, its intellectual property and its trade names. (A copy of the Asset Purchase Agreement is attached hereto as Exhibit A). Defendant Umar and Dr. Kenan Umar, as sole owners of CPS, signed the agreement on behalf of CPS and themselves.

15.   Pursuant to the Asset Purchase Agreement, plaintiff acquired the CPS correctional healthcare contracts in New York and Pennsylvania.

### Defendant Umar Signed A Non-competition Agreement Ancillary to Sale of His Business

16.   In order to protect the interests of PHS in the acquired business and assets of CPS, the Asset Purchase Agreement explicitly prohibited CPS from competing against PHS in any way for a period of five years.

17.   In addition, as a condition precedent to the Asset Purchase Agreement, it was required that defendant Umar and Dr. Kenan Umar enter into Noncompetition Agreements. Defendant Umar signed a Noncompetition Agreement on March 29, 2000 (copy of which is attached hereto as Exhibit B).

18.   As part of the Noncompetition Agreement, defendant Umar acknowledged that:

a) Purchaser [PHS] has agreed to purchase certain assets of the Business... and to assume certain obligations and liabilities of the Business pursuant to an Asset Purchase Agreement, dated as of March 29, 2000... between Purchaser, Seller, Mr. Umar and Dr. Kenan Umar;

b) Mr. Umar, is the beneficial owner of shares of the issued and outstanding capital stock of seller, and as such, will receive a direct and significant financial benefit from the sale of the Assets to Purchaser;

c) To protect adequately the interests of purchasers in the business and goodwill of Seller, it is essential that Mr. Umar enter into this [Noncompetition] Agreement; and

        d) To induce purchasers to consummate the transactions contemplated under the Purchase Agreement, Mr. Umar desires to enter into this [Noncompetition] Agreement.

(Noncompetition Agreement at Exhibit B at p.1) (emphasis added).

    19.    In accordance with Sections 1 and 3.2 of the Noncompetition Agreement, Umar agreed not to compete against PHS in the provision of healthcare services to inmates of correctional facilities in any way, "directly or indirectly, as an employee of any person or entity, proprietor, partner, stockholder or officer, consultant, joint venturer, investor, lender or in any other capacity or any substantially similar activity, to provide, or to furnish aid or assistance to another person or entity in connection with the provision of" services "of the type" provided by PHS or CPS.

    20.    Umar agreed to refrain from competing in all "Company Activities" for five years, with Company Activities defined as:

        (i) all activities of the type previously conducted by Seller [CPS] as a part of the Business [defined as the "provision of healthcare services to inmates of correctional facilities"] and (ii) all activities of the type hereafter conducted by the Company [plaintiff PHS and its successors and affiliates] with respect to the Business during the Noncompete Period..

(Exhibit B, Sections 1 and 3.2).

The five-year term was expressly negotiated and agreed to by the parties and their lawyers.

    21.    Section 3.1 of the Noncompetition Agreement provided that:

    Mr. Umar hereby acknowledges that the Company [PHS] will conduct Company Activities throughout the Territory (defined as "all fifty states"). Emre Umar acknowledges that to protect adequately the interest of the Company [PHS] in the Business, it is <u>essential</u> that any noncompete covenant with respect thereto cover all Company Activities and the entire Territory.

(emphasis supplied).

    22.    The scope of the Noncompetition Agreement was consistent with PHS' nationwide operations, and Umar's past involvement in the provision of prison healthcare services across much of the United States.

5

23.     Defendant Umar specifically acknowledged and agreed that he entered into the Noncompetition Agreement in consideration of PHS entering into the Purchase Agreement and performing its obligations thereunder, including payment of the purchase price of $14 million, with a $500,000 payment directly to Umar.  (Exhibit AB@at Section 4).

24.     Defendant Umar further agreed in the Noncompetition Agreement that Aany remedy at law for any breach of the provisions contained in this Agreement shall be inadequate and that the Purchaser [PHS] shall be entitled to injunctive relief in addition to any other remedy Purchaser might have under this agreement.@(Exhibit B at Section 6).

25.     The Noncompetition covenant was for a term of five years following the date of the termination of a consulting agreement Umar signed.  The consulting agreement terminated within a year after the sale closed on March 29, 2000.

