IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

---

PRISON HEALTH SERVICES, INC.      :
105 Westpark Drive                :
Suite 200                         :
Brentwood, Tennessee 37027        :
                                  :
            Plaintiff,            :     CIVIL ACTION
                                  :
        v.                        :
                                  :
EMRE UMAR                         :
818 Hidden Forrest Drive          :
Collegeville, PA 19426            :
                                  :
        AND                       :
                                  :
CORRECTIONAL MEDICAL CARE, INC.   :     No.
818 Hidden Forrest Drive          :
Collegeville, PA 19426            :
                                  :
            Defendants.           :

---

## ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

AND NOW, this ____ day of _____, 2002, upon consideration of plaintiff Prison Health Services, Inc.'s Motion for Preliminary Injunction, the Complaint, and Memorandum of Law in Support of Plaintiff's Motion, and any opposition thereto [and following a hearing on plaintiff's motion held on the ____ day of _____, 2002], the Court finds that plaintiff will suffer immediate and irreparable injury for which there is no adequate remedy at law if the preliminary relief is not granted.

Accordingly, for good cause shown, IT IS HEREBY ORDERED that:

(a)     Defendant Correctional Medical Care, Inc., is ordered to withdraw its

        proposal to Montgomery County Correctional Facility to provide inmate

healthcare services commencing on or about May 30, 2002, and to notify the Montgomery County Correctional Facility that it can no longer provide any such services;

(b)     Defendants Emre Umar and  Correctional Medical Care, Inc., and anyone or any entity acting in concert or participation with them, are prohibited and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of prison healthcare services to Montgomery County Correctional Facility until March 29, 2005, and thereafter;

(c)     Defendants Emre Umar and Correctional Medical Care, Inc. are prohibited and enjoined from commencing any work for the Montgomery County Correctional Facility pursuant to Correctional Medical Care's proposal to provide prison health services to the facility beginning May 30, 2002;

(d)     Defendant Emre Umar is prohibited and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of healthcare services to inmates of correctional facilities that are currently customers or clients of Prison Health Services, or its affiliates or successors, until March 29, 2005, and thereafter, with the exception of the Excluded Contracts identified in the Asset Purchase Agreement attached as Exhibit A to the Complaint;

(e)    Defendant Emre Umar is prohibited and enjoined from otherwise competing against Prison Health Services by providing healthcare services to correctional facilities until March 29, 2005, and thereafter;

(f)    Defendant Emre Umar is prohibited and enjoined from disclosing, publishing or making use of any confidential information or trade secrets of Prison Health Services or Correctional Physician Services, Inc.;

(g)    Defendant Emre Umar is prohibited and enjoined from trading on the goodwill, name, reputation or experience of Prison Health Services or Correctional Physician Services; and

(h)    Defendant Correctional Medical Care is  enjoined from further aiding, employing, assisting or otherwise acting in connection with Emre Umar in any of the above enjoined activities, including engaging in any of the enjoined competitive activities for so long as Emre Umar, directly or indirectly, controls, manages, works for, consults, or holds an ownership interest in Correctional Medical Care or any affiliate thereof.

_____
J.

3

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PRISON HEALTH SERVICES, INC.<br>105 Westpark Drive<br>Suite 200<br>Brentwood, Tennessee 37027 | : <br> : <br> : <br> : <br> : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : <br> : | |
| EMRE UMAR<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : <br> : <br> : <br> : | |
| AND | : <br> : | |
| CORRECTIONAL MEDICAL CARE, INC.<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : <br> : <br> : <br> : | No. |
| Defendants. | : <br> : | |

**ALTERNATIVE ORDER**

Upon consideration of the Complaint in this matter and the Motion of Plaintiff, Prison

Health Services, Inc., for Preliminary Injunction:

IT IS ORDERED that the parties and their counsel, if any, shall appear before this Court

on the _____ day of May, 2002 at _____ o'clock in Courtroom _____ to determine whether a

Preliminary Injunction providing the relief sought in plaintiff's Motion should be entered.

BY THE COURT:

_____
                                                                        J.

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC. | : | |
| 105 Westpark Drive | : | |
| Suite 200 | : | |
| Brentwood, Tennessee 37027 | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| EMRE UMAR | : | |
| 818 Hidden Forrest Drive | : | |
| Collegeville, PA 19426 | : | |
| | : | |
| AND | : | |
| | : | |
| CORRECTIONAL MEDICAL CARE, INC. | : | No. |
| 818 Hidden Forrest Drive | : | |
| Collegeville, PA 19426 | : | |
| | : | |
| Defendants. | : | |

## MOTION  FOR PRELIMINARY INJUNCTION

Plaintiff  Prison Health Services, Inc. ("PHS") hereby moves this Court for an Order

granting a Preliminary Injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

In support of its motion, plaintiff PHS avers as follows:

1.      Plaintiff PHS has instituted this action today by filing a two-count Complaint with

this Court.  The claims are for breach of contract against defendant Emre Umar ("Umar") and

tortious interference with contract against defendant Correctional Medical Care, Inc. ("CMC"), a

newly formed corporation controlled and indirectly owned by defendant Umar.

2.      At issue in the lawsuit is Umar's breach of a Noncompetition Agreement (attached

to the Complaint as Exhibit B)  he entered into with the plaintiff, ancillary to his sale of his

business to plaintiff (as set forth in the Asset Purchase Agreement, attached to the Complaint as Exhibit A).  Umar's newly formed company, defendant CMC, knowingly and deceptively has aided and assisted Umar – and continues to aid and assist Umar – in his breach of his contractual obligations, to the great detriment and irreparable harm of plaintiff.

3.     Immediate injunctive relief is necessary to prevent further irreparable harm to plaintiff PHS, including the pending award of the Montgomery County Correctional Facility contract for prison healthcare services to defendant CMC, with defendant Umar acting as CMC's President, CEO and indirect owner.   Plaintiff PHS has held this contract for 15 years, and defendant Umar's activities in pursuing this work have been in direct violation of the Noncompetition Agreement.  Furthermore, award of such contract to defendant CMC would cause immediate, irreparable and incalculable loss to plaintiff PHS of business relationships, good will, income, and confidential information.

4.     **The governing board of the Montgomery County Correctional Facility is scheduled to vote on May 9, 2002, to approve the awarding of the prison health services contract to CMC rather than to PHS, the only other qualified bidder.  The contract is scheduled to take effect May 30, 2002.**

5.     Plaintiff PHS is likely to prevail on its claims against defendant Umar for breach of contract and against defendant CMC for tortious interference with contractual relations.

6.     If the requested preliminary injunction is not granted, plaintiff PHS will suffer immediate and irreparable harm.

7.     The requested preliminary injunctive relief will not cause undue harm to defendants, and will be in the public interest.

2

8.    Therefore, to prevent immediate and ongoing injury, breach of contract and tortious interference with contract, plaintiff PHS requests that this Court issue an Order that:

(a)    Defendant Correctional Medical Care, Inc., is ordered to withdraw its proposal to Montgomery County Correctional Facility to provide inmate healthcare services commencing on or about May 30, 2002, and to notify the Montgomery County Correctional Facility that it can no longer provide any such services;

(b)    Defendants Emre Umar and  Correctional Medical Care, Inc., and anyone or any entity acting in concert or participation with them, are prohibited and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of prison healthcare services to Montgomery County Correctional Facility until March 29, 2005, and thereafter;

(c)    Defendants Emre Umar and Correctional Medical Care, Inc. are prohibited and enjoined from commencing any work for the Montgomery County Correctional Facility pursuant to Correctional Medical Care's proposal to provide prison health services to the facility beginning May 30, 2002;

(d)    Defendant Emre Umar is prohibited and enjoined from providing, soliciting or otherwise aiding or assisting in connection with the provision of healthcare services to inmates of correctional facilities that are currently customers or clients of Prison Health Services, or its affiliates or successors, until March 29, 2005, and thereafter, with the exception of the

3

Excluded Contracts identified in the Asset Purchase Agreement attached as Exhibit A to the Complaint;

(e)     Defendant Emre Umar is prohibited and enjoined from otherwise competing against Prison Health Services by providing healthcare services to correctional facilities until March 29, 2005, and thereafter;

(f)     Defendant Emre Umar is prohibited and enjoined from disclosing, publishing or making use of any confidential information or trade secrets of Prison Health Services or Correctional Physician Services, Inc.;

(g)     Defendant Emre Umar is prohibited and enjoined from trading on the goodwill, name, reputation or experience of Prison Health Services or Correctional Physician Services;

(h)     Defendant Correctional Medical Care is  enjoined from further aiding, employing, assisting or otherwise acting in connection with Emre Umar in any of the above enjoined activities, including engaging in any of the enjoined competitive activities for so long as Emre Umar, directly or indirectly, controls, manages, works for, consults, or holds an ownership interest in Correctional Medical Care or any affiliate thereof; and

(i)     Any other relief or award the Court deems proper and just be granted.

9.     In the alternative, due to the pending May 9, 2002, action by the Board of the Montgomery County Correctional Facility (referenced in paragraph 4, *supra*), which would cause further substantial and irreparable harm to plaintiff, plaintiff requests that the Court

4

schedule a hearing within four (4) to six (6) calendar days to consider the relief requested herein, if such relief is not immediately grant based on this motion alone.

      10.      In further support of its Motion for Preliminary Injunction, plaintiff PHS relies upon and incorporates herein by reference the Complaint, the accompanying Memorandum of Law, and the verification and other attachments thereto.

      Respectfully submitted,


      _____
      Carol A. Mager (I.D. #17548)
      Michael D. Homans  (I.D. #76624)
      Lee Albert  (I.D. # 46852)
      MAGER WHITE & GOLDSTEIN, LLP
      One Liberty Place
      1650 Market Street, 44th Floor
      Philadelphia, PA 19103
      (215)569-6924


Dated: May 2, 2002

5

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC. | : | |
| 105 Westpark Drive | : | |
| Suite 200 | : | |
| Brentwood, Tennessee 37027 | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| EMRE UMAR | : | |
| 818 Hidden Forrest Drive | : | |
| Collegeville, PA 19426 | : | |
| | : | |
| AND | : | |
| | : | |
| CORRECTIONAL MEDICAL CARE, INC. | : | No. |
| 818 Hidden Forrest Drive | : | |
| Collegeville, PA 19426 | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION  FOR PRELIMINARY INJUNCTION**

Plaintiff Prison Health Services, Inc. ("PHS") seeks  immediate injunctive relief against

defendant Emre Umar and the company he formed and controls, Correctional Medical Care, Inc.

("CMC"), for willful violation of a covenant not to compete signed by Umar.  Defendant Umar

and plaintiff entered into the Noncompetition Agreement on March 29, 2000, as a condition

precedent and essential term of plaintiff's agreement to purchase much of defendant Umar's

prison healthcare services business, Correctional Physician Services, Inc., which was in the same

industry as plaintiff.  The purchase included the transfer of certain assets, goodwill, confidential

information, trade secrets, the trade name and contract rights to plaintiff PHS.  Umar personally

received $500,000 from this Asset Purchase Agreement, in addition to his share of the $14 million in payments and consideration made by plaintiff PHS for the purchase.

Plaintiff has instituted this action today by filing a two-count Complaint with the Court. The claims are for breach of contract against defendant Umar and tortious interference with contract against defendant CMC.

An immediate preliminary injunction is necessary because on May 9, 2002 – eight days from the date of this motion – the Board of the Montgomery County Correctional Facility is scheduled to vote to award defendant CMC, owned and controlled by defendant Umar, a three-year, $9 million contract to provide prison healthcare services, beginning May 30, 2002.  This contract is currently held by plaintiff PHS, as it has been for the past 15 years.  If PHS is displaced as the contractor in the facility – PHS is the only other qualified bidder for this work – it will suffer irreparable harm to its business relationships, loss of good will, and loss of the essential consideration for its $14 million bargain with defendant Umar.  In addition, loss of this contract will require plaintiff to terminate most of the nearly 25 employees who work at the facility – employees who cannot afford to lose their jobs and wait indefinitely for this case to work its way through discovery and a trial on the merits.

I.    **INTRODUCTION**

In May of 2001, defendant Umar – in direct violation of his Noncompetition Agreement with plaintiff, which had a term of five years  – assisted in the formation of defendant CMC, a company now active in the same business as plaintiff, providing healthcare services to correctional facilities.  Defendant Umar placed ownership of the company in his wife's name and made the corporate address his home address.  Since the formation of CMC by defendant Umar,

Umar and CMC have clandestinely set about in a pattern of conduct to that has enabled Umar to breach almost every aspect, if not all, of the Noncompetition Agreement, including (1) the solicitation of business from plaintiff's customers, (2) the actual taking of business from plaintiff's customers, (3) the marketing of CMC and Umar by direct reference to the experience and good will of plaintiff PHS and the business PHS acquired from Umar, CPS, and (4) the use of confidential information from PHS and from the business Umar sold to PHS.   CMC attempted to conceal Umar's role in this competitive conduct for several months by denying Umar's involvement in the company and its competitive activities.  The scope and continuation of these breaches have recently been discovered and undeniably confirmed by defendant CMC's own marketing materials and public documents filed by CMC and defendant Umar.

Most recently and urgently, plaintiff has learned that defendants CMC, acting in concert with defendant Umar, has obtained "preferred vendor" status in a bid to take away from plaintiff PHS a contract for prison healthcare services work at the Montgomery County Correctional Facility.  This new contract with CMC is scheduled to take effect May 30, 2002.  The board of the Correctional Facility is scheduled to vote on awarding the contract – which has been held by plaintiff for 15 years – to CMC on May 9, 2002.  Unless the preliminary injunctive relief is granted, plaintiff PHS will be irreparably harmed by the loss of this longstanding contract (worth nearly $9 million over three years), loss of good will, loss of a longstanding business relationship, and loss of countless other customers and business relationships due to defendant Umar's ongoing competitive conduct, by and through defendant CMC.

II.    **STATEMENT OF FACTS**

3

In March 2000, and prior thereto, defendant Emre Umar ("Umar"), a Collegeville, Pennsylvania resident, operated, managed, controlled and had an ownership interest in Correctional Physician Services ("CPS"), which  provided  healthcare services to inmates of correctional facilities in many states, including Pennsylvania, New York, Virginia and Florida. At that time,  Prison Health Services ("PHS"), a Delaware corporation with a principal office in Tennessee,  entered into negotiations with Umar and CPS, and their counsel, for plaintiff PHS to purchase most of CPS' assets and CPS' contracts for prison health services in Pennsylvania and New York.

On March 29, 2000, PHS purchased a substantial portion of the assets and contracts of CPS for $14,000,000, plus a $500,000 direct payment to defendant Umar and another $500,000 direct payment to Umar's father, Dr. Kenan Umar. (Asset Purchase Agreement, Ex. A). Importantly, this purchase included, among others,  CPS' New York and Pennsylvania contracts. The purchase also included the goodwill, intellectual property and trade names of CPS.  (Id.) Defendant Umar and his father, Dr. Kenan Umar, as sole owners of CPS, signed the Asset Purchase Agreement on behalf of CPS and themselves.  (Id.).

Umar retained ownership and control of other affiliated businesses and excluded CPS contracts under the Asset Purchase Agreement, and was not barred from earning a living through these other established business operations. (Id.)

### Defendant Umar Signed Noncompetition Agreement Ancillary to Sale of His Business

In order to protect the interests of plaintiff PHS in the acquired business and assets of CPS, the Asset Purchase Agreement explicitly prohibited CPS from competing against PHS in

any way for five years.  (Id.)  Additionally, defendant Umar and Dr. Kenan Umar were required

to enter into Noncompetition Agreements with PHS, which Umar signed on March 29, 2000.

(Umar Noncompetition Agreement, attached hereto as Exhibit B).  The Noncompetition

Agreement is for five years and specifically states that Umar cannot compete against PHS in the

provision of healthcare services to inmates of correctional facilities in any way, "directly or

indirectly, as an employee of any person or entity, proprietor, partner, stockholder or officer,

consultant, joint venturer, investor, lender or in any other capacity or any substantially similar

activity, to provide, or to furnish aid or assistance to another person or entity in connection with

the provision of" such services.  (Exhibit B, Sections at 1 and 3.2).  Umar also agreed to refrain

from competing in all "Company Activities" for five years, with such term defined as:

> (i)  all activities of the type previously conducted by Seller [CPS]
> as a part of the Business [defined as the "provision of healthcare
> services to inmates of correctional facilities"] and (ii) all activities
> of the type hereafter conducted by the Company [plaintiff PHS and
> its successors and affiliates] with respect to the Business during the
> Non-compete Period.

(Exhibit B, Sections 1 and 3.2).  Umar further agreed that he would refrain from competing in all

Company Activities throughout the United States.  (Id. at Section  3.1).  This provision was

essential because plaintiff PHS conducts business nationally, and Umar was involved in the past

in the provision of prison healthcare services across much of the United States.  Umar  also

agreed under the Noncompetition Agreement that any failure to comply with the provisions in

the agreement could be remedied by injunctive relief in addition to any other remedy provided

for under the Agreement.  (Id. at Section 6).  Umar acknowledged in writing that the

Noncompetition Agreement was a condition precedent and integral to the sale of CPS to PHS.

(Id. Section 4; Exhibit A at Section 6).

**Defendant Umar, By and Through Defendant CMC,**
**Began Competition in Breach of Agreement**

Less than 14 months after Umar signed the five-year Noncompetition Agreement with PHS, he secretly formed defendant Correctional Medical Care, Inc. ("CMC"), which now directly competes with PHS.  The registered address for CMC is the same as the residence of Umar, 818 Hidden Forrest Drive, Collegeville, PA. (See Pennsylvania Department of State, Corporation document attached as Exhibit G).  Defendant CMC is a "health care provider that supplies a comprehensive range of high quality fully auditable health care services to small and medium sized city and county facilities," mainly prisons and other correctional facilities. (*See* miscellaneous documents provided by defendant CMC to Ulster County (N.Y.) Law Enforcement Center in support of its  bid to Ulster County, attached collectively as Exhibit E).[1] Umar, as President and Chief Executive Officer, manages, consults and directly controls the business operations of defendant CMC.  Additionally, Umar indirectly owns the company through his wife.  (Ex. E, second page).  Umar placed his ownership of the firm, CMC, under the name of his wife, Maria Carpio, in order to conceal his involvement in CMC.  Carpio has no active role in operating or managing CMC, and  has no knowledge or experience in providing prison health services. Her name is not referenced in CMC's  promotional materials or list of "Leadership of Firm." (See Exhibit E).

Immediately upon learning of the formation of CMC in October 2001, PHS wrote to defendant Umar advising him that he remained bound by his five-year Noncompetition

---

[1] This documentation is attached as it was given to plaintiff PHS by Ulster County, upon a request to review documents submitted in 2001 and 2002 by defendant CMC.  More complete documentation will be available shortly, but these documents establish defendant CMC's competitive activities in Ulster County, and defendant Umar's leadership of CMC.

Agreement with PHS. (See Letter of October 12, 2001 to Emre Umar from Jean L. Byassee, attached as Exhibit C). Plaintiff PHS further warned that it would seek injunctive relief and damages against him and his company if he breached the agreement. (Id.) To date, plaintiff PHS has received no response from Umar. Instead, plaintiff later learned that Umar was directly soliciting PHS clients and potential clients through CMC at or about the time that PHS issued its warning to him. (Exhibit E).

### The New York Bids

In approximately November 2001, Umar, through CMC, directly competed with plaintiff PHS and attempted to take away two PHS customers in New York. These two New York contracts were small, but valuable customers of PHS. Unbeknownst at the time to PHS, CMC's bid documents included promotional material stating that Umar was the President and Chief Executive Officer of CMC. (Exhibit E). The documents also included Umar's previous experience with PHS. (Id.). This conduct was in clear violation of the Noncompetition Agreement.

At or around this time, plaintiff PHS asked CMC officers whether defendant Umar was involved in CMC's operations and bids for the New York contracts. In response, CMC falsely communicated to plaintiff that defendant Umar was not involved in the activities.[2]

### The Montgomery County Bid

---

[2] Even if plaintiff had known about defendant Umar's improper competitive activities in New York in late 2001, the Asset Purchase Agreement, Exhibit A, provides at Section 11.4(a) that "No waiver of any breach will operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof."

In or around February 14, 2002, Montgomery County (Pa.) Correctional Facility advertised a Request for Qualification (RFQ), with regard to a new contract to provide healthcare services to its approximately 1,150 inmates. Responses were due on February 28, 2002. The new contract is scheduled to commence on May 31, 2002, at the same time the old contract, which PHS holds, expires.

PHS has held the Montgomery County Correctional Facility contract since 1987, and considers this a large and important customer because it has provided PHS with annual revenues of nearly $2.2 million during the past three years. (See generally, Bruce Teal Verification, attached as Exhibit H). Plaintiff PHS expects that amount to grow to roughly $3 million per year over the next three years. On March 27, 2002, PHS made a timely bid to renew its contract with the facility.

In direct violation of the Noncompetition Agreement, Umar, through CMC, also submitted a bid to the Montgomery County Correctional Facility. (See two pages of bid submitted by CMC to the Montgomery County Correctional Facility, attached as Exhibit F).[3] In fact, PHS has learned that Umar was active in communicating with Montgomery County on behalf of defendant CMC. Similar to the New York bids, CMC's bid contained Umar's resume which set forth his ten-year affiliation with CPS – the business he sold to plaintiff – as well as a summary of his accomplishments. The bid documents also specifically state that Umar will be responsible for the corporate administration in support of the Montgomery County contract.

---

[3] Plaintiff has been unable to obtain copies of the entire CMC bid from the County, but the County has allowed plaintiff's counsel has to review the entire bid. The two pages attached hereto are certified as being copies of the CMC bid to the Montgomery County Correctional Facility.

The Montgomery County Correctional Facility gave a formal notice of "favorable consideration" to CMC on or about April 11, 2002.  The notice of favorable consideration allows the Montgomery County Correctional Facility to commence  negotiations exclusively with CMC on the new contract.

The present contract with the Montgomery County Correctional Facility expires on May 30, 2002 and defendant CMC's contract would begin immediately thereafter should PHS be replaced.  At this time, the board of the Montgomery County Correctional Facility is scheduled to meet on  May 9, 2002, to vote on awarding the new contract to defendant CMC.  If and when the bid is formally awarded to CMC, an instantaneous  transition period will commence resulting in plaintiff PHS, and its employees being displaced from the facility.  Losing this contract, which it has held since 1987, will have a substantial financial impact on PHS,  and result in the immediate  termination of PHS employees who currently work at the facility. Just as importantly,  plaintiff PHS  will suffer damage to its reputation and loss of good will and a longstanding business relationship due to defendants' competition.

As a result of this improper conduct, on April 24, 2002,  plaintiff PHS notified defendants that Umar has breached the Noncompetition Agreement.  (See Letter of April 24, 2002, attached as Exhibit D).  Plaintiff also warned that it would seek immediate legal and injunctive action if defendants did not contact them and cease in the competitive activities.  To date, defendants have ignored these warnings to the detriment and irreparable harm of PHS.

## III.    ARGUMENT

Defendants cannot dispute that defendant Umar knowingly and in exchange for substantial consideration ancillary to the sale of his business entered into a  Noncompetition

Agreement with plaintiff PHS.  (Exhibits A and B, respectively, attached hereto; also attached as Exhibits A and B to the Complaint).  In this Noncompetition Agreement Umar willingly agreed and obligated himself not to compete against plaintiff PHS in any way for a term of  five years. This agreement was a condition precedent and expressly "essential" to plaintiff PHS's agreement to pay $14 million for Umar's business, and $500,000 directly to defendant Umar, and was necessary to protect PHS's interests in the business, good will and confidential information it was acquiring.  The Noncompetition Agreement's terms were reasonable in all respects (1) preventing competition against plaintiff PHS in the provision or solicitation of prison health services – the business of both plaintiff PHS and the purchased business of Umar; (2) binding Umar for a term of five years, reflecting the long-term nature of the contracts and relationships involved in the prison healthcare industry; and (3) having a geographic territory consistent with the nationwide reach of plaintiff PHS's prison healthcare business and the multi-state nature of the business purchased from Umar.

Defendant Umar, after having freely agreed to the noncompetition provisions and collected the lucrative benefit of his bargain from plaintiff PHS, now (in addition to breaching his agreement to pay off CPS debts incurred prior to the closing date) he has begun to renege on his obligations.  He has intentionally and deceptively begun breaching the Noncompetition Agreement by competing directly against plaintiff PHS, and soliciting its prison healthcare services customers, including most recently the Montgomery County Correctional Facility – a three-year contract for nearly $9 million.   This conduct is in blatant violation of the Noncompetition Agreement, Sections 1 and 3.2 (Exhibit B), and comes barely two years into the five-year term of noncompetition.  Umar cannot deny any of these facts, as they are taken

primarily from documents he and his company, defendant Correctional Medical Care, Inc., have submitted to customers of plaintiff PHS in New York and Pennsylvania. (*See, e.g.*, Exhibits E and F, attached hereto).

Pennsylvania courts will enforce noncompetition agreements ancillary to the sale of a business for terms of five and even ten years in recognition of the buyer's right to gain the benefit of its bargain from the seller of the business.  Alexander & Alexander, Inc. v. Drayton, 378 F. Supp. 824, 831 (E.D. Pa. 1974), *aff'd*, 505 F.2d 729 (3d Cir. 1974) (noting that a noncompetition clause ancillary to the sale of a business, which ran for 10 years from the sale of the business, was "reasonable in time . . . and necessary to protect the employer and did not impose an undue hardship on the employees who had profited handsomely by their sale of the business to the plaintiff")[4]; Vector Security, Inc. v. Stewart, 88 F. Supp. 2d 395 (E.D. Pa. 2000) (upholding five-year term of noncompetition clause barring former authorized dealer from soliciting plaintiff's customers, even though situation was more akin to an employment relationship).  As recognized by the Supreme Court of Pennsylvania, and cited with favor by this Court, "Were the seller free to re-enter the market [before the term of noncompetition], the buyer would be left holding the proverbial empty poke."  Alexander, 378 F. Supp. at 829 (citing Morgan's Home Equipment v.

---

[4] In Alexander, the seller of an insurance brokerage business became an employee of the buyer, defendants, and worked for them for nearly eight years before seeking to breach the 10-year noncompetition agreement. The court  held that the original 10-year period, ancillary to the sale of the business, was reasonable to protect the buyers' interests from the date of sale, but that it would not be reasonable to enforce the covenant for another 10 years after the termination of employment eight years later.  Therefore, the covenant was modified to restrict competition for two additional years post-employment – resulting in a total restriction equal to the original 10-year covenant.

Martucci, 390 Pa. 618, 136 A.2d 838, 846 (1957) and referring to Restatement, Contracts, §
515(b), comment b (1932)).

Like the plaintiffs in these cases, plaintiff PHS acquired defendant Umar's business with
the understanding and agreement that PHS would be free from competition by Umar for five
years, and paid handsomely for this commitment (more than $14 million in consideration and
cash payments). Defendant Umar, and his new company, defendant Correctional Medical Care,
Inc., must be barred from competing against plaintiff and seeking its business during the five-
year term of the Noncompetition Agreement.

Moreover, because Umar's and CMC's competitive conduct is now imminently
threatening to take from plaintiff PHS the Montgomery County Correctional Facility contract, a
preliminary injunction is warranted to bar such competitive conduct in Montgomery County, as
well as anywhere else.   (Bruce A. Teal Verification, attached as Ex. H).  Preliminary injunctive
relief is warranted immediately because (1) plaintiff PHS will likely succeed in its action against
defendant Umar for breach of the Noncompete Agreement, ancillary to the Asset Purchase
Agreement, and against defendant CMC for tortious interference of contract;  (2) PHS will suffer
irreparable harm if defendant Umar's breach of his covenant not to compete is not immediately
and judicially restrained; and (3) the balance of the equities favor entering the injunction against
defendants, and enforcing the agreement.

    **(i)**    <u>**Legal Standard for Injunctive Relief**</u>

In deciding whether an injunction should issue, a district court weighs four factors: (1)
whether the movant has demonstrated a reasonable probability of succession the merits; (2)
whether the movant will be irreparably  injured by denial of the relief; (3) whether granting

preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the injunction serves the public interest. <u>Gerardi v. Pelullo</u>, 16 F. 3d 1363, 1373 (3d Cir. 1994). While state law applies to the substantive issues in a diversity action, federal law governs the standards for issuing a preliminary injunction. *See* <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 799 (3d Cir. 1999).

In construing a contract the court's paramount consideration is the intent of the parties. <u>Westec Security Services, Inc. v. Westinghouse Electric Corporation</u>, 538 F.Supp. 108, 117 (E.D. Pa. 1982). The Asset Purchase Agreement (Ex. A) and Noncompetition Agreement (Ex. B) – both of which were negotiated by counsel for all parties – clearly demonstrate the intent of the parties was that Umar would not compete against plaintiff PHS for the five-year period set forth in the Noncompetition Agreement.

### B.    <u>Plaintiff PHS Is Likely To Succeed On The Merits.</u>

#### 1.    The Covenants Contained in Umar's Noncompetition Agreement Are Reasonable, Enforceable and Ancillary to the Sale of a Business.

Plaintiff PHS is likely to succeed in its action against Umar for breach of the covenants contained in the Noncompetition Agreement he executed on March 29, 2000. In the Asset Purchase Agreement (Ex. A), and the Noncompetition Agreement itself (Ex. B), it was expressly agreed that the noncompetition commitment was a "condition precedent," "ancillary," "essential" and necessary to the sale of Umar's business, Correctional Physician Services, to plaintiff PHS.

In Pennsylvania, "[i]n order to be enforceable, a restrictive covenant must satisfy three requirements: (1) the covenant must relate to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) the covenant must be supported by adequate consideration; and (3) the application of the covenant must be reasonably limited in both time and territory. <u>Piercing Pagoda, Inc. v. Hoffner</u>, 465 Pa. 500, 506-07, 351 A.2d 207,

13

210 (1976); <u>Davis & Warde, Inc. v. Tripodi</u>, 420 Pa. Super. 450, 454, 616 A.2d 1384, 1386-87 (1992).

      "A covenant not to compete which is ancillary to a contract for the sale of a business is subject to less rigorous reasonableness examination than those ancillary to an employment contract." <u>Scobel, Inc. v. Schade</u>, 455 Pa. Super. 414, 688 A.2d 715, 718  (Pa.Super.1997). "A buy-sell restrictive covenant is enforceable if it is designed to protect the legitimate interests of the purchaser of the business." <u>Id.</u>  "The purpose of allowing enforcement of non-competition covenants when such covenants are ancillary to sales of businesses is to make goodwill a saleable asset by protecting the buyer in the enjoyment of that for which he pays." <u>Westec Security Services, Inc. v. Westinghouse Electric Corporation</u>, 538 F.Supp. 108, 121 (E.D.Pa.1982).  In many such sales, "it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducement for a sale.  Were the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke." <u>Alexander</u>,  378 F. Supp. at 829.

      The covenants contained in defendant Umar's Non-compete Agreement with PHS satisfy all of the requirements set forth under Pennsylvania law.  First, the covenants were entered into in connection with an Asset Purchase Agreement between plaintiff PHS and defendant Umar. Second, in exchange for the asset sale, Umar was required to sign an agreement not to compete against plaintiff PHS for a period of five years.  Third, defendant Umar received substantial consideration – including a $500,000 payment directly to him personally and $14 million in payments and consideration for the business assets of his former company, CPS.  And fourth, the covenant not to compete executed by defendant Umar on March 29, 2000 is reasonably restricted in time and scope. The restriction lasts until five years following the termination of the consulting agreement, which ended in 2000.  In <u>Vector Security v. Stewart</u>, 88 F.Supp. 2d 395 (E.D.Pa. 2000), the district court determined that a five-year restriction, barring an authorized dealer from competing against the plaintiff, was a reasonable time period to restrict competition

and allow the plaintiff to solidify its business relations.  Likewise, an initial prohibition against competition for 10 years after the sale of a business was deemed essential to protect plaintiff's interest in the acquired business and its good will.  Alexander & Alexander v. Drayton, 378 F.Supp.824, 831 (E.D.Pa. 1974).   As for the national scope, Pennsylvania courts routinely recognize that nationwide limitations on competition are warranted where the plaintiff has a business with clients and operations nationwide.  See, e.g., National Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998); Kramer v. Robec, Inc., 824 F. Supp. 508, 512 (E.D. Pa. 1992) (nationwide bar on competition reasonable "because Robec and its competitors market their products in all fifty states").

> **2.    Defendant Umar Has Undeniably Breached His Covenant Not To Compete Against Plaintiff PHS.**

Defendant Umar has breached his obligations under the Noncompetition Agreement, without a doubt.  Plaintiff PHS can show – through documents submitted by defendant Umar and his company, defendant CMC (see Exhibits E and F), to customers of PHS – that defendants are competing against plaintiff PHS and soliciting its customers, in direct breach of the provisions of the Noncompetition Agreement.  The fact that Umar clandestinely initiated this wrongful competition through the guise of his newly formed corporation, defendant CMC, does not lessen this breach – to the contrary it magnifies it because Umar is now acting through a corporation that he controls as President and CEO, and staffed by him with former PHS executives. (Ex. E). It also illustrates that Umar knew he was violating his contractual obligations, and was attempting to disguise such violations by acting through an entity incorporated under his wife's name, rather than his own. (Ex. E, Ex. G).

Undeniably, on March 29, 2000, defendant Umar agreed in writing that for at least five years he would not compete with plaintiff PHS.  (Sections 3.2 and 1(f), Exhibit B).   As detailed

15

in the Complaint, by forming and operating CMC defendant Umar is directly engaging in a line of business that competes with a line of business at plaintiff PHS. (Teal Verification, Ex. H). He and his company, CMC, are directly soliciting customers of PHS, including the Montgomery County Correctional Facility. (Id.; Ex. F). Moreover, Umar's management and business development duties and activities at CMC are essentially the same as the ones he performed for his former business, CPS, before he sold it to plaintiff PHS. (Exhibits E, A and B). It is difficult to imagine a clearer case of a knowing, material breach of a covenant not to compete.

### 3.    Plaintiff Also Is Likely to Prevail On Its Claims Against Defendant CMC, As CMC Has Intentionally Assisted Defendant Umar In Breaching His Contractual Obligations to Plaintiff PHS.

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Cirvelli v. General Motors Corp., 215 F.3d 386 (3d Cir.2000).

In this action, there is no dispute as to a contractual relation between plaintiff PHS and a third party, defendant Umar, thereby satisfying the first element. (Exhibits A and B). As to the second element, defendant CMC has assisted defendant Umar in competing against plaintiff PHS, in violation of the Noncompetition Agreement between Umar and PHS. (See, e.g., Exhibits E and F). Defendant CMC has knowledge of this contract and the breach through Umar himself, who acts as President and CEO of CMC, and uses his home as its corporate offices. (Exhibits E and G). Moreover, CMC has assisted Umar in the knowing violation of his contractual commitments to PHS by falsely reporting to PHS that Umar was not involved with CMC and specific bids it made for the business of PHS customers in New York. (Teal Verification, Ex. H). Defendant CMC has no privilege or justification for this conduct, and

16

therefore plaintiff can prove the third element of this tort.  Fourth and finally, plaintiff PHS can establish actual legal damage as a result of defendant's conduct including, without limitation, the loss of the Ulster County, N.Y., contract to defendant CMC and the pending loss of the Montgomery County Correctional Facility prison health services contract, which has a three-year value of nearly $9 million. (Exhibit F).

> **B.      PHS will Suffer Irreparable Harm If Mr. Umar Is Permitted To Violate His Employment Agreement, Including Such Violations By And Through CMC.**

Plaintiff PHS will suffer irreparable harm if defendant Umar, by and through his company, defendant CMC,  continues to violate the restrictive covenants contained in the Noncompetition Agreement.   It is well-settled under Pennsylvania law that the consequences of unwarranted interference with customer relationships is unascertainable and incapable of being fully compensated by money damages.  John G. Bryant Co. v. Sling Testing & Repair, Inc., 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977); see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger, 75 F. Supp. 2d 375, 381 (M.D. Pa. 1999).  In fact, the Pennsylvania Supreme Court specifically explained the nature of the irreparable harm resulting form a breach, or threatened breach, of a restrictive covenant:

> It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.
>
> * * * *
>
> [A restrictive] covenant . . . is designed to prevent a disturbance in the relationship that has been established between appellees and their accounts through prior dealings.  It is the possible consequences of this unwarranted interference with customer relationships that is [sic] unascertainable and not capable of being fully compensated by money damages . . . .[W]here a covenant of this type meets the test of reasonableness, it is prima facie enforceable in equity.

Bryant Co., 471 Pa. at 7-8, 369 A.2d at 1167.

In this case, without an injunction,  defendants Umar and CMC will irreparably harm

plaintiff PHS's 15-year relationship with the Montgomery County Correctional Facility, as well

as other PHS customers already targeted and solicited by Umar and CMC.  (Exhibits E and F;

Teal Verification, Ex. H). Plaintiff PHS's losses would be incalculable and irreparable, but they

are clearly of a great magnitude. For instance, the Montgomery County Correctional Facility

contract will generate an estimated $3 million in revenues per year over the next three years – for

a total of nearly $9 million. (Exhibit F).  As this motion is written, the Board of Montgomery

County Correctional Facility is making plans to finalize a new contract with defendant CMC on

May 9, 2002, that would shift this work to CMC for three years, with defendant Umar as CMC's

primary contact person for the contract.   Plaintiff PHS has many other similar contracts and

should not be subjected to competition by Umar, or any person or entity acting in concert with

him.   Making matters worse, defendants Umar and CMC are marketing themselves based on

their experiences, good will and association with plaintiff PHS, and CPS, the business Umar sold

to PHS in exchange for nearly $14 million and a commitment not to compete against PHS. (*See*

CMC marketing literature at Exhibits E, and the Asset Purchase Agreement at Exhibit A).

In sum, plaintiff PHS will be irreparably harmed, unless an immediate injunction is

issued to bar defendant Umar's competitive activities, in breach of his covenant not to compete,

as well as CMC's activities in furtherance of that breach.

## C.    Greater Injury Will Result Without An Injunction.

The next prong of the test for injunctive relief is that "greater injury would result by

refusing [the injunction] than by granting it."  All-Pak, Inc. v. Johnston, 694 A.2d 347, 350 (Pa.

Super. 1997).  Here, Umar has already received a direct personal payment of $500,000, plus his

share of $14 million in payments and consideration for the sale of his business and his agreement

to enter into a Noncompetition Agreement as an "essential" term to that sale.  In other words, he

has already received a huge benefit in exchange for agreeing to the Noncompetition Clause – it is

difficult for him to claim any harm from it.  Moreover, under the Asset Purchase Agreement and

18

Noncompetition Agreement he retained ownership and control of his established, affiliated businesses and Excluded Contracts for prison healthcare services – thus ensuring that he has had an ongoing way to earn a living with breaching his covenant not to compete.

His new business venture, defendant CMC, did not even exist when he entered into the Noncompetition Agreement, and rather was created by him in direct contravention of the agreement.   The requested preliminary injunction will not work any undue harm or detriment to defendant Umar, or his company, CMC.  Rather, it will simply enforce the very terms and agreement he entered into on March 29, 2000, in exchange for more money than most people will ever earn in their lives.

In sum,  the immediate grant of injunctive relief would merely restore the parties to the status quo existing immediately prior to defendant Umar's breaches of his Noncompetition Agreement, by and through defendant CMC.  Gerardi v. Pelullo, 16 F. 3d 1363, 1373 (3d Cir. 1994).

> ### D.      The Public Interest Favors Granting the Preliminary Injunction Against Defendants, And Enforcing The Noncompetition Agreement.

Finally, the public interest supports granting the preliminary injunction.  For 15 years, plaintiff PHS has diligently and efficiently provided prison healthcare services to Montgomery County Correctional Facility and – for a longer term – to other correctional facilities throughout the United States.  In addition, plaintiff PHS has been an honest and fair corporate citizen, paying its taxes, paying its creditors, and honoring its contractual commitments.  Through plaintiff's efforts, more than 7,000 people are employed nationwide, including more than 23 people with steady, reliable jobs providing needed healthcare services at the  Montgomery County Correctional Facility – employees who could lose their jobs if this preliminary injunction is not granted.  (Complaint ¶.57, Teal Verification, Ex. H).

Further, when defendant Umar and his father, Dr. Kenan Umar, sold CPS to plaintiff PHS in 2000, they left debts substantially in excess of escrowed purchase funds – many of these bills

plaintiff PHS has been forced to pay in order to maintain and operate the contracts it purchased from Umar. (Teal Verification, Exhibit H).  Certainly, defendant Umar's recent devious conduct in attempting to disguise his involvement in CMC indicates that his current *modus operandi* continues to be questionable.  Moreover, defendant CMC, operated and owned indirectly by defendant Umar, has no track record of service and is tainted by its association with defendant Umar.

It cannot be in the public interest to permit unfair competition and complete disregard for private contractual obligations in the award of public bids.  Rather, the public interest favors fair competition in pursuit of public contracts, honest conduct and reliable service to the public.  All of these considerations favor the granting of an injunction here.


**III.    CONCLUSION**

For the foregoing reasons, plaintiff PHS requests that the Court grant its motion and immediately issue a preliminary injunction in the form submitted herewith against both defendants Emre Umar and Correctional Medical Care, Inc.  In the alternative, plaintiff requests that the Court schedule immediately a hearing on its motion for a preliminary injunction.

Respectfully submitted,


_____
Carol A. Mager (I.D. #17548)
Michael D. Homans (I.D. #76624)
Lee Albert (I.D. # 46852)
MAGER WHITE & GOLDSTEIN, LLP
One Liberty Place
1650 Market Street, 44th Floor
Philadelphia, PA 19103
(215)569-6924

May 2, 2002

20

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused the foregoing Motion for Preliminary

Injunction to be served upon the following, by hand delivery:

<u>Counsel for Defendant Emre Umar</u>

Rick Troncelliti, Esquire
**McTighe, Weiss, O'Rourke, Milner
& Troncelliti**
11 East Airy Street
Norristown, PA 19401

<u>Defendant Correctional Medical Care, Inc.</u>

Correctional Medical Care, Inc.
818 Hidden Forrest Drive
Collegeville, PA  19426

Dated:  May 2, 2002

_____
Michael D. Homans