IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC.<br>105 Westpark Drive<br>Suite 200<br>Brentwood, Tennessee 37027 | : : : : : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : : | |
| EMRE UMAR<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : : : : | |
| AND | : : | |
| CORRECTIONAL MEDICAL CARE, INC.<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : : : | No. 02-2642 |
| Defendants. | : : : | |

**PLAINTIFF'S TRIAL BRIEF
ON THE LEGAL AND FACTUAL ISSUES**

Pursuant to the Court's Order of May 10, 2002, plaintiff Prison Health Services,

Inc. ("PHS") submits the following trial brief, including a discussion of the factual and

legal basis for its position.

**I.     STATEMENT OF FACTS**

   **A.     The Parties**

Plaintiff PHS is engaged nationwide in the business of providing healthcare

services to inmates of correctional facilities.  PHS is incorporated in Delaware and has

its principal place of business in Brentwood, Tennessee.

Defendant Emre Umar is an individual residing and doing business at his home at 818 Hidden Forest Drive, Collegeville, Pa.  Since at least September of 2001, Mr. Umar has been President and Chief Executive Officer of defendant Correctional Medical Care, Inc., which is based at the same address.  Mr. Umar formerly was a 50 percent owner and vice president of Correctional Physician Services, Inc. ("CPS"), a company he jointly owned with his father.  CPS, like plaintiff, was engaged in the business of providing healthcare services to inmates of correctional facilities.  On March 29, 2000, Mr. Umar and his father sold substantial assets of Correctional Physician Services, Inc., to plaintiff for $14 million, and as an essential part of that sale Mr. Umar entered into the Noncompetition Agreement at issue in this lawsuit.

Defendant Correctional Medical Care, Inc. ("CMC") was incorporated in Pennsylvania in May of 2001, and is engaged in the same business as plaintiff – providing healthcare services to inmates of correctional facilities.

**B.     Mr. Umar's Ownership of CPS, Prior To Sale To Plaintiff PHS**

Prior to March 2000, defendant Umar had a 50 percent ownership interest in Correctional Physician Services ("CPS"), with his father, Dr. Kenan Umar, owning the other 50 percent.  CPS had business in states across the country, including Pennsylvania, New York, Virginia, Florida, Texas and Illinois.  CPS identified itself as a "national leader" in the field, with Mr. Umar specifically expressing a goal to expand the company nationwide.  In addition to being a half owner of CPS, defendant Umar was its Vice President, and managed a staff of approximately 500 health care providers and management and administrative personal at multiple contract sites.   In particular, CPS had contracts with various entities including the Pennsylvania Department of

2

Corrections and the New York Department of Correctional Services, covering 20 different jails and prisons.  Due to poor financial management, CPS was in weak financial condition in late 1999 and various assets of CPS were placed for sale.  Several companies expressed an interest in purchasing all or part of CPS from the Umars.

Mr. Umar's ownership and control of CPS was so thorough and complete that he used the company as his own personal banking account, taking out six-figure withdrawals and loans without consulting anyone else at the company.  He also used company assets to pay his personal bills, including his mortgage, his federal income taxes and  his wife's cosmetic and clothing purchases.  Mr. Umar's wife, Maria Carpio Umar, had no active role as an officer, owner or employee of CPS.

   C.    **Plaintiff PHS Purchases CPS from Umars**

In late 1999, PHS  entered into negotiations with Umar and CPS, and their counsel, for PHS to purchase various CPS assets and  contracts. Following a period of negotiations PHS purchased  assets and contracts of CPS for $14,000,000.  Mr. Umar, as a 50 percent owner of CPS, received the benefit of $7 million of the total payments, either through direct payments to him or through payment of his 50 percent share of the companies debts and liabilities.  The  total $14,000,000 payment  was used to pay various creditors of CPS, and included a  $500,000 direct payment to defendant Umar and another $500,000 direct payment to Umar's father, Dr. Umar. (*See* Asset Purchase Agreement).  In exchange for the $14,000,000, PHS received  CPS' goodwill, intellectual property and trade names, tangible and intangible property, business data, various inventories and supplies, and intangible assets, and contracts with the New York Department of Correctional Services and contacts with the Pennsylvania

3

Department of Corrections, covering 20 jails and prisons.   Goodwill was so important to the sale that 100 percent of the purchase price was attributed to it by the parties. Defendant Umar signed the Asset Purchase Agreement on behalf of CPS and on behalf of himself.

CPS had a good reputation for providing medical care to inmates.  However, its reputation with regard to paying vendors and with regard to its treatment of employees was less than stellar.  The reputation regarding payment of vendors got much worse after PHS purchased CPS assets, because defendant Umar and his father stopped paying many of CPS's pre-closing debts and liabilities.

After the sale to PHS, Umar retained ownership and control of other affiliated businesses (a pharmacy business and a lab business he had created) and excluded CPS contracts under the Asset Purchase Agreement.  He was not barred from earning a living through these other established business operations, but apparently chose not to pursue them after cashing in on the sale to plaintiff PHS.  The Umars retained a license to use the CPS name with regard to the excluded contracts.

### D.    Defendant Umar Signed Noncompetition Agreement Ancillary to Sale of His Business

In order to protect the interests of plaintiff PHS in the acquired business and assets of CPS, the Asset Purchase Agreement explicitly prohibited CPS and the Umars from competing against PHS in the business of providing prison healthcare services for five years.  (*See* Asset Purchase Agreement).  Defendant Umar and Dr. Kenan Umar were required to enter into Noncompetition Agreements with PHS, which Umar signed on March 29, 2000. The Noncompetition Agreement was for five years and specifically

4

stated that Umar cannot compete against PHS in the provision of healthcare services to inmates of correctional facilities in any way, "directly or indirectly, as an employee of any person or entity, proprietor, partner, stockholder or officer, consultant, joint venturer, investor, lender or in any other capacity or any substantially similar activity, to provide, or to furnish aid or assistance to another person or entity in connection with the provision of" such services.  (Noncompetition Agreement Sections at 1 and 3.2).  Umar also agreed to refrain from competing in all "Company Activities" for five years, with such term defined as:

> (i)  all activities of the type previously conducted by Seller [CPS] as a part of the Business [defined as the "provision of healthcare services to inmates of correctional facilities"] and (ii) all activities of the type hereafter conducted by the Company [plaintiff PHS and its successors and affiliates] with respect to the Business during the Non-compete Period.

(Noncompetition Agreement Sections 1 and 3.2).  Umar further agreed that he would refrain from competing in all Company Activities throughout the United States.  (Id. at Section  3.1).  This provision was essential because plaintiff PHS conducts business nationally, and Umar had been  involved in the provision of prison healthcare services across much of the United States with CPS, and expressed a goal of competing nationwide.  Umar also agreed under the Noncompetition Agreement and Asset Purchase Agreement that PHS would be "irreparably harmed" by any breach of the restrictive covenant and that failure to comply with the provisions in the agreement could be remedied by injunctive relief, in addition to any other remedy provided for under the Agreement.  (Id. at Section 6; Asset Purchase Agreement at Section 11.17).  Umar acknowledged in writing that the Noncompetition Agreement was a "condition

precedent," "essential," and integral to the sale of CPS to PHS.  (Noncompetition

Agreement Section 3.1;  Asset Purchase Agreement at Section 6). Specifically, the

Noncompetition Agreement, which Umar signed, provided that:

> Purchaser [PHS] has agreed to purchase certain assets of
> the Business... and to assume certain obligations and
> liabilities of the Business pursuant to an Asset Purchase
> Agreement, dated as of March 29, 2000... between
> Purchaser, Seller, Mr. Umar and Dr. Kenan Umar;

> Mr. Umar, is the beneficial owner of shares of the issued and
> outstanding  capital stock of seller, and as such, will receive
> a direct and significant financial benefit from the sale of the
> Assets to Purchaser;

> To protect adequately the interests of purchasers in the
> business and goodwill of Seller, it is essential that Mr. Umar
> enter into this [Noncompetition] Agreement; and

> To induce purchasers to consummate the transactions
> contemplated under the Purchase Agreement, Mr.  Umar
> desires to enter into this [Noncompetition] Agreement.

(Noncompetition Agreement at p.1) (emphasis added).

### E.     All Parties Agree Industry Requires Strong, Long-term Relationships

Plaintiff PHS required the five-year non-competition provision because, in large

part, the industry requires the development and maintenance of long-term relationships

in order to ensure success.  In general, PHS contracts with its client jails and prisons

last from 5-10 years, including numerous renewals of shorter-term contracts.

Defendant CMC's Chief Operating Officer Kevin Duffy admits that his long-term

relationship with Ulster County played a significant role in CMC obtaining its contract

and that such relationships are important in most bid solicitations.

6

Moreover, the award of bids to prison healthcare providers is often based on factors other than price, including experience, long-term relationships, goodwill, services offered, and quality of care.

**F.    Defendant Umar, By and Through Defendant CMC, Began Competition in Breach of Agreement**

Less than 14 months after defendant Umar signed the five-year Noncompetition Agreement with PHS, he secretly formed defendant Correctional Medical Care, Inc. ("CMC"), which now directly competes with PHS. The registered address for CMC is the same as the residence of Umar, 818 Hidden Forrest Drive, Collegeville, PA. Defendant CMC holds itself out as a "health care provider that supplies a comprehensive range of high quality fully auditable health care services to small and medium sized city and county facilities," mainly prisons and other correctional facilities.

CMC used attorney Francis X. Clark to draft and file the incorporation papers. Mr. Clark is Mr. Umar's attorney in this case, and has represented him in the past.

Ownership of CMC is nominally held by "Maria Asuncion Carpio," the maiden name of Mr. Umar's wife. Mrs. Umar continues to use her married name ("Umar") in other contexts, and now admits that her name is Mario Carpio Umar. Although Mrs. Umar filed for divorce in May 2000, the divorce has never been, and may never be, finalized. Mr. Umar spends much of his time at the Hidden Forest Drive address, which he co-owns with Mrs. Umar.

Umar placed his ownership of the firm, CMC, under the name of his wife, Maria Asuncion Carpio, in order to conceal his involvement in CMC. Defendant CMC admits that Mrs. Umar has no active day-to-day role in operating or managing CMC. She has

no knowledge or experience in providing prison health services.  Her name is not referenced in any of CMC's  promotional materials or in the  list of "Leadership of Firm."

Mr. Umar is President and CEO of CMC, and has been since at least early September of 2001 – before the company even made its first bid for business. Specifically, Mr. Umar's resume, as provided by  CMC  states that Umar:

> In current role as President of CMC , oversee[s] and direct[s] all fiscal matters of corporation. Oversee[s] and work[s] with Corporate Vice President regarding all operational, and business development matters.

As the President and CEO, Umar manages, consults and directly controls the business operations of defendant CMC.  Additionally, Umar indirectly owns the company through his wife.

Mr. Umar has been involved in CMC since at least August of 2001, before Mr. Duffy.  Mr Umar was, in fact, the person who contacted and recruited Mr. Duffy to join CMC.  Defendants' and Mrs. Umar's position that Mr. Umar did not join the company until late 2001 or early 2002, is a complete fabrication.   Defendants also contend that "Vice President" and alleged owner, Duffy, supervises "President" Umar.  Duffy claims an ownership interest in CMC dating to September of 2001, but admittedly has no written agreement of such, put in no capital to get his ownership share, and has assumed no liabilities for CMC.

### G.    Plaintiff Learns Of Possible Competition By Umar, CMC Denies It

In October of 2001, a PHS employee in New York, Karen Rapoch, became aware that Kevin Duffy had become part of a new firm, calling itself "Correctional Medical Care," and that this firm was planning to bid to take over PHS's contract to

supply services to the Ulster County jail.  Ms. Rapoch also reported that she believed Mr. Umar was affiliated with Mr. Duffy in the venture.

PHS, through its Vice President and Chief Legal Officer, Jean Byassee, immediately wrote to defendant Umar advising him that it had learned that he "intend[ed] to start up a corrections healthcare company."  Ms. Byassee also reminded Mr. Umar that he remained bound by his five-year Noncompetition Agreement with PHS.  (*See* Letter of October 12, 2001 to Emre Umar from Jean L. Byassee).  Plaintiff PHS further warned that it would seek injunctive relief and damages against him and his company if he breached the agreement.  (Id.)  Plaintiff received no response from Mr. Umar, admitting or denying any such intention or claiming that his Noncompetition Agreement was not enforceable.

Ms. Byassee also called Kevin Duffy, a former PHS executive, to ask him about the rumors of his affiliation with Mr. Umar, and to inform him of Mr. Umar's Noncompetition Agreement.  Mr. Duffy, in an effort to conceal Mr. Umar's involvement with CMC, told Ms. Byassee that, "I am not working for Emre's company."  This led Ms. Byassee to believe that the reports of Mr. Duffy and Mr. Umar working together at CMC were false, and that Mr. Duffy was not working with Mr. Umar, despite the previous rumors.

Mr. Umar had never disclosed his Noncompetition Agreement to Mr. Duffy, and Mr. Duffy admits he was "really irritated" by this deceptive omission.  Mrs. Umar knew of Mr. Umar's Noncompetition Agreement before Mr. Duffy, but also did not disclose it to him.  Mr. Duffy, despite learning of the Noncompetition Agreement and reviewing a copy

of it, proceeded to assist Mr. Umar in breaching the agreement through his CMC activities.

Not until months later, March-April of 2002, did plaintiff learned that Mr. Umar was directly soliciting PHS clients and potential clients through CMC at or about the time that PHS issued its warning to him.

### H.    Umar and CMC Competed In New York In Late 2001

In approximately November 2001, after both Mrs. Umar and Mr. Duffy admit they were aware of the Noncompetion Agreement, defendant Umar, through CMC, directly competed with plaintiff PHS and attempted to take away the Ulster County jail work by submitting a bid to the county.  In addition, Mr. Duffy and Mr. Umar explored submitting a bid to take away PHS prison healthcare work at Albany County, N.Y., and made inquiries as to that project.  These two New York contracts were small, but valuable customers of PHS.  Defendant CMC's bid documents  touted Mr. Umar's ten years of experience with CPS (1990-2000). The Umar resume listed all of Umar's activities with CPS, along with his accomplishments which were earned while he was with CPS. Among the contracts listed were those in New York and Pennsylvania, which PHS purchased in the Asset Purchase Agreement.  All of this conduct was knowing, intentional and clear in its violation of both the letter and the spirit of the Noncompetition Agreement, of which all of CMC's top officers and owners were aware.[1]

---

[1] Even if plaintiff had known about defendant Umar's improper competitive activities in New York in late 2001, the Asset Purchase Agreement, Exhibit A, provides at Section 11.4(a) that "No waiver of any breach will operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.  No delay on the part of any party in exercising any right, power or  privilege hereunder shall operate as a waiver thereof."

CMC's bid to Ulster County included five named references of contractors and professionals who had worked with CMC executives before.  All five were Emre Umar references, with only one or two also having any experience with other top CMC officers.

I.     **CMC and Umar Continue Improper Competition At Montgomery County Correctional Facility**

Plaintiff PHS has provided prison health services to the Montgomery County Correctional Facility ("MCCF") since 1987, either under its name, or under the name of EMSA, a company in purchased in or around 1999, which held the contract for a time prior the purchase.  PHS considers MCCF a large and important customer.  The contract has provided PHS with annual revenues of nearly $2.2 million during the past two years.  The current PHS contract to provide healthcare services to MCCF was originally scheduled  to terminate on June 30, 2003.  However, the contract – like most in the industry, including those of defendant CMC – provided a provision for early termination by either party, upon supplying 180 days' notice.  As of late 2001, the MCCF contract was operating at a substantial monthly loss due to escalating healthcare costs. As a result, in late November of 2001, PHS exercised its prerogative under the contract, and provided the 180 days notice of termination to the MCCF.  This notice led to ending the contract approximately one year before its original termination date.

Plaintiff PHS attempted to negotiate continued service to the county without the need to re-bid the contract, but MCCF chose to re-bid the contract, as was its prerogative.  PHS had no guarantee or assurance it would be awarded the re-bid contract, and in fact knew it risked losing the contract by terminating it early.

11

In or around February 14, 2002, MCCF advertised a Request for Qualification (RFQ), with regard to a new contract to provide healthcare services to its approximately 1,150 inmates. Responses were due on February 28, 2002. The new contract is scheduled to commence on May 31, 2002, at the same time the old contract, which PHS holds, expires.

The MCCF RFQ contained eight requirements in order to qualify to bid. Among the requirements, was that a respondent have:

•    an executive management team with at least 10 years of experience;

•    resumes of the proposed onsite management team;

•    a minimum of three (3) references from prior correctional facility personnel for which the respondent of the Executive Management Team has previously provided Professional Medical and Mental Health Care Services; and

•    Executive Management team's demonstration of experience and the quality of its care . . . in a minimum of three (3) correctional facilities.
     PHS submitted qualification documents pursuant to the RFQ.

Defendant CMC also submitted qualification documents, in order to qualify to bid for the heath care work.   In its Qualification Package, CMC, once again submitted the resume of Emre Umar, listing him as its President and CEO, along with a list of other individuals from CMC. As it did in Ulster, the proposal listed the contract experience of CMC for various prisons, which was actually the contract experience of individuals (including Umar) associated with CMC, rather than actual experience of CMC.   Among the contracts listed, and relied upon by MCCF, in qualifying CMC for the bid, were those in New York and Pennsylvania, which PHS purchased in the Asset Purchase Agreement.

12

Finally,  CMC presented the three required references.  One of the three, a reference from the Commonwealth of Pennsylvania, Department of Corrections, State Correctional Institution at Graterford (one of those contracts purchased by PHS from CPS in the Asset Purchase Agreement), specifically referred to the President of CMC , Emre Umar, in the recommendation. Specifically, the recommendation to Warden Roth, from Warden Vaughn stated:

> You should know that I have known the President of this (CMC) company, Mr. Emre Umar, professionally for some ten years now.  I have always known him to be knowledgeable in the field of correctional heathcare, cooperative with the members of my staff and willing to listen to and consider suggestions made by my administration.
>
> I want to recommend Mr. Umar and Correctional Medical Care Inc. to you because I believe that CMC would be an asset to the Montgomery County Correctional facility and your administration.

With this and the other two references provided, CMC was  deemed qualified to bid.  On March 27, 2002, PHS also was deemed qualified and both companies (along with a third) made a timely proposal to MCCF.

 CMC  submitted its bid, again listing Umar as its President.   The bid documents also specifically state that Umar will be responsible for the corporate administration in support of the Montgomery County contract.

The Montgomery County Correctional Facility gave a formal notice of "favorable consideration" to CMC on or about April 11, 2002.  The notice of favorable consideration allowed the Montgomery County Correctional Facility to commence  negotiations exclusively with CMC on the new contract.  The present contract with the Montgomery County Correctional Facility expires on May 30, 2002.  On May 8, 2002, this Court

issued an Order prohibiting CMC from entering into a contract with MCCF. The Prison

Board of the Montgomery County Correctional Facility  awarded the bid to CMC on  May

9, 2002, contingent upon CMC signing a contract on or before May 30, 2002.

Since May 8, 2002, CMC's COO, Kevin Duffy, has obtained an MCCF badge,

and holds himself out to PHS employees as the supervisor of the company that will

inevitably take over the MCCF contract.  Mr. Duffy, on behalf of CMC, has also posted

public letters at MCCF, for review by PHS employees and MCCF employees, mis-

characterizing the Court's Order and the position of plaintiff PHS.

As a result of defendants'  improper conduct, on April 24, 2002,  plaintiff PHS

notified defendants that Umar has breached the Noncompetition Agreement. and

warned that it would seek immediate legal and injunctive action if defendants did not

contact them and cease in the competitive activities.  Defendants' activities have not

ceased.  Moreover, defendants did not respond to the letter with any denial,

confirmation or other response (other than former counsel Rick Troncelliti stating he no

longer represented Mr. Umar).

### J.    Plaintiff Will Suffer Irreparable Harm If Competition Continues

Plaintiff PHS will suffer irreparable and incalculable harm if defendants Umar and

CMC continue to collude to compete against PHS.  In addition to the lost contracts in

Ulster County and Montgomery County, the company will lose the goodwill, confidential

information and intangible assets it purchased from Mr. Umar and his father from CPS.

Moreover, the long-term customer relationships plaintiff PHS bargained to build through

the five-year Noncompetition Agreement will be utterly destroyed by defendants

ongoing competition.  Defendants are already trading on Mr. Umar's experience at CPS,

14

including his experience with the Pennsylvania and New York contracts, thereby depriving plaintiff of the benefit of his bargain on those points.

These losses are real and may have an impact into the millions or tens of millions of dollars, but cannot be calculated or measured in any certain way. Moreover, defendant Umar contractually agreed that specific performance and injunctive relief is warranted to prevent such harm.

Finally, Mr. Umar has demonstrated repeatedly his failure to pay prior creditors and business associates – including his father and his former company, CPS. Plaintiff may not be able to collect on any monetary judgment against him or CMC, thereby making immediate injunctive relief a preferable remedy.

## II.   ARGUMENT

### A.   Introduction

Defendants cannot dispute that defendant Umar knowingly and in exchange for substantial consideration ancillary to the sale of his business entered into a Noncompetition Agreement with plaintiff PHS. (*See* Asset Purchase Agreement and Noncompetition Agreement)  In this Noncompetition Agreement Umar willingly agreed and obligated himself not to compete against plaintiff PHS in any way for a term of  five years.  This agreement was a "condition precedent" and expressly "essential" to plaintiff PHS's agreement to pay $14 million for Umar's business, including $500,000 directly to defendant Umar, and was necessary to protect PHS's interests in the business, goodwill and confidential information it was acquiring. In addition to the  $500,000 payment directly to defendant Umar, a large number of CPS creditors were paid millions of

dollars, from the oversight committee of  CPS. Funds which defendant Umar, as a

shareholder of CPS could have been obligated to pay. The Noncompetition

Agreement's terms were reasonable in all respects (1) preventing competition against

plaintiff PHS in the provision or solicitation of prison health services – the business of

both plaintiff PHS and the purchased business of Umar; (2) binding Umar for a term of

five years, reflecting the long-term nature of the contracts, goodwill  and relationships

involved in the prison healthcare industry; and (3) having a geographic territory

consistent with the nationwide reach of plaintiff PHS's prison healthcare business and

the multi-state nature of the business purchased from Umar.

Defendant Umar, after having freely agreed to the noncompetition provisions,

with advice of counsel,  and collecting  the lucrative benefit of his bargain from plaintiff

PHS, now (in addition to breaching his agreement to pay off CPS debts incurred prior to

the closing date)  has  reneged on his obligations.  He intentionally and deceptively

began breaching the Noncompetition Agreement by competing directly against plaintiff

PHS, as President and CEO of newly formed CMC. Umar has solicited PHS healthcare

services customers, including most recently the Montgomery County Correctional

Facility, wherein Umar provided with CMC's submissions an essential reference  which

allowed CMC to qualify to bid in the first place.   This conduct is in blatant violation of

the Noncompetition Agreement, Sections 1 and 3.2, and comes barely two years into

the five-year term of noncompetition.  Umar cannot deny any of these facts, as they are

taken primarily from documents he and his company, defendant Correctional Medical

Care, Inc., have  submitted to customers of plaintiff PHS in New York and Pennsylvania.

(*See* Ulster and MCCF submissions by CMC ).

16

Pennsylvania courts will enforce noncompetition agreements ancillary to the sale of a business for terms of five and even ten years in recognition of the buyer's right to gain the benefit of its bargain from the seller of the business. Alexander & Alexander, Inc. v. Drayton, 378 F. Supp. 824, 831 (E.D. Pa. 1974), *aff'd*, 505 F.2d 729 (3d Cir. 1974) (noting that a noncompetition clause ancillary to the sale of a business, which ran for 10 years from the sale of the business, was "reasonable in time . . . and necessary to protect the employer and did not impose an undue hardship on the employees who had profited handsomely by their sale of the business to the plaintiff")[2]; Vector Security, Inc. v. Stewart, 88 F. Supp. 2d 395 (E.D. Pa. 2000) (upholding five-year term of noncompetition clause barring former authorized dealer from soliciting plaintiff's customers, even though situation was more akin to an employment relationship). As recognized by the Supreme Court of Pennsylvania, and cited with favor by this Court, "Were the seller free to re-enter the market [before the term of noncompetition], the buyer would be left holding the proverbial empty poke." Alexander, 378 F. Supp. at 829 (citing Morgan's Home Equipment v. Martucci, 390 Pa. 618, 136 A.2d 838, 846 (1957) and referring to Restatement, Contracts, § 515(b), comment b (1932)).

---

[2] In Alexander, the seller of an insurance brokerage business became an employee of the buyer, defendants, and worked for them for nearly eight years before seeking to breach the 10-year noncompetition agreement. The court held that the original 10-year period, ancillary to the sale of the business, was reasonable to protect the buyers' interests from the date of sale, but that it would not be reasonable to enforce the covenant for another 10 years after the termination of employment eight years later. Therefore, the covenant was modified to restrict competition for two additional years post-employment – resulting in a total restriction equal to the original 10-year covenant.

Like the plaintiffs in these cases, plaintiff PHS acquired defendant Umar's business with the understanding and agreement that PHS would be free from competition by Umar for five years, and paid handsomely for this commitment (more than $14 million in consideration and cash payments). PHS would not have even entered into the Asset Purchase Agreement but for the signing of the Noncompetition Agreement by defendant Umar. This was acknowledged by Umar as set forth in the Noncompetition Agreement at page 1. Umar and his new company, defendant Correctional Medical Care, Inc., must be barred from competing against plaintiff and seeking its business during the five-year term of the Noncompetition Agreement.

Moreover, because defendant Umar's and CMC's competitive conduct is now imminently threatening to take from PHS the Montgomery County Correctional Facility contract, a preliminary injunction is warranted to bar such competitive conduct in Montgomery County, as well as anywhere else.    Preliminary injunctive relief is warranted immediately because (1) plaintiff PHS will likely succeed in its action against defendant Umar for breach of the Noncompete Agreement, ancillary to the Asset Purchase Agreement, and against defendant CMC for tortious interference of contract; (2) PHS will suffer irreparable harm if defendant Umar's breach of his covenant not to compete is not immediately and judicially restrained; and (3) the balance of the equities and the public interest favor entering the injunction against defendants, and enforcing the agreement.

**B.    Legal Standard for Injunctive Relief**

 In deciding whether an injunction should issue[3], a district court weighs four factors: (1) whether the movant has demonstrated a reasonable probability of succession the merits; (2) whether the movant will be irreparably  injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4)  whether granting the injunction serves the public interest. Gerardi v. Pelullo, 16 F. 3d 1363, 1373 (3d Cir. 1994).

The Asset Purchase Agreement and Noncompetition Agreement – both of which were negotiated by counsel for all parties – clearly demonstrate the intent of the parties was that Umar would not compete against plaintiff PHS for the five-year period set forth in the Noncompetition Agreement.

**C.    Plaintiff PHS Is Likely To Succeed On The Merits**

**1.    The Covenants Contained in Umar's Noncompetition Agreement Are Reasonable, Enforceable and Ancillary to the Sale of a Business.**

Plaintiff PHS is likely to succeed in its action against Umar for breach of the covenants contained in the Noncompetition Agreement he executed on March 29, 2000. In the Asset Purchase Agreement, and the Noncompetition Agreement itself, it was expressly agreed that the noncompetition commitment was a "condition precedent," "ancillary," "essential"  and necessary to the sale of Umar's business, Correctional Physician Services, to plaintiff PHS.

---

[3] While state law applies to the substantive issues in a diversity action, federal law governs the standards for issuing a preliminary injunction.  See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1999).

In Pennsylvania, "[i]n order to be enforceable, a restrictive covenant must satisfy three requirements: (1) the covenant must relate to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) the covenant must be supported by adequate consideration; and (3) the application of the covenant must be reasonably limited in both time and territory. Piercing Pagoda, Inc. v. Hoffner, 465 Pa. 500, 506-07, 351 A.2d 207, 210 (1976); Davis & Warde, Inc. v. Tripodi, 420 Pa. Super. 450, 454, 616 A.2d 1384, 1386-87 (1992).  Protocomm Corp. v. Fluent, Inc., Civ. A. No. 93-0518, 1995 WL 3671, *5 (E.D.Pa. 1995); Westec Security Services, Inc. v. Westinghouse Electric Corp., 538 F. Supp. 108, 121 (E.D. Pa. 1982) (applying rule of reason and citing to Restatement (Second)); Volunteer Fireman's Ins. Servs., Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997).

The defendant has the burden of proving that the covenant not to compete is unreasonable.  Protocomm, 1995 WL3671, *5; Westec, 538 F. Supp. at 122; John G. Bryant Co. v. Sling Testing and Repair, Inc., 369 A.2d 1164, 1169 (Pa. 1977).  ("The law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful").

"A covenant not to compete which is ancillary to a contract for the sale of a business is subject to less rigorous reasonableness examination than those ancillary to an employment contract." Scobel, Inc. v. Schade, 455 Pa. Super. 414, 688 A.2d 715, 718  (Pa.Super.1997).  Worldwide Auditing Services, Inc. v. Richter, 587 A.2d 772, 777 (Pa. Super. Ct. 1991); Sobers v. Shannon Optical Company, Inc., 473 A.2d 1035, 1038 (Pa. Super. Ct. 1984) (citations omitted). "A buy-sell restrictive covenant is enforceable if it is designed to protect the legitimate interests of the purchaser of the business." Id. Geisinger Clinic v. DiCuccio, 606 A.2d 509, 518 (Pa. Super. Ct. 1992), allocator denied, 637 A.2d 285 (Pa. 1993), cert denied, 513 U.S. 1112 (1995) (citation omitted).  "The purpose of allowing enforcement of non-competition covenants when such covenants

are ancillary to sales of businesses is to make goodwill a saleable asset by protecting
the buyer in the enjoyment of that for which he pays." Westec Security Services, Inc. v.
Westinghouse Electric Corporation, 538 F.Supp. 108, 121 (E.D.Pa.1982). Geisinger
Clinic v. DiCuccio, 606 A.2d 509, 518 (Pa. Super. Ct. 1992), allocator denied, 637 A.2d
285 (Pa. 1993), cert denied, 513 U.S. 1112 (1995) (citation omitted). Volunteer
Firemen's Ins. Servs., Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330,
1337 (Pa. Super. Ct. 1997); Protocomm Corp. v. Fluent, Inc., Civ. A. No. 93-0518, 1995
WL 3671, *5 (E.D.Pa.1995). In many such sales, "it is the name, reputation for service,
reliability, and the trade secrets of the seller rather than the physical assets which
constitute the inducement for a sale. Were the seller free to re-enter the market, the
buyer would be left holding the proverbial empty poke." Alexander, 378 F. Supp. at
829; Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 846 (Pa. 1953). In
determining the reasonableness on such restraints on trade, Pennsylvania law includes
an inquiry into whether the restraint on the promissor's activities are no greater than is
necessary to protect the legitimate interests of the promissee and into whether the
promissee's need for protection is outweighed by the hardship enforcement would
create for the promissor and/or the injury it would work to the public's interests. Westec,
538 F. Supp. at 122. The reasonableness of such agreements requires the
consideration of the following factors: (1) the types of activities embraced; (2) the
geographical area; (3) the duration of the covenant (4) hardship on the defendant; and
(4) the public interest. Protocomm, 1995 WL3671, *6; Westec, 538 F. Supp. at 122.

In Westec Security Services, Inc. v. Westinghouse Electric Corporation, 538
F.Supp.108 (E.D.Pa 1982). Judge Pollak discussed the enforceability of a lengthy
restraint sought to be enforced against Westinghouse, by Westec. The two companies
previously entered into an agreement where Westec would purchase the various assets
of Westinghouse regarding the Westec home security business. Ancillary to that sale of

21

the business was a 20-year covenant not to compete.  Fifteen months later, a wholly owned subsidiary of Westinghouse began providing home security systems, the same business as Westec.  In order to interpret the covenant, the court first looked to the intent of the parties as expressed in the contract.  "If the language of the contract is unambiguous and susceptible of only one interpretation, a court will determine the parties' intentions on the basis of the clear wording of the contract." Westec Security Services, Inc. v. Westinghouse Electric Corporation, 538 F.Supp. at 117.

In the matter before this court, the intent is clear.  The Asset Purchase Agreement, references the Noncompetition Agreement as a condition precedent to the closing (Section 6.1.14 of the Asset Purchase Agreement).  Evidencing further intent of the parties is the noncompetition language in the Asset Purchase Agreement.  CPS agreed that it would not "Compete with the Business" directly or indirectly, as an employee of any person, or entity, proprietor, partner, stockholder, officer, director, consultant...or in any other capacity... provide, or furnish aid or assistance to any other person or entity...  (Section 9.4 of the Asset Purchase Agreement).  More significantly Umar acknowledged that it was essential to PHS that he entered into the Noncompetition Agreement "[T]o protect adequately the interests of purchasers in the business and goodwill of Seller." (Noncompetition Agreement at  p.1).  The covenant agreed to by Umar was necessary to protect the interests of PHS, as acknowledged by Umar.

The court in Westec, found significant that goodwill was being transferred with the sale of the business and noted that the Pennsylvania Supreme Court, expressed in Morgan's Home Equipment v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957),

> General covenants not to compete which are ancillary to the sale of a business serve a useful economic function; they protect the asset known as 'good will' which the purchaser has bought. Indeed, in many businesses it is the name,

reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale.

Id. at 846.

In Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp., 410 Pa. 214, 189 A.2d 180 (1963), the Pennsylvania Supreme Court found that the lower court had reasonable grounds to grant a preliminary injunction enforcing a five year nationwide restrictive covenant ancillary to a buy-sell agreement, noting that a restrictive employment contract was entered into, the same day as the buy sell agreement.

The covenants contained in defendant Umar's Non-compete Agreement with PHS satisfy all of the requirements set forth under Pennsylvania law. First, the covenants were entered into in connection with an Asset Purchase Agreement between plaintiff PHS and defendant Umar. Second, in exchange for the asset sale, Umar was required to sign an agreement not to compete against plaintiff PHS for a period of five years. In fact the signing of the noncompetition agreement was a condition precedent to the Asset Purchase Agreement. Third, defendant Umar received substantial consideration – including a $500,000 payment directly to him personally and $14 million in payments and consideration for the business assets of his former company, CPS.[4] And fourth, the covenant not to compete executed by defendant Umar on March 29, 2000 is reasonably restricted in time and scope. The restriction lasts until five years following the termination of the consulting agreement, which ended in 2000. In Vector Security v. Stewart, 88 F.Supp. 2d 395 (E.D.Pa. 2000), the district court determined that a five-year restriction, barring an authorized dealer from competing against the plaintiff, was a reasonable time period to restrict competition and allow the plaintiff to solidify its

---

[4] As a 50 percent owner of CPS, defendant Umar received, in effect, $7 million from PHS for the sale of CPS.

business relations.  Likewise, an initial prohibition against competition for 10 years after the sale of a business was deemed essential to protect plaintiff's interest in the acquired business and its goodwill. Alexander & Alexander v. Drayton, 378 F.Supp.824, 831 (E.D.Pa. 1974).   As for the national scope, Pennsylvania courts routinely recognize that nationwide limitations on competition are warranted where the plaintiff has a business with clients and operations nationwide.  See, e.g., National Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998); Kramer v. Robec, Inc., 824 F. Supp. 508, 512 (E.D. Pa. 1992) (nationwide bar on competition reasonable "because Robec and its competitors market their products in all fifty states").

     Defendants' argument that the Noncompetition Agreement is unenforceable because it was entered into under conditions of duress is unpersuasive where Defendants admit the Noncompetition Agreement was negotiated and executed at arm's length.  See Worldwide Auditing Services, Inc. v. Richter, 587 A.2d 772, 777 (Pa. Super. Ct. 1991) (no duress defense where signatory to restrictive covenant consulted with counsel and plaintiff did not exercise economic coercion over defendant) (quoting Carrier v. William Penn Broadcasting Co., 233 A.2d 519, 521 (1967) ("[T]here can be no duress where the contracting parties each consult with counsel.")).

     The covenant agreed to by Umar is both reasonable in time and necessary to protect plaintiff's interest in its purchase of assets and to protect the goodwill  from Correctional Physician Services, Inc. Westec, 538 F. Supp. at 121.  In Westec Security Services, Inc. v. Westinghouse Electric Corporation, 538 F.Supp.108 (E.D.Pa 1982), the court took note of the fact that the plaintiff (purchaser of defendant's business) was undertaking to exploit the chief assets of the business sold.  "Were defendant...to resume marketing home security services to the public, such activities would plainly compete with plaintiffs undertaking."  Id. at 123.  In concluding that a ten-year restriction was reasonable protection for plaintiff the court in Westec considered what would

24

constitute a reasonable period within which plaintiff may establish its following.  With the sale of the Correctional Physician Services, Inc.'s assets, the plaintiff, Prison Health Services, Inc., was likewise undertaking to exploit the chief assets of the business sold to it.  Umar's resumption of competitive activities, through Correctional Medical Care, Inc., plainly competes with plaintiff, Prison Health Services, Inc., which interests must be protected with the enforcement of the covenant against Correctional Medical Care, Inc. in addition to Emre Umar.

In order to even qualify to bid on the MCCF work, CMC provided a reference to MCCF from Graterford prison, wherein its warden commended Emre Umar, President of CMC, and alluded to his ten year relationship with Umar. A relationship which was developed  while Umar worked with the prison through CPS. The Graterford contract was one of those contracts purchased by PHS from CPS. The fact that CMC presented the Graterford reference is clear evidence that, despite the noncompete agreement, CMC and Umar were trading on the goodwill of CPS  in order to even qualify for the MCCF bid.

## 2.    Defendant Umar Has Undeniably Breached His Covenant Not To Compete Against Plaintiff PHS.

Defendant Umar has breached his obligations under the Noncompetition Agreement, without a doubt.  Plaintiff PHS can show – through documents submitted by defendant Umar and his company, defendant CMC, to customers of PHS – that defendants are competing against plaintiff PHS and soliciting its customers, in direct breach of the provisions of the Noncompetition Agreement.  The fact that Umar clandestinely initiated this wrongful competition through the guise of his newly formed corporation, defendant CMC, does not lessen this breach – to the contrary it magnifies it because Umar is now acting through a corporation that he controls as President and

25

CEO, and staffed by him with former PHS executives.  It also illustrates that Umar knew he was violating his contractual obligations, and was attempting to disguise such violations by acting through an entity incorporated under his wife's maiden name.

The fact that CMC is incorporated in the name of Mrs. Umar is irrelevant.  Mr. and Mrs. Umar filed for divorce in May 2000.  As the court stated in <u>Fidelity Bank v. Carroll</u>, 416 Pa.Super. 9, 13, 610 A.2d 481 (1992):  "Under the Divorce Code, 23 Pa.C.S.A. § 3101 et seq., it is presumed that all real and personal property acquired by the parties during marriage is marital property regardless of whether the property is held individually or by some form of co-ownership such as joint tenancy, tenancy in common or tenancy by the entirety, 23 Pa.C.S.A. § 3501(b), and all such property is subject to equitable distribution upon request of either party, 23 Pa.C.S.A. § 3502(a)."  CMC was acquired by the parties during the marriage.

Undeniably, on March 29, 2000, defendant Umar agreed in writing that for at least five years he would not compete with plaintiff PHS.  (Noncompetition Agreement, Sections 3.2 and 1(f)).   By forming and operating CMC defendant Umar is directly engaging in a line of business that competes with a line of business at plaintiff  PHS. He and his company, CMC, are directly soliciting customers of PHS, including the Montgomery County Correctional Facility.   Moreover, Umar's management and business development duties and activities at CMC are essentially the same as the ones he performed for his former business, CPS, before he sold it to plaintiff PHS. Not only are  CMC and Umar providing references from transferred CPS contracts, CMC is listing those transferred  (New York and Pennsylvania) contracts as its contracts, to demonstrate its experience.   It is difficult to imagine a clearer case of a knowing, material breach of a covenant not to compete.

**3.    Plaintiff Also Is Likely to Prevail On Its Claims Against Defendant CMC, As CMC Has Intentionally Assisted Defendant Umar In Breaching His Contractual Obligations to Plaintiff PHS.**

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Cirvelli v. General Motors Corp., 215 F.3d 386 (3d Cir.2000). Under Pennsylvania law, one who intentionally interferes with an existing contractual relation, including a covenant not to compete, is subject to liability. Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 847 (Pa. 1957).

In Morgan's Home, the plaintiff, a home furnishing company, brought a suit against not only its former employees who had signed a restrictive covenant but also a competitor who was not bound by any contract with plaintiff. Id., at 841. The plaintiff's competitor admitted that he hired plaintiff's former employees with knowledge that they had signed restrictive covenants. Id., at 847. The Supreme Court of Pennsylvania affirmed an injunction preventing the competitor from further inducing the breach of the restrictive covenants. Id. See also Jacobson & Co. v. International Environment Corp., 245 A.2d 612 (Pa. 1967) (affirming enforcement of restrictive covenant against plaintiff's former employee and said employee's current employer, and requiring accounting of employee's salary and competitors profits gained as a result of interference with

27

restrictive covenant).[5]

In this action, there is no dispute as to a contractual relation between plaintiff PHS and a "third party," defendant Umar, thereby satisfying the first element. As to the second element, defendant CMC has assisted defendant Umar in competing against plaintiff PHS, in violation of the Noncompetition Agreement between Umar and PHS. CMC representatives, Kevin Duffy and Maria Carpio-Umar were each aware of the covenant not to compete yet solicited clients using Umar's name, experience and goodwill, as well as the goodwill of CPS, by listing contracts and references related to Umar's former company. Defendant CMC has knowledge of this contract and the breach through Umar himself, who acts as President and CEO of CMC, and uses his home as its corporate offices. Moreover, CMC has assisted Umar in the knowing violation of his contractual commitments to PHS by falsely reporting that Mr. Duffy was not associated with Mr. Umar in Mr. Duffy's CMC bid to Ulster County for the business of PHS customers in New York. Defendant CMC has no privilege or justification for this conduct, and therefore plaintiff can prove the third element of this tort. Fourth and finally, plaintiff PHS can establish actual legal damage as a result of defendant's conduct including, without limitation, the loss of the Ulster County, N.Y., contract to defendant CMC and the pending loss of the Montgomery County Correctional Facility prison health services contract, which has a three-year value of nearly $9 million.

The evidence is that Umar assisted in the formation of Correctional Medical Care, Inc., a company now active in the same business as plaintiff, which

---

[5] Of note, in Jacobson was the fact that the new employer offered employment to the individual defendant with knowledge that he had signed restrictive covenant agreements and that he would then be acting inconsistently with the covenants contained which had been previously entered into between defendant and his former employer. Jacobson at 235 A.2d at 621. "One who intentionally interferes with an existing contractual relationship is subject to liability for the breach of the contract." Id.

provides healthcare services to correctional facilities.  It is Umar who sought out Kevin

Duffy. Correctional Medical Care, Inc. cannot possibly claim a lack of knowledge of

Umar's covenant not to compete when Umar is the President and Chief Executive

Officer.

> **D.    PHS will Suffer Irreparable Harm If Mr. Umar Is Permitted To Violate His Employment Agreement, Including Such Violations By And Through CMC**

Plaintiff PHS will suffer irreparable harm if defendant Umar, by and through his

company, defendant CMC,  continues to violate the restrictive covenants contained in

the Noncompetition Agreement.   It is well-settled under Pennsylvania law that the

consequences of unwarranted interference with customer relationships is

unascertainable and incapable of being fully compensated by money damages.  John

G. Bryant Co. v. Sling Testing & Repair, Inc., 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977);

see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger, 75 F. Supp. 2d 375, 381

(M.D. Pa. 1999).  In fact, the Pennsylvania Supreme Court specifically explained the

nature of the irreparable harm resulting form a breach, or threatened breach, of a

restrictive covenant:

> It is not the initial breach of a covenant which necessarily
> establishes the existence of irreparable harm but rather the
> threat of the unbridled continuation of the violation and the
> resultant incalculable damage to the former employer's
> business that constitutes the justification for equitable
> intervention.
>
> * * * *
>
> [A restrictive] covenant . . . is designed to prevent a
> disturbance in the relationship that has been established
> between appellees and their accounts through prior dealings.
> It is the possible consequences of this unwarranted
> interference with customer relationships that is [sic]
> unascertainable and not capable of being fully compensated
> by money damages . . . .[W]here a covenant of this type
> meets the test of reasonableness, it is prima facie
> enforceable in equity.

Bryant Co., 471 Pa. at 7-8, 369 A.2d at 1167.

In this case, without an injunction, defendants Umar and CMC will irreparably harm plaintiff PHS's 15-year relationship with the Montgomery County Correctional Facility, as well as other PHS customers already targeted and solicited by Umar and CMC. Plaintiff PHS's losses would be incalculable and irreparable, but they are clearly of a great magnitude. For instance, the Montgomery County Correctional Facility contract will generate an estimated $3 million in revenues per year over the next three years – for a total of nearly $9 million.   In addition to the instant contract with MCCF, Plaintiff PHS has many other similar contracts and should not be subjected to competition by Umar, or any person or entity acting in concert with him.   Making matters worse, defendants Umar and CMC are marketing themselves based on their experiences, goodwill and association with plaintiff PHS, and CPS, the business Umar sold to PHS in exchange for nearly $14 million and a commitment not to compete against PHS.  Plus, even if PHS were to win a monetary judgment against defendants Umar and CMC, based on Mr. Umar's past history it is likely that plaintiff would have a difficult, if not impossible time, collecting on such a judgment.

In sum, plaintiff PHS will be irreparably harmed, unless a preliminary  injunction is issued to bar defendant Umar's competitive activities, in breach of the covenant not to compete, as well as CMC's activities in furtherance of that breach.

**E.      Greater Injury Will Result Without An Injunction**

The next prong of the test for injunctive relief is that "greater injury would result by refusing [the injunction] than by granting it."  All-Pak, Inc. v. Johnston, 694 A.2d 347, 350 (Pa. Super. 1997).  Here, Umar has already received a direct personal payment of $500,000, in addition to the rest of his share of $14 million in payments and consideration for the sale of his business and his agreement to enter into a Noncompetition Agreement as an "essential" term to that sale.  In other words, he has

already received a huge benefit in exchange for agreeing to the Noncompetition Clause – it is difficult for him to claim any harm from it.  Moreover, under the Asset Purchase Agreement and Noncompetition Agreement he retained ownership and control of his established, affiliated businesses and Excluded Contracts for prison healthcare services – thus ensuring that he has had an ongoing way to earn a living with breaching his covenant not to compete.

Defendant CMC, of which Umar is President  did not even exist when he entered into the Noncompetition Agreement, and rather was created for him in direct contravention of the agreement.   The requested preliminary injunction will not work any undue harm or detriment to defendant Umar, or his company, CMC.  Rather, it will simply enforce the very terms and agreement he entered into on March 29, 2000, in exchange for more money than most people will ever earn in their lives.

In sum,  the immediate grant of injunctive relief would merely restore the parties to the status quo existing immediately prior to defendant Umar's breaches of his Noncompetition Agreement, by and through defendant CMC.  Gerardi v. Pelullo, 16 F. 3d 1363, 1373 (3d Cir. 1994).

**F.    The Public Interest Favors Granting the Preliminary Injunction Against Defendants, And Enforcing The Noncompetition Agreement**

Finally, the public interest supports granting the preliminary injunction. Numerous cases decided under Pennsylvania law have held that the public interest is served by enforcement of a restrictive covenant executed in connection with the sale of a business or its assets.  See, e.g., Volunteer Firemen's Ins. Servs. Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997); Westec Security Services, Inc. v. Westinghouse Electric Corporation, 538 F. Supp. 108, 121 (E.D.Pa. 1982).  With respect to the public interest in maintaining competitive bidding on public contracts, courts outside of Pennsylvania have refused to place such interest

31

above the public interest in enforcing covenants not to compete and have upheld the restrictive covenant.  See Wirum & Cash Architects v. Cash, 837 P.2d 692 (Alaska 1992) (citing Leff v. Gunter, 658 P.2d 740, 747 (1983) (en banc)).  For 15 years, plaintiff PHS has diligently and efficiently provided prison healthcare services to Montgomery County Correctional Facility and – for a longer term – to other correctional facilities throughout the United States.  In addition, plaintiff PHS has been an honest and fair corporate citizen, paying its taxes, paying its creditors, and honoring its contractual commitments.  Through plaintiff's efforts, more than 7,000 people are employed nationwide, including more than 23 people with steady, reliable jobs providing needed healthcare services at the  Montgomery County Correctional Facility – employees who could lose their jobs if this preliminary injunction is not granted.

Further, when defendant Umar and his father, Dr. Kenan Umar, sold CPS to plaintiff PHS in 2000, they left debts substantially in excess of escrowed purchase funds – many of these bills plaintiff PHS has been forced to pay in order to maintain and operate the contracts it purchased from Umar.  Certainly, defendant Umar's recent devious conduct in attempting to disguise his involvement in CMC indicates that his current *modus operandi* continues to be questionable.  Moreover, defendant CMC, operated and owned indirectly by defendant Umar, has no track record of service and is tainted by its association with defendant Umar.

It cannot be in the public interest to permit unfair competition and complete disregard for private contractual obligations in the award of public bids.  Rather, the public interest favors fair competition in pursuit of public contracts, honest conduct and reliable service to the public.  All of these considerations favor the granting of an injunction here.

III.     **CONCLUSION**

For the foregoing reasons, plaintiff PHS requests that the Court grant its motion and issue a preliminary injunction in the form submitted herewith against both defendants Emre Umar and Correctional Medical Care, Inc.

Respectfully submitted,

_____
Michael D. Homans (I.D. #76624)
Lee Albert (I.D. # 46852)
MAGER WHITE & GOLDSTEIN, LLP
One Liberty Place
1650 Market Street, 44th Floor
Philadelphia, PA 19103
(215)569-6924

**CERTIFICATE OF SERVICE**


        I hereby certify that on this day I caused the foregoing trial brief to be served upon

the following, in the manner indicated:

<u>By hand delivery and electronic mail:</u>

Larry H. Spector, Esquire
**Mann, Ungar, Spector & Labovitz, PC**
1709 Spruce Street
Philadelphia, PA 19103-6103

<u>By fax and electronic mail:</u>

Francis X. Clark, Esquire
**Francis X. Clark, P.C.**
987 Old Eagle School Road
The Woods, Suite 705
Wayne, PA 19087


Dated:  May 21, 2002                    _____

                                         Michael D. Homans