**Defendant Umar, By and Through Defendant CMC,
Began Competition in Breach of Agreement**

26.     Shortly after the sale of the assets of CPS to PHS, and directly contrary to his Noncompetition Agreement and covenant, defendant Umar began to participate clandestinely in the creation, ownership, management, operation and control of defendant Correctional Medical Care, Inc., previously designated as "CMC."  At the present time, defendant Umar controls the business activities of defendant CMC, and is its President and Chief Executive Officer.

27.     Defendant CMC currently holds itself out as a Ahealth care provider that supplies a comprehensive range of high quality fully auditable health care services to small and medium sized city and county facilities,@mainly prisons and other correctional facilities. (*See, e.g.*, marketing materials submitted by CMC in soliciting PHS's customer, Ulster County, N.Y.).

28.     Less than 14 months after Umar signed the five-year Noncompetition Agreement with plaintiff PHS, and received millions of dollars in payments and consideration for the sale and covenant, he took steps to form defendant CMC, which now directly competes with PHS.

29.     CMC filed papers of incorporation with the Pennsylvania Department of Corporations on May 21, 2001. As noted above, the address listed for CMC is 818 Hidden Forrest Drive, Collegeville, PA., which is also the address of residence of defendant Umar.

30.     Umar placed his ownership of the firm, CMC, under the name of his wife, Maria Carpio, in order to conceal his involvement in CMC and his knowing breach of the Noncompetition Agreement. Carpio has no active role in operating or managing CMC, and has no apparent knowledge or experience in providing prison health services. Her name is not referenced in CMC's promotional materials submitted to prospective customers.

31.     In October of 2001, upon learning of the formation of CMC with an address identical to Umar's, PHS wrote to Umar advising him that he remained bound by his five-year Noncompetition Agreement with PHS, and warning that PHS would seek injunctive relief and damages against him and his company if he breached the agreement. PHS received no response, disagreement or disclaimer from Umar.

32.     Despite plaintiff's objection and notice to Umar about the binding Noncompetition Agreement, plaintiff later learned that Umar was directly soliciting PHS clients and potential clients through CMC at or around that time.

**The New York Bids**

33. In approximately November of 2001, CMC submitted a bid to take over a PHS contract to provide prison healthcare services to inmates of the Ulster County, N.Y., jail.

34. CMC also bid to take over a PHS contract in Albany, N.Y.

35. Both acts were directly competitive with PHS and attempted to take away PHS' customers and contracts. These two New York contracts were small, but valuable customers of PHS when CMC solicited their prison healthcare business.

36. Still, PHS was not certain of Umar's involvement in CMC at this time, and inquired as to his involvement with officers of CMC. CMC, knowingly and with intent to mislead PHS, informed PHS employees that Umar was not involved in the ownership or control of the company, CMC, or its bids in New York.

### The Montgomery County, Pa., Bid

37. On or around February 14, 2002, Montgomery County (Pa.) Correctional Facility advertised a Request for Qualification ("RFQ") for a new contract, commencing May 30, 2002, to provide healthcare services to approximately 1,150 inmates. Responses were due on February 28, 2002. The current contract, held by plaintiff PHS, expires on May 30, 2002.

38. Plaintiff PHS has held the Montgomery County Correctional Facility contract since 1987, and considers this a large and important customer. PHS has aggressively sought renewal of and an increase in this contract, which has provided PHS with annual revenues of nearly $2.2 million during the past three years. Revenues for the contract are expected to grow to roughly $3 million per year over the next three years.

39. Subsequent to the RFQ, the Montgomery County Correctional Facility issued a Request for Proposal ("RFP") for the healthcare contract. Proposals were due March 27, 2002.

40. On March 27, 2002, plaintiff PHS made a timely bid to renew its contract at the Montgomery County Correctional Facility.

41. In direct violation of the Noncompetition Agreement and improperly using information from CPS and PHS, defendant Umar, acting through and with defendant CMC, also made a bid for the Montgomery County work. Three bids were submitted in all, including those from PHS and CMC. The third bidder, Correctional Medical Services, was rejected by Montgomery County early in the bidding process, leaving only plaintiff PHS and defendant CMC.

42. The Montgomery County Correctional Facility gave a "notice of favorable consideration" to defendant CMC on or about April 11, 2002. The "notice of favorable consideration" allowed the Montgomery County Correctional Facility to commence negotiations on the new contract exclusively with defendant CMC.

43. Around this time, plaintiff PHS learned that Umar had been active in communicating with Montgomery County on behalf of defendant CMC, and determined that, contrary to CMC's denials, Umar was in fact an active participant in the company.

44. The bids submitted by CMC to the Montgomery County Correctional Facility contain the resume of defendant Umar. His resume touts his ten years of experience with CPS B the company he sold to plaintiff PHS, including its good will, confidential information and customer relations B and provides a summary of his accomplishments while he was Vice President of Operations at CPS. The bid documents specifically state that Umar will be responsible for the corporate administration in support of the Montgomery County contract.

45. The documents submitted by defendant CMC make absolutely clear that defendant Umar intended to use his knowledge of the correctional healthcare field, which he learned as Vice President of CPS, in administering the contract between CMC and the Montgomery County Correctional Facility.

46. As part of its April 2002 investigation of defendants CMC and Umar's activities, plaintiff made further inquiries into the bids CMC submitted in Albany County and Ulster County, N.Y. From these inquiries, plaintiff learned for the first time that Umar was in fact the President and Chief Executive Officer of CMC. This information appeared in CMC's own documents submitted to Ulster County, N.Y., and directly contradicted earlier denials of such involvement by CMC.

47. On April 24, 2002, counsel for plaintiff placed defendants on notice of Umar's breaches of the Noncompetition Agreement. (See Letter of April 24, 2002, attached as Exhibit C). Plaintiff also warned that it would seek immediate legal and injunctive action if defendants did not contact them and cease in the competitive activities.

48. In soliciting business for CMC, defendants Umar and CMC are trading on and promoting Umar's experience at CPS B the very business that he sold to plaintiff, including ongoing business relations, good will and trade secrets. In other words, the express and essential consideration under the Asset Purchase Agreement and Noncompetition Agreement is now being wrongfully used by Umar and CMC, in violation of those agreements, to compete and to take business away from PHS. Also, on information and belief, Umar is using confidential information and trade secrets from CPS and PHS to solicit and compete against PHS, in direct violation of his contractual commitments. Defendant CMC also is employing at least three

former PHS employees as its top officers and administrators, and trading on their experience at PHS across the nation in many different states.

49.     Furthermore, in promoting their own upstart business, defendants CMC and Umar are condemning and criticizing PHS and other established prison healthcare service companies as providing inferior services B adding insult to the injury caused by the breach of the Noncompetition Agreement.

50.     On May 9, 2002, the Board of the Montgomery County Correctional Facility is scheduled to meet and vote to award the new contract to CMC.  To date, the Board has exclusively negotiated with CMC.  Plaintiff PHS is the only other qualified bidder for this contract, but will be required to wind down its operations for a May 30, 2002, contract termination if CMC is awarded the contract on May 9th.

51.     Defendant CMC and defendant Umar continue to breach the Noncompetition Agreement set forth above, to the irreparable harm and economic detriment of plaintiff.

**COUNT I**
**BREACH OF CONTRACT B DEFENDANT UMAR**

52.     Plaintiff incorporates by reference the paragraphs 1 through 47 as though fully set forth at length herein.

53.     As set forth in more detail above, defendant Umar entered into an enforceable covenant not to compete with plaintiff PHS, ancillary to the sale of a substantial portion of his CPS business.  Umar subsequently violated both the Noncompetition Agreement and the Asset Purchase Agreement, attached hereto as Exhibits B and A, respectively.

54.     Both Umar and PHS expressly agreed and acknowledged in the Noncompetition Agreement and the Asset Purchase Agreement that the noncompetition covenant was necessary

and essential to protect PHS's legitimate interests in the acquired business, goodwill, confidential information and customer relationships of CPS, as well as the continuing nationwide operations of PHS.

55.     The covenant not to compete was supported by adequate consideration, including a $500,000 payment directly to Umar and $14 million in consideration and payments to Umar and his father, Dr. Kenan Umar, for CPS, pursuant to the Asset Purchase Agreement.

56.     The covenant not to compete appropriately recognized the long-term nature of prison healthcare services contracts and relationships, and therefore had a five-year term. Under Pennsylvania law, a covenant not to compete that is ancillary to the sale of a business is reasonable and enforceable for a term of 5-10 years, and is not subject to the same scrutiny that courts give to noncompete agreements imposed on employees by employers.

57.     The covenant covers the fifty states of the United States, a term that was expressly acknowledged by defendant Umar as reasonable and necessary to protect PHS's interests, and is consistent with the national scope of PHS's business and the multi-state scope of the business acquired from Umar. This geographic scope was reasonable and necessary to protect PHS's legitimate business interests. Pennsylvania courts have recognized the appropriateness of such national noncompetition covenants in similar circumstances.

58.     Defendant Umar, as President and CEO of CMC, has breached and continues to breach his covenant not to compete against PHS, by acting as an officer, employee and agent, and indirectly as an owner, to provide and furnish aid and assistance to CMC in connection with:

    (a)     soliciting and obtaining the business of providing healthcare services to the inmates of the Ulster County, N.Y., prison, such activities having been

     conducted immediately prior thereto by PHS and of the type previously conducted by CPS;

(1) soliciting and obtaining a notice of favorable consideration for providing healthcare services to the inmates of the Montgomery County Correctional Facility, such services currently being provided by plaintiff PHS and of the type previously provided by CPS, the business plaintiff purchased from defendant Umar;

(2) soliciting the business of providing healthcare services to the inmates of the Albany County, N.Y., prison, such activities having been conducted at that time by PHS and of the type previously conducted by CPS; and

(3) Otherwise assisting CMC in the solicitation and provision of prison healthcare services in the United States, thereby competing with the business of PHS.

59. Umar, by and through CMC, also is using confidential information of PHS and CPS to promote his own business and that of CMC, in further breach of the Noncompetition Agreement.

60. Umar, by and through CMC, also is using and trading on the goodwill of CPS in these competitive activities by citing previous CPS experience and PHS contracts as references in marketing literature, in further breach of the Noncompetition Agreement.

61. In addition, Umar, by and through CMC, has assisted and aided in recruiting former PHS employees and officers to work for CMC.

62. Due to Umar's breach of contract and improper competition, and aid and assistance to defendant CMC, including *inter alia* bidding for the Montgomery County Correctional Facility, that facility has issued a notice of favorable consideration to defendant CMC, and the facility has opened exclusive negotiations with CMC on the new contract, which will be effective May 30, 2002. Montgomery County Correctional Facility has a board meeting scheduled for May 9, 2002, for the purpose of making its award, and is currently preparing to supplant plaintiff PHS as the provider of those inmate healthcare services. Plaintiff will be irreparably harmed by the impending award and transfer and loss of business, business relationships, good will and reputation, unless an immediate injunction is issued. Plaintiff PHS also will be forced to terminate many of its nearly 25 employees of the facility if it loses the contract.

63. All of these competitive activities have taken place within less than two years and two months, of Umar signing the binding and enforceable Noncompetition Agreement ancillary to the sale of a business, with a term of five years.

**64.** At all times material hereto, defendant Umar was fully aware of his obligations under the Noncompetition Agreement, which he negotiated and freely entered into, with the advice of his own counsel. Despite this knowledge, defendant Umar engaged in the prohibited competitive activities set forth above and knowingly breached his obligations under the Noncompetition Agreement.

65. Umar's breach of the Noncompetition Agreement was malicious, willful, intentional and in gross disregard for both the rights and obligations to plaintiff, as set forth in the Asset Purchase Agreement and the Noncompetition Agreement.

66.     Plaintiff has suffered, and unless defendants are immediately enjoined by this court, will continue to suffer irreparable harm as a result of defendant Umar's breach of the Noncompetition Agreements and the Asset Purchase Agreement, and the resulting loss of business.

67.     This irreparable harm will be magnified greatly if defendants Umar and CMC are not enjoined, as set forth below, and are allowed to proceed with their proposal to the Montgomery County Correctional Facility board meeting on May 9, 2002, to obtain the award of the contract, effective May 30, 2002, involving nearly 25 employees and almost $3 million per year in annual revenues.

## COUNT II
## INTENTIONAL INTERFERENCE WITH CONTRACT - DEFENDANT CMC

68.     Plaintiff incorporates by reference the paragraphs 1 through 57 as though fully set forth at length herein.

69.     Defendant CMC, through its officers and agents, knew that defendant Umar was subject to a Noncompetition Agreement and was thereby under duty to refrain from competing with PHS and soliciting PHS=s prospective and current clients during the period following five (5) years after the termination of Umar=s Noncompetition Agreement and Consulting Agreement.

70.     Despite this knowledge, defendant CMC (of which Umar is President and CEO) has (and still is) actively competing against PHS and has been soliciting PHS=s prospective and current clients during the prohibited five-year period.

71.     As a result of CMC=s actions and support, Umar did breach, and continues to breach, the Noncompetition Agreement, as set forth above, causing direct financial harm to

plaintiff. CMC's actions constitute tortious interference with plaintiff's contracts and agreements with Umar.

72. Defendant CMC has intentionally misled PHS as to Umar's involvement in CMC's activities, in an attempt to conceal his wrongful competition and breach of contract, and their tortious interference with that contract.

73. Plaintiff PHS has suffered, and unless defendants are immediately enjoined by this court will continue to suffer, irreparable harm as a result of defendant CMC's tortious interference with contract. Defendant CMC's actions constitute malicious, willful, and intentional interference with the Noncompetition Agreement between defendant Umar and plaintiff.

74. Because of good will that CMC has falsely used in its marketing activities, its activities cannot be separated from Umar's actions at this point in time and CMC should be prevented from moving forward with its wrongly secured business and reputation.

WHEREFORE, plaintiff requests that this Court rule as follows:

1) That an injunction be issued ordering that:

    (a) Defendant Correctional Medical Care, Inc., is ordered to withdraw its proposal to Montgomery County Correctional Facility to provide inmate healthcare services commencing on or about May 30, 2002, and to notify the Montgomery County Correctional Facility that it can no longer provide any such services;

    (2) Defendants Emre Umar and Correctional Medical Care, Inc., and anyone or any entity acting in concert or participation with them, are prohibited

and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of prison healthcare services to Montgomery County Correctional Facility until March 29, 2005, and thereafter;

(c) Defendants Emre Umar and Correctional Medical Care, Inc. are prohibited and enjoined from commencing any work for the Montgomery County Correctional Facility pursuant to Correctional Medical Care's proposal to provide prison health services to the facility beginning May 30, 2002;

(d) Defendant Emre Umar is prohibited and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of healthcare services to inmates of correctional facilities that are currently customers or clients of Prison Health Services, or its affiliates or successors, until March 29, 2005, and thereafter, with the exception of the Excluded Contracts identified in the Asset Purchase Agreement attached as Exhibit A to the Complaint;

(e) Defendant Emre Umar is prohibited and enjoined from otherwise competing against Prison Health Services by providing healthcare services to correctional facilities until March 29, 2005, and thereafter;

(f) Defendant Emre Umar is prohibited and enjoined from disclosing, publishing or making use of any confidential information or trade secrets of Prison Health Services or Correctional Physician Services, Inc.;

    (g)    Defendant Emre Umar is prohibited and enjoined from trading on the business reputation, goodwill, name or experience of Prison Health Services or Correctional Physician Services;

    (h)    Defendant Correctional Medical Care is enjoined from further aiding, employing, assisting or otherwise acting in connection with Emre Umar in any of the above enjoined activities, including engaging in any of the enjoined competitive activities for so long as Emre Umar, directly or indirectly, controls, manages, works for, consults, or holds an ownership interest in Correctional Medical Care or any affiliate thereof; and

    (1)    Such other relief be awarded as the Court may deem just and proper.

2)    That a declaratory judgment be issued that the Noncompetition Agreement attached hereto as Exhibit B is valid and enforceable against defendants Umar and CMC (for so long as Umar controls, owns, manages, works for, consults, or in any way acts as an agent for CMC) through March 29, 2005; and

3)    That CMC be required to pay any and all monetary damages and costs to PHS resulting from CMC's tortious interference, including without limitation lost profits, compensatory damages, punitive damages, attorneys fees and costs in bringing this action, and such other award and relief as the Court may deem just and proper.

    Respectfully submitted,

_____
Carol A. Mager (I.D. #17548)
Michael D. Homans (I.D. #76624)

                                                Lee Albert (I.D. # 46852)  
                                                MAGER WHITE & GOLDSTEIN, LLP  
                                                One Liberty Place, 44th Floor  
                                                1650 Market Street  
                                                Philadelphia, PA 19103  
                                                (215)569-6924

May 2, 2002