**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PRISON HEALTH SERVICES, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EMRE UMAR AND CORRECTIONAL** | : | **NO. 02-2642** |
| **MEDICAL CARE, INC.** | : | |

<u>**MEMORANDUM & ORDER**</u>

**SURRICK, J.**                                                      **JULY 2, 2002**

Plaintiff Prison Health Services, Inc. ("Plaintiff") filed this action against Defendant Emre Umar ("Umar") for breach of contact and against Defendant Correctional Medical Care, Inc. ("CMC") for intentional interference with contract. Plaintiff seeks, *inter alia*, to enjoin Defendants from violating a noncompetition agreement and asset purchase agreement entered into between Plaintiff and Umar in connection with Plaintiff's purchase of certain assets from Correctional Physician Services, Inc. ("CPS"), Umar's former company. Presently before the Court is Plaintiff's Motion For Preliminary Injunction (the "Motion," Docket No. 2). For the following reasons, the Motion will be granted.

**I.        STATEMENT OF FACTS**

Plaintiff is a Delaware corporation with its principal place of business in Brentwood, Tennessee. Plaintiff is engaged nationwide in the business of providing healthcare services to correctional facility inmates.

Correctional healthcare is a $5 billion industry in which sixty percent of services are preformed by correctional facilities themselves and forty percent are provided through the private market. Approximately fifty private companies provide correctional healthcare services. Transcript of May 22, 2002 Hearing (hereinafter, "May 22 Trans.") at 163. Plaintiff has a ten percent share of the entire correctional healthcare market and approximately a twenty-five percent share of the private market. May 22 Trans. at 27-28.

Defendant Emre Umar is an individual residing at 818 Hidden Forrest Drive, Collegeville, Pennsylvania. Umar is the President and Chief Executive Officer of Defendant CMC, a newly formed Pennsylvania corporation with its principal place of business at the same address, 818 Hidden Forrest Drive, Collegeville. Umar has been President and CEO of CMC since approximately September 2001.

Umar earned a Bachelor of Science degree from Penn State University in 1988. May 23 Trans. at 44. After graduating, he became a market analyst for an insurance company. Id.

In 1990, Emre Umar became an employee of CPS, a company established by his father, Dr. Kenan Umar. CPS provided healthcare services to inmates in correctional facilities in many states, including Pennsylvania, New York, Virginia and Florida. At some point, Emre Umar became a fifty percent owner and vice president of CPS.

Defendant CMC was incorporated in Pennsylvania in May of 2001. Like Plaintiff, CMC is engaged in the business of providing healthcare services to correctional facility inmates.

2

Defendant Umar, along with his father, operated, managed and owned CPS. CPS identified itself as a "national leader" in the field, having business in states across the country, including Pennsylvania, New York, Virginia, Florida, Texas and Illinois. Emre Umar himself had the goal of expanding CPS nationwide.

In late 1999, Emre Umar's salary was approximately $250,000. May 23 Trans. at 46, 75-76.

At that time, however, CPS had significant financial problems. CPS's senior credit facility, First Union Bank, called for payment of a $5 million note from CPS. May 23 Trans at 47-48. The balance on the loan was $4,538,570.59. Oversight Agreement at 1. Although Umar had not personally guaranteed the note, his father had. Id.; May 23 Trans. at 48.

CPS chose to put many of its assets up for sale, and several companies expressed an interest in purchasing all or part of CPS from the Umars. At that time, Plaintiff entered into negotiations with Emre Umar and CPS for Plaintiff to purchase most of the assets of CPS, including its contracts for prison health services in Pennsylvania and New York. The parties were represented by counsel. May 23 Trans. at 79. Defendant Umar had an active role in negotiating the agreement with Plaintiff. May 22 Trans. at 31.

On March 29, 2000, Plaintiff executed an asset purchase agreement, agreeing to f purchase a substantial portion of the assets and contracts of CPS for $14,000,000. The purchase price included a $500,000 payment to Defendant Umar and a $500,000 payment to his father. These $500,000 payments were distributed by an oversight committee pursuant to the Asset

Purchase Agreement.[1]  The purchase included, among other assets, CPS's contracts with the New

York Department of Correctional Services (the "New York Contract") and the Pennsylvania

Department of Corrections (the "Pennsylvania Contract"), which together covered twenty

different jails and prisons, defined as "Sites" in the Asset Purchase Agreement.  See Asset

Purchase Agreement at 1.  Other correctional healthcare service contracts performed by CPS

were excluded from the Asset Purchase Agreement.  Id., Section 1.2.8 (Excluded Contracts).

　　　　The purchase also included the goodwill, intellectual property and trade names of

CPS.  Id., Section 1.1.  Specifically, Plaintiff purchased, with respect to CPS's trade name and

other intellectual property:

> All right, title and interest of [CPS] in and to the name "Correction
> Physician Services" and all other trademarks, trade names . . . trade
> secrets *(including supplier and provider lists)*, personnel and
> provider databases, know-how, manuals, processes, techniques and
> all rights related thereto . . . (collectively, "Intellectual Property
> Rights") of Seller used primarily in the Business or which have in
> the past been used in the Business and are now dormant . . . ;

> The original documents representing all current and historical
> information, files, correspondence, records, marketing data and
> plans related to the Business, including, without limitation, any
> lists of historical, current and potential personnel, providers and
> suppliers of the Business (collectively, the "Business Data");

> All other tangible or intangible properties and assets that are
> carried on the books with [CPS] or that are owned by [CPS]

---

[1]  A copy of the signed Asset Purchase Agreement, dated March 29, 2000 (the
"Asset Purchase Agreement"), is attached as Exhibit A to the Complaint.  Most of the $14
million proceeds from the sale were deposited pursuant to the Asset Purchase Agreement into an
oversight account controlled by a three person committee entrusted with the disbursement of the
sale proceeds.  Asset Purchase Agreement, Sections 2.2 and 9.2.6; Oversight Agreement.  This
oversight committee controlled the funds and used them to pay CPS's creditors.  Id.  In addition,
with Plaintiff's consent and as contemplated in the Asset Purchase Agreement, Emre Umar and
his father each received $500,000 from the funds in the oversight account.  Id.

> wherever located that are used exclusively in the Business as of the
> Closing . . . .

Id., Section 1.1.5 (Trade Name and other Intellectual Property), Section 1.1.8 (Business Data) and Section 1.1.11 (Other Assets) (emphasis added).

The Asset Purchase Agreement defined "Business" to encompass only the provision of managed healthcare services in connection with the Pennsylvania and New York Contracts. Id. at 1.

The Asset Purchase Agreement attributed 100 percent of the purchase price to goodwill. Id., Section 2.5 and Schedule 2.5. CPS had a good reputation for providing medical care to inmates; nevertheless it had difficulty paying its bills.

The $14 million purchase price was based on a price of three times the projected net profits of the Pennsylvania and New York Contracts. May 22 Trans. at 99, 112. May 22 Trans. at 112, 116-17.

Defendant Emre Umar and Dr. Kenan Umar, as sole owners of CPS, both signed the Asset Purchase Agreement. Asset Purchase Agreement at 49. Defendant Emre Umar also signed the Asset Purchase Agreement on behalf of CPS as its officer. Id. Under the Asset Purchase Agreement, Emre Umar retained ownership and control of other affiliated businesses and excluded CPS contracts, and was not barred from earning a living through these other established business operations. May 22 Trans. at 41.

5

In order to protect Plaintiff's interests in the acquired business and assets of CPS, the Asset Purchase Agreement explicitly prohibited CPS from competing against Plaintiff in the United States for five years. Id., Section 9.4.[2]

Moreover, as a condition precedent to closing and Plaintiff's obligations to consummate the transaction, the Asset Purchase Agreement required Defendant Emre Umar and Dr. Kenan Umar to each enter into separate noncompetition and consulting agreements with Plaintiff. Id., Section 6.1.14.

Had Emre Umar refused to enter into a noncompetition agreement, the transaction would not have been consummated, and CPS would not have been relieved of its liabilities. May 22 Trans. at 48.

---

[2] Section 9.4 of the Asset Purchase Agreement states:

Until the fifth anniversary of the Closing Date, Seller will not, directly or indirectly, Compete with the Business (as hereinafter defined) anywhere within the United States of America. Notwithstanding the foregoing, Seller may continue to perform its obligations under the Excluded Contracts for the current terms thereof and any renewal term thereof. As used in this Section 9.4, the term "Compete with the Business" shall mean, directly or indirectly, as an employee of any person or entity, proprietor, partner, stockholder, officer, . . ., to provide, or to furnish aid or assistance to another person or entity in connection with the provision of Company Activities (as hereinafter defined). "Company Activities" shall mean (i) all activities of the type previously conducted by [CPS] as part of the Restricted Business (as hereinafter defined) and (ii) all activities of the type hereafter conduct by [Plaintiff] . . . with respect to the Restricted Business during the period commencing on the Closing Date and ending of [sic] the fifth anniversary of the Closing Date. "Restricted Business" shall mean the provision of healthcare services to inmates of correctional facilities.

From Emre Umar's perspective, he was in a position where he was either going to execute the Noncompetition Agreement and take $500,000 from the transaction, or get nothing from CPS.  May 23 Trans. at 64.

In addition, under the consulting agreement, Emre Umar was promised additional compensation contingent upon Plaintiff retaining and renewing the Pennsylvania and New York Contracts.  Consulting Agreement, Section 3; May 22 Trans. at 105; May 23 Trans. at 54-56.[3]

Accordingly, on March 29, 2000, Defendant Emre Umar entered into an agreement not to compete with Plaintiff.[4]  The Noncompetition Agreement specifically states that Emre Umar cannot compete against Plaintiff in the conduct of the Company Activities, defined as:

> (i)  all activities of the type previously conducted by Seller [CPS] as a part of the Business [defined as the "provision of healthcare services to inmates of correctional facilities"] and (ii) all activities of the type hereafter conducted by the Company [Plaintiff and its successors and affiliates] with respect to the Business during the Noncompete Period.

Noncompetition Agreement, Section 1(d).  The Noncompetition Agreement defined "Business" as "providing healthcare to inmates of correctional facilities."  Id., at 1.

---

[3]  The Consulting Agreement also states that "[Emre Umar] will not be engaged in providing [Plaintiff] with Consulting Services on a full-time basis, and those services will be provided on a limited basis . . . ."  Consulting Agreement, Section 1.  Furthermore, "Th[e] Agreement is not an employment agreement and [Emre Umar] is not and will not become by performance of services hereunder an employee of [Plaintiff]."  Id., Section 6.

[4]  A signed copy of Defendant Emre Umar's noncompetition agreement with Plaintiff, dated March 29, 2000 (the "Noncompetition Agreement"), is attached as Exhibit B to the Complaint.

Under the Noncompetition Agreement, Emre Umar is prohibited from competing in any way, "directly or indirectly, as an employee of any person or entity, proprietor, partner, stockholder or officer, consultant, joint venturer, investor, lender or in any other capacity or any substantially similar activity, to provide, or to furnish aid or assistance to another person or entity in connection with the provision of" such services.  Id., Sections 1(c) and 3.2.

In addition, the Agreement states that "Emre Umar shall hold in confidence at all times after the date hereof all Trade Secrets, and shall not disclose, publish or make use at any time after the date hereof of Trade Secrets without prior written consent of [Plaintiff]."  Id., Section 2.1.  "Trade Secrets" is defined to mean "information proprietary to the Business or [Plaintiff], including, but not limited to, . . . list of actual or potential customers or suppliers, or other information . . . which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use."  Id., Section 1(h).

The Noncompetition Agreement covers the entire United States, id., Section 1(g), and, beginning on the date of execution, was intended to last until the fifth anniversary of the date of termination of Defendant Emre Umar's consulting agreement with Plaintiff.[5]

---

[5] The Consulting Agreement was intended to terminate three years after its date of execution.  Consulting Agreement, Section 2; May 22 Trans. at 102-03.  Thus, the term for the Noncompetition Agreement was eight years after its execution.  After the parties consummated their transaction, however, Emre Umar made little, if any, effort to provide consultating services to Plaintiff.  May 22 Trans. at 103-105.  As a result, Plaintiff has treated the Consulting Agreement as a nullity and eliminated its three year term from Plaintiffs calculation of the noncompetition period.  Plaintiff takes the position that Emre Umar is barred from competing with Plaintiff for a period of five years from the date the Noncompetition Agreement was executed.

Umar also agreed under the Noncompetition Agreement that any failure to comply with the provisions in the agreement could be remedied by injunctive relief in addition to any other remedy provided for under the Agreement.  Id., Section 6.

The Noncompetition Agreement also states that "Emre Umar acknowledges and agrees that he has entered into [the Noncompetition Agreement] in consideration of [Plaintiff] entering into the [Asset] Purchase Agreement and performing its obligation thereunder, including payment of the purchase price."  Id., Section 4.

Umar expressly agreed in the Noncompetition Agreement that its entry was essential to the consummation of the Asset Purchase Agreement.  The Noncompetition Agreement states:

> Purchaser [Plaintiff] has agreed to purchase certain assets of the Business . . . and to assume certain obligations and liabilities of the Business pursuant to an Asset Purchase Agreement, dated as of March 29, 2000 . . . between Purchaser, Seller, Mr. Umar and Dr. Kenan Umar;

> Mr. Umar, is the beneficial owner of shares of the issued and outstanding  capital stock of seller, and as such, will receive a direct and significant financial benefit from the sale of the Assets to Purchaser;

> To protect adequately the interests of purchasers in the business and goodwill of Seller, it is essential that Mr. Umar enter into this [Noncompetition] Agreement; and

> To induce purchasers to consummate the transactions contemplated under the Purchase Agreement, Mr.  Umar desires to enter into this [Noncompetition] Agreement.

Noncompetition Agreement at 1 (emphasis added).

Plaintiff required the five-year non-competition provision, in large part, because the industry requires the development and maintenance of long-term relationships in order to ensure success.[6] In general, Plaintiff's contracts with its client last from 5-10 years, including renewals of shorter-term contracts.

Moreover, the award of bids to prison healthcare providers is often based on factors other than price, including experience, long-term relationships, goodwill, services offered, and quality of care. May 22 Trans. at 53; see also May 22, Trans. at 86, 87 and 251. In the industry, a company's reputation can be established and enhanced at national conferences with the aid of references through existing or past clients. May 22 Trans. at 54. Requests for correctional healthcare service vary in the industry from contract to contract, and contracts are not always awarded to the lowest bidder. May 22 Trans. at 53.

At the time Plaintiff began negotiating with CPS and entered into the Asset Purchase Agreement, CPS's reputation for service was very good. May 22 Trans. at 31. Emre Umar had made a reputation for himself based on his marketing and operations skills, and he was very knowledgeable about the industry. Id. at 32. Both CPS and Emre Umar were respected in the industry nationwide. See Id. at 31-32; 54.

In paying the $14 million to CPS, Plaintiff had in part purchased the New York and Pennsylvania contracts believing that it would then have an advantage in continuing to provide services to the two prison authorities involved when the contracts expired. May 22 Trans. at 135-36. The Pennsylvania Contract was to expire on December 31, 2002, but the

---

[6] For instance, the Montgomery County Correctional Facility ("MCCF") contacted various providers, including the parties here, requesting them to submit qualifications and bid proposals.

bidding for the new contract took place in the Spring of 2001.  Plaintiff was not awarded the new

contract.  The New York Contract was to expire on May 31, 2002, but Plaintiff was advised in

the second quarter of 2001 that the New York Department of Correctional Services would not

put a new contract out for public bidding and would instead provide the services "in house."

Having booked most of its $14 million purchase price for the two contracts as

goodwill, Plaintiff had to write off substantially all of that goodwill as an asset on its balance

sheet.  It reported the write-off in its Form 10-Q filed with the SEC for the quarter ending June

30, 2001:

> The Company currently provides services under two contracts for
> the Eastern and Western Regions of the Pennsylvania Department
> of Corrections.  Another vendor has been selected to negotiate a
> contract for these services . . .
>
> The Company also currently provides services under a contract
> with the Yonkers Region of the New York State Department of
> Corrections.  It is anticipated that the Company will cease
> operations under the Yonkers Region contract, with annual
> revenues of approximately $14.8 million, on May 31, 2002, as the
> services are to be assumed by the client under circumstances
> applicable to other vendors operating under similar regional
> contracts.  The Company acquired the contracts for the Eastern
> Region of Pennsylvania and for the Yonkers Region of New York
> through the acquisition of certain assets of Correctional Physician
> Services, Inc. (CPS) in March 2000.  Due to the anticipated
> expiration of these contracts, the Company wrote off $13.2 million,
> $8.3 million after tax, during the second quarter, representing
> goodwill that was recorded in connection with this acquisition.

In May of 2001, less than 14 months after Emre Umar signed the Noncompetition

Agreement, CMC was formed by Maria Carpio ("Carpio"),  Umar's wife.  CMC now directly

competes with Plaintiff.  Defendant CMC is a "health care provider that supplies a

comprehensive range of high quality fully auditable health care services to small and medium

11

sized city and county facilities," mainly prisons and other correctional facilities. Carpio obtained a credit line for CMC based exclusively on her own personal guarantee.

Although originally a 100 percent owner of CMC, Carpio later reduced her ownership interest to 60 percent, giving 40 percent ownership interest to Kevin Duffy ("Duffy"), a former operations officer for Plaintiff. Duffy is the current Vice President of CMC and runs its day-to-day operations. Neither Carpio nor Duffy are parties to any non-competition agreement with Plaintiff.

Duffy, through contacts and references in the industry, assembled CMC's Executive Management Team. Transcript of May 23, 2002 (hereinafter "May 23 Trans.") at 7-8. In approximately September of 2001, Duffy asked Emre Umar to serve as CMC's President and Chief Executive Officer. May 22 Trans. at 250. In that capacity, Umar manages and consults in CMC's business operations.

In October of 2001, Karen Rapoch, an employee of Plaintiff in New York, discovered that Duffy had become part of a new company, calling itself "Correctional Medical Care," that was planning to bid on a contract for services at a jail in Ulster County, New York (the "Ulster County contract").[7] Plaintiff had held that contract previously and would also be bidding on the Ulster County contract. Rapoch reported to Plaintiff that she believed that Emre Umar was affiliated with Duffy in the venture.

Upon learning of the formation of CMC in October 2001, Plaintiff, through its Vice President and Chief Legal Officer, Jean Byassee ("Byassee"), wrote to Emre Umar advising

---

[7] The Ulster County facility was not part of the New York Contract purchased by Plaintiff from CPS and was not one with which Emre Umar had any prior dealings.

him that he remained bound by the Noncompetition Agreement.   Plaintiff further warned that it would seek injunctive relief and damages against him and his company if he breached the agreement.  After receiving the letter, Umar spoke to his attorney; however, he never responded to the letter. May 22 Trans. at 266; May 23 Trans. at 96.

Byassee also called Duffy, who was a former PHS executive, to ask him about the rumors of his affiliation with Emre Umar, and to inform him of Emre Umar's Noncompetition Agreement.  Duffy, in an effort to conceal Umar's involvement with CMC, told Byassee that, "I am not working for Emre's company."  This led Byassee to conclude that Emre Umar was not affiliated with CMC.[8]  Thus, Plaintiff was unaware that Emre Umar was involved with CMC at the time CMC was competing with Plaintiff for the Ulster County contract.[9]

CMC was eventually awarded the Ulster County contract in February of 2002. Mr. Duffy, CMC's chief operating officer, admits that his long-term relationship with Ulster County played a significant role in CMC obtaining this contract and that such relationships are important in most bid solicitations.[10]

---

[8]  Emre Umar had never disclosed his Noncompetition Agreement to Duffy, who admits he was "really irritated" by Umar's omission. May 23 Trans. at 23.  Despite learning of the Noncompetition Agreement and reviewing a copy of it, Mr. Duffy proceeded to assist Emre Umar in breaching the agreement through his CMC activities.

[9]  Even if plaintiff had known about defendant Emre Umar's improper competitive activities in New York in late 2001, the Asset Purchase Agreement provides at Section 11.4(a) that "No waiver of any breach will operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.  No delay on the part of any party in exercising any right, power or  privilege hereunder shall operate as a waiver thereof."

[10]  CMC admits that relationships and reputation are critical in the industry.  May 23 Trans. at 36-37; see also May 22 Trans. at 251.  Reputation and goodwill matter, for example, when correctional facilities contact healthcare providers to request that they submit information

(continued...)

In early February, hoping to obtain further information about the formation and ownership of CMC, Byassee unsuccessfully attempted to obtain a copy of CMC's articles of incorporation by performing an Internet search with the Secretary of State for both New York and Delaware.  Byassee focused on those two states because Ulster County is located in New York and Duffy resides in Delaware.  May 22 Trans. at 247-48.

Plaintiff received CMC's bid documents for the Ulster County contract, in late March or early April of 2002, and only then learned that Emre Umar was involved with CMC and had been directly soliciting Plaintiff's clients and potential clients through CMC at or about the time that Plaintiff issued its warning to him.  May 22 Trans. at 247-48.[11]  At that point, it became apparent that Emre Umar, as President and CEO of CMC, directly competed with Plaintiff in the Ulster County contract bidding process.

Indeed, CMC's bid materials for the Ulster County contract included promotional material stating that Emre Umar was CMC's President and CEO.  See CMC's Nov. 13, 2001 Proposal to Ulster County, Qualifications of Proposer at 8.  Emre Umar's resume listed all of his activities and accomplishments which he was with CPS.  Id.  Among the "Contract Experience"

_____

[10](...continued)
to qualify for a bidding process.  See, e.g., Jan. 18, 2002 Letter from Assistant Warden Dennis Molyneaux to Robert Castille (inviting Requests for Qualification from Robert Castille & Assocs. for the MCCF contract); May 23 Trans. at 10-11.  See also CMC Letter dated Nov. 29, 2001 (regarding Requested Information RFP 01-73, Duffy stated he was contacted by Colonel Fister and told "[Ulster] County intended to put the system out to bid and asked if [Duffy] was interested in providing consulting services relative to that effort.").

[11]  Plaintiff was unable to obtain a copy of CMC's bid materials prior to Ulster County awarding the contract because such documents remain confidential during the bidding process and would not be released until Ulster County awarded the contract.  May 22, 2002 Trans. at 227.

listed were the Pennsylvania and New York contracts, which PHS purchased in the Asset Purchase Agreement. Id. at 3 and 6.

CMC's bid to Ulster County included five named entrepreneurs affiliated with CMC to serve as references. Id. at 12. All five were references for Emre Umar, and only one had experience with Duffy. May 22 Trans. at 254.

CMC also provided four additional references to attest to CMC staff performance on contracts CMC listed in its proposal as part of its healthcare services experience. CMC's Nov. 13, 2001 Proposal to Ulster County, Qualifications of Proposer at 12. Of these four individuals, Emre Umar had experience with Timothy Ringler, Chief for Division of Fiscal Management of the Pennsylvania Department of Corrections, and Duffy had experience with all four. May 22 Trans. 254-56.

The foregoing conduct violated both the letter and the spirit of the Noncompetition Agreement, and all of CMC's top officers and owners knew this. May 22 Trans. at 252; May 23 Trans. at 96 and 126.

Defendant CMC is currently competing with Plaintiff for a health services contract that was advertized by Montgomery County (Pa.) Correctional Facility ("MCCF"). Plaintiff has held the MCCF contract since 1987, under its name or under the name of EMSA, a company purchased by Plaintiff in 1999, which held the contract for a time prior to the purchase.

Plaintiff considers MCCF a large and important customer because it has provided Plaintiff with annual revenues of nearly $2.2 million during the past three years.[12]

---

[12]  Plaintiff expects that amount to increase to roughly $3 million per year over the next three years.

The most recent contract with MCCF was originally scheduled to terminate on June 30, 2003.  However, the contract, like most in the industry, permitted either party to terminate the agreement on 180-day notice.  On November 29, 2001, Plaintiff informed MCCF that it would not continue to operate under the financial terms of their agreement.

Plaintiff attempted to negotiate continued service to MCCF without the need to re-bid the contract, but MCCF chose to re-bid the contract nonetheless.  Accordingly, on or around February 14, 2002, MCCF began a bidding process with regard to a new contract for the provision of inmate health services to its approximately 1,150 inmates.  At that time, MCCF advertised a Request for Qualifications (the "MCCF RFQ") seeking information from prospective bidders.

The MCCF RFQ contained eight requirements in order to qualify to bid.  These requirements include:

- an executive management team with at least 10 years of experience;

- resumes of the proposed Onsite Management Staff (including the Medical Director and Program Administrator) who would be directing the operation of the Health Care Program at MCCF;

- a minimum of three (3) references from prior correctional facility personnel for which the respondent or the Executive Management Team has previously provided Professional Medical and Mental Health Care Services; and

- Executive Management team's demonstration of experience and the quality of its care by having obtained through its own initiative and efforts (not inherited from a previous provider) the accredation of the National Commission on Correctional Health Care (NCCHC) in a minimum of three (3) correctional facilities.

MCCF RFQ at 5.

16

Responses to the RFQ were due on February 28, 2002. Three companies submitted qualification packages. These companies were Plaintiff, CMC and Correctional Medical Services, Inc. ("CMS").

MCCF had no prior dealings with either Emre Umar or CPS. May 22 Trans. at 193. MCCF's assistant warden, Dennis Molyneaux, had never heard of Emre Umar or Umar's reputation prior to the bidding process, and MCCF had no reason to favor CMC based on Umar's association with the company. Id.

In its Qualification Package, CMC once again submitted the resume of Emre Umar, listing him as its President and CEO, along with a list of other individuals from CMC. Qualification Package, at 28-29. Umar's resume demonstrated that he had the necessary ten years experience in administering healthcare services. Id. All of the other individuals whose resumes were provided on behalf of CMC, including Duffy and Robert Castille, had more relevant experience than Emre Umar. Qualification Package, at 9-30; May 22 Trans. at 197-98.

Assistant Warden Molyneaux knew Duffy from 1987 as a result of Duffy's employment with Plaintiff during the time Plaintiff provided healthcare services for MCCF. May 22 Trans. at 197.

In providing CMC's contract experience with various prisons, the Qualification Package actually listed the contract experience of individuals (including Emre Umar) associated with CMC, rather than the actual experience of CMC. Among other contracts, CMC listed the Pennsylvania Contract and several of the facilities associated with the New York Contract as part of its contract experience. CMC Qualification Package, at 5-7. MCCF relied upon this representation in qualifying CMC for the bid. May 22 Trans. at 180.

17

Finally, CMC presented three required references, one of which was a reference from Donald Vaughn, Superintendent of the Commonwealth of Pennsylvania, Department of Corrections, State Correctional Institution at Graterford (a facility that was part of the Pennsylvania Contract for which CPS had provided healthcare services). Warden Vaughn's reference letter specifically identified Emre Umar as the President of CMC in the recommendation. Specifically, the recommendation from Warden Vaughn to Warden Roth, from Warden Vaughn stated:

> I have known the President of [CMC], Mr. Emre Umar, professionally for some ten years now. I have always known him to be knowledgeable in the field of correctional healthcare, cooperative with the members of my staff and willing to listen to and consider suggestions made by my administration.
>
> I want to recommend Mr. Umar and Correctional Medical Care Inc. to you because I believe that CMC would be an asset to the Montgomery County Correctional facility and your administration.

Qualification Package, at 30-34. MCCF relied upon Warden Vaughn's reference, along with the other two, in deeming CMC qualified to bid.[13]

Assistant Warden Molyneaux testified that Emre Umar's association with CMC did not have anything to do with CMC being deemed a qualified bidder. May 22 Trans. at 199.

Plaintiff was also deemed qualified to bid, and Plaintiff, CMC and CMS each made timely proposals to MCCF.

---

[13] Carpio testified that she, too, knew Warden Vaughn well and had a good relationship with him. May 23 Trans. at 109. Notwithstanding the alleged goodwill between Warden Vaughn and Carpio, Warden Vaughn's letter neither mentioned Carpio nor recommended her services to MCCF.

In submitting its bid, CMC again listed Emre Umar as its President. The bid documents also specifically state that Umar will be responsible for the corporate administration in support of the Montgomery County contract.

CMC was the lowest responsible bidder. May 22 Trans. at 201. Its bid was expected to save MCCF more than $192,000 per year over the comparable bid by Plaintiff, and even more over the comparable bid by CMS. Id.

Pursuant to its bidding procedures, MCCF gave a formal notice of "favorable consideration" to CMC on or about April 11, 2002. This allowed MCCF to negotiate exclusively with CMC on the new contract. Favorable consideration was given to CMC because of CMC's proposed price, and not because of Emre Umar's association with CMC or his reputation. May 22 Trans. at 203.

It was anticipated that MCCF would award its contract to CMC at a board meeting scheduled for May 9, 2002. However, Plaintiff filed its Complaint and Motion for Preliminary Injunction on May 2, 2002. Plaintiff advances claims against Defendant Emre Umar for breach of the Noncompetition Agreement and Asset Purchase Agreement, and against Defendant CMC for intentional interference with those agreements. The amount in controversy is alleged to exceed $150,000.

Plaintiff filed a Motion for Temporary Restraining Order on May 5, 2002 to enjoin Defendants from competing with Plaintiff for the provision of health services to correctional facility inmates. In particular, Plaintiff sought to enjoin Defendants from accepting a contract from or otherwise providing healthcare services to MCCF.

On May 8, 2002, this Court issued a temporary restraining order (the "TRO," Docket No. 7), temporarily enjoining Defendant CMC from accepting the MCCF contract.[14] Notwithstanding our issuance of the TRO, the MCCF board met on May 9 and awarded the contract to CMC, contingent upon CMC signing a contract on or before May 30, 2002, without being in violation of any order of this Court.

If the bid is formally awarded to CMC, an instantaneous transition period will commence resulting in Plaintiff and its employees being displaced from MCCF.

Plaintiff's contract with MCCF expired on May 30, 2002. Plaintiff, however, continues to provide service to MCCF pursuant to this Court's Order of May 8, 2002.

On May 22, 2002, a hearing was held on Plaintiff's Motion for Preliminary Injunction. In the Motion, Plaintiff seeks to enjoin Defendants from competing with Plaintiff for the provision of health services to correctional facility inmates.

CMC does not need Emre Umar to function. If necessary, CMC is willing to sever all business ties with Emre Umar and proceed without him. May 23 Trans. at 116.

---

[14] On May 8, 2002, after a hearing, we granted Plaintiff's TRO Motion, issuing an order prohibiting and enjoining Defendants from entering into any contract, agreement or negotiations with the Board of Prison Inspectors of Montgomery County Pennsylvania or the Montgomery County Correctional Facility for providing professional medical services or mental health care services for the Montgomery County Correctional Facility. We also ordered Plaintiff to continue providing professional medical services and mental health care services to the Montgomery County Correctional Facility pursuant to the terms of Plaintiff's current contract with MCCF for a period of thirty (30) days from the date of the order and that, thereafter, Plaintiff to continue providing said services, in accordance with the terms contained in the bid submitted by CMC for said medical and mental health care services at MCCF, for an additional period of sixty (60) days or until MCCF enters into a contract for the providing of medical services and mental health care services to MCCF, whichever occurs first. Finally, we ordered that, in the event that MCCF must renew the bidding process for providing medical services and mental health care services at MCCF, Plaintiff will submit a bid that is no higher than the bid which it originally submitted.

Under these circumstances, we address Plaintiff's Motion for Preliminary

Injunction.

II.        **ANALYSIS**

A.         STANDARD

While state law applies to the substantive issues in a diversity action, federal law

governs the standards for issuing a preliminary injunctive relief.  See Instant Air Freight Co. v.

C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989).  In ruling on a motion for a preliminary

injunction, the court must consider the following factors:  (1) the likelihood that the plaintiff will

prevail on the merits at final hearing;  (2) the extent to which the plaintiff is being irreparably

harmed by the conduct complained of;  (3) the extent to which the defendant will suffer

irreparable harm if the preliminary injunction is issued;  and (4) the public interest.  See, e.g.,

ACLU v. Reno, 217 F.3d 162, 172 (3d Cir. 2000); New Jersey Hosp. Assocs. v. Waldman, 73

F.3d 509, 512 (3d Cir. 1995); AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-

27 (3d Cir. 1994); American Civil Liberties Union of New Jersey v. Black Horse Pike Regional

Board of Education, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)); American Civil Liberties Union v.

Reno, Civ. A. No. 98-5591,1998 WL 813423, *1 (Reed, J.) (E.D. Pa. Nov. 23, 1998); Nat'l

Ass'n of Alzheimer Victims & Friends, Civ. A. No. 88-2426, 1988 WL 29338, *1 (Bechtle, J.)

(E.D. Pa. Mar. 23, 1988); Wright v. Columbia University, 520 F. Supp. 789, 793 (E.D. Pa.1981).

B.         Plaintiff is Likely to Succeed on the Merits of its Case.

For the reasons stated below, Plaintiff has shown a likelihood of success on the

merits of both its claims.

1.        Plaintiff Is Likely to Succeed on its Breach of Contract Claim

21

For Enforcement of the Noncompetition Agreement.

To determine whether Plaintiff is likely to succeed on the merits of its claim for breach of the Noncompetition Agreement, we must first determine whether the Noncompetition Agreement embraces the activities Plaintiff seeks to enjoin and, if it does, whether, under Pennsylvania law, the covenant is enforceable. Westec Security Services, Inc. v. Westinghouse Electric Corp., 538 F. Supp. 108, 117 (E.D. Pa.1982).[15]

In order to interpret the Noncompetition Agreement, we first look to the intent of the parties as expressed in the contract. Westec, 538 F. Supp. at 117. "If the language of the contract is unambiguous and susceptible of only one interpretation, a court will determine the parties' intentions on the basis of the clear wording of the contract." Id. The Noncompetition Agreement clearly covers the provision of healthcare by Emre Umar to inmates at correctional facilities throughout the United States for a period which has yet to lapse. Defendant CMC is marketing itself based on Umar's experience, goodwill and association with CPS, the business Umar sold to Plaintiff in exchange for nearly $14 million and a commitment not to compete against Plaintiff. In obtaining references in order to qualify for bidding on prison contracts, CMC has utilized the goodwill Emre Umar established with individuals in the industry during his

---

[15] Both the Asset Purchase Agreement and the Noncompetition Agreement contain choice-of-law provisions expressly stating that their enforcement is governed by Pennsylvania substantive law. Asset Purchase Agreement, Section 11.11; Noncompetition Agreement, Section 7.2. A federal court sitting in diversity is bound by the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Following Pennsylvania choice of law principles, we will follow the contractual choice of law provisions in the Asset Purchase Agreement and Noncompetition Agreement and apply Pennsylvania substantive law. American Air Filter Co., Inc. v. McNichol, 527 F.2d 1297 n.4 (3d Cir. 1975).

time with CPS. In our view, Umar has violated the terms of the Noncompetition Agreement. We therefore assess whether the Noncompetition Agreement is enforceable.

A covenant not to compete is a disfavored restraint on trade, Kramer v. Robec, Inc., 824 F. Supp. 508, 511 (E.D. Pa. 1992); see also Westec, 538 F. Supp. at 121, and must be carefully reviewed to assure that it is reasonable. Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 846 (Pa. 1957); see also Westec, 538 F. Supp. at 121. Consequently, to be enforceable under Pennsylvania law, a covenant not to compete must be: (1) ancillary to an employment contract or to a contract for the sale of goodwill or other subject property, (2) supported by adequate consideration, (3) reasonably necessary to protect legitimate interests of the purchaser and (4) reasonable. Protocomm Corp. v. Fluent, Inc., Civ. A. No. 93-0518, 1995 WL 3671, *5 (E.D. Pa. 1995); Westec Security Services, Inc. v. Westinghouse Electric Corp., 538 F. Supp. 108, 121 (E.D. Pa.1982) (applying rule of reason and citing to Restatement (Second) Contracts, § 188, and Comment a); Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210 (Pa.1976); Volunteer Firemen's Ins. Servs., Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997).

The reasonableness of a noncompetition agreement requires consideration of the following factors: (1) the types of activities embraced; (2) the geographical area; (3) the duration of the covenant (4) the hardship on the defendant; and (5) the public interest. Protocomm, 1995 WL 3671, *5 (citing Westec, 538 F. Supp. at 122); see also Harris Calorific Co. v. Marra, 29 A.2d 64, 67 (Pa. 1942) (citing Restatement Contracts, § 515).

The defendant has the burden of proving that the covenant not to compete is unreasonable. Protocomm, 1995 WL 3671, *5; Westec, 538 F. Supp. at 122; John G. Bryant Co.

23

v. Sling Testing and Repair, Inc., 369 A.2d 1164, 1169 (Pa. 1977) ("The law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful.").

In our view, Plaintiff is likely to demonstrate that the Noncompetition Agreement satisfies the requirements of Pennsylvania law.

a.    The Noncompetition Agreement was Ancillary To
The Sale of CPS's Business Assets.

With respect to ancillary restraints on competition, Pennsylvania courts have adopted the Restatement (Second) of Contracts, § 188(2), which states that "[P]romises imposing restraints that are ancillary to a valid transaction or relationship include . . . (a) a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold."  See Protocomm, 1995 WL 3671, *5; Westec, 538 F. Supp. at 121; Volunteer Firemen's Ins., 693 A.2d at 1337.  Plaintiff and Emre Umar entered into the Noncompetition Agreement in connection with Plaintiff's purchase of the assets of Umar's company, CPS.  Although Plaintiff did not purchase CPS in its entirety, but only certain assets, that fact does not render the Noncompetition Agreement unenforceable.  Volunteer Firemen's Ins. Servs., Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330, 1337 n.7 (Pa. Super. Ct. 1997) ("[Pennsylvania courts have placed primary focus on whether the restraint (covenant) is ancillary to the main purpose of the agreement rather than on the nature of the relationship between the parties. . . . [T]he fact that the instant relationship cannot fit neatly into one of the above categories [enumerated in the Restatement Second of Contracts, Restatement (Second) Contracts, § 188], does not render it per se unenforceable.").  The restrictive covenant

24

was not entered into as the primary benefit of the Asset Purchase Agreement.  Id.; Protocomm,

1995 WL 3671, *6.

Defendant argues that the Noncompetition Agreement was ancillary to an

employment agreement, and not the Asset Purchase Agreement.  We disagree.  The

Noncompetition Agreement was entered into ancillary to a contract for the sale of CPS's

business assets, including goodwill.  The Noncompetition Agreement was a condition precedent

to the execution of the Asset Purchase Agreement.  See Alabama Binder & Chemical Corp. v.

Pennsylvania Industrial Chemical Corp.,189 A.2d 180 (Pa. 1963) (covenant entered into by

employee held to be ancillary to a buy-sell agreement, where sale agreement was contingent upon

former owner executing noncompete).  In addition, Emre Umar entered into the Noncompetition

Agreement in consideration of Plaintiff entering in the Asset Purchase Agreement and

performing its obligations thereunder, including payment of the purchase price.  Noncompetition

Agreement, Section 4.  Plaintiff paid $14 million to Emre Umar's company in consideration of

the Asset Purchase Agreement, and Emre Umar himself received $500,000.

Although Plaintiff retained Umar as a consultant, Plaintiff's retention of  Umar

did not serve as consideration for his entry into the Noncompetition Agreement.  See Consulting

Agreement at 1 (stating that "Whereas, [Plaintiff] has agreed to purchase certain assets of [CPS]

and to assume certain obligations and liabilities of CPS pursuant to an Asset Purchase

Agreement.").  For these reasons, the Noncompetition Agreement is properly viewed as being

ancillary to the sale of assets rather than to an employment relationship.   See Alabama

Binder,189 A.2d 180, 184, n.8 (Pa. 1963); Geisinger Clinic v. DiCuccio, 606 A.2d 509, 511, 518

(Pa. Super. Ct. 1992); Scobell, Inc v. Schade, 688 A.2d 715 (Pa. Super. Ct. 1997) (ancillary to

sale of business, although defendant was retained by plaintiff as an employee).  Compare

Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 845 (Pa. 1957) (restrictive

covenant entered into by employees of purchased company was ancillary to employment because

continued employment was consideration for signing of covenant).

b.    The Noncompetition Agreement Is Reasonably Necessary
      to Protect Plaintiff's Legitimate Interests.

In this case, the Noncompetition Agreement was designed to protect the assets

Plaintiff purchased from Emre Umar's company, including the goodwill Umar had generated in

providing healthcare services under the Pennsylvania and New York contracts prior to their sale

to Plaintiffs.  A covenant not to compete entered into for the purpose of facilitating the sale of a

business or business asset, such as goodwill, is enforceable if it is designed to protect the

legitimate interests of the purchaser of the business.  Geisinger Clinic v. DiCuccio, 606 A.2d

509, 518 (Pa. Super. Ct. 1992), allocatur denied, 637 A.2d 285 (Pa. 1993), cert. denied, 513 U.S.

1112 (1995) (citation omitted).

> Specifically, restrictive covenants ancillary to the sale of a
> business, as here, are designed to protect, in addition to physical
> assets and investments, the good will of the business, i.e. its name,
> reputation and reliability.   For that reason, a restrictive covenant
> ancillary to the sale of a business promotes "goodwill [as] a
> saleable asset 'by protecting the buyer in the enjoyment of that for
> which he pays.' "   It is the interference with or the destruction of
> the good will purchased with the physical attributes of the business
> which is unascertainable and unquantifiable in terms of actual
> loss....

Id. (citations omitted); Volunteer Firemen's Ins., 693 A.2d at 1337-38 (noncompete was

necessary to protect insurance agency's legitimate property interest in specialized program of

insurance coverages it developed, customer base and distribution network it developed, goodwill

generated and confidential information); <u>Protocomm Corp. v. Fluent, Inc.</u>, Civ. A. No. 93-0518, 1995 WL 3671, *5 (E.D. Pa. 1995) (covenant ancillary to sale of a license).  "The purpose of allowing enforcement of non-competition covenants when such covenants are ancillary to sales of businesses is to make goodwill a saleable asset by protecting the buyer in the enjoyment of that for which he pays." <u>Westec Security Services, Inc. v. Westinghouse Electric Corporation</u>, 538 F. Supp. 108, 121 (E.D. Pa.1982).  Indeed, often "it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducement for a sale.  Were the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke." <u>Id.</u>, at 121-22 (citing <u>Morgan's Home Equipment Corp. v. Martucci</u>, 136 A.2d 838, 846 (Pa. 1953); <u>Alexander & Alexander, Inc. v. Drayton</u>, 378 F.Supp. 824, 829 (E.D. Pa.), <u>aff'd</u>, 505 F.2d 729 (3d Cir. 1974)).

   The Noncompetition Agreement was entered into in connection with the Asset Purchase Agreement between Plaintiff and Emre Umar and his former company.  In our view, entry into the Noncompetition Agreement was essential to the consummation of the Asset Purchase Agreement, and to protect the "trade secrets (including supplier and provider lists), personnel and provider databases, [and] know-how" as well as the goodwill Plaintiff purchased from CPS.  <u>Westec</u>, 538 F. Supp. at 121.[16]  From the language of the Asset Purchase Agreement and Noncompetition Agreement, it is clear that the parties intended that CPS and Umar would not trade on or interfere with the goodwill Plaintiff purchased.  Accordingly, the Noncompetition Agreement protects the asset purchase by Plaintiff by precluding Emre Umar from trading on

---

   [16]  Although the list of purchased assets does not specifically mention goodwill, <u>see</u> Asset Purchase Agreement, Section 1.1, the Agreement attributes 100 percent of the purchase price to goodwill, <u>id.</u>, Section 2.5 and Schedule 2.5.

CPS's name.  It also proscribes Umar from, among other activities, trading on the goodwill CPS and Umar had established with CPS's healthcare customers and providers in connection with the Pennsylvania and New York Contracts.  Such prohibition covers Emre Umar's use of his business relationships established through the Pennsylvania and New York Contracts to the advantage of CMC, such as by obtaining references for CMC and listing his prior work experience with CPS as a measure of CMC's qualifications.  We therefore view the Noncompetition Agreement to be ancillary to the sale of CPS's and Umar's assets and necessary to protect Plaintiff's legitimate interests in those assets.[17]

       Defendants argue that in the field of public bidding, goodwill is irrelevant.  See Laidlaw, Inc. v. Student Transportation of America, Inc., 20 F. Supp. 2d 727, 756 (D.N.J. 1998); Panther Systems II, Ltd. v. Panther Computer Systems, Inc., 783 F. Supp. 53 (E.D.N.Y. 1991); Whitmayer Bros., Inc. v. Doyle, 274 A.2d 577 (N.J. 1971).  Although we recognize that courts may be "reluctant in instances of public bidders to enjoin competitors from bidding on public contracts or responding to a public requests for proposals," see Panther Systems, 783 F. Supp. at 69 (distinguishing between private and public entities as customers in action to enjoin

---

    [17]  Although Emre Umar's knowledge of CPS's customers and providers may not be protectable trade secrets, see SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244 (3d Cir. 1985) (list of suppliers not trade secret); Multitherm Corp. v. Fuhr, Civ. A. No. 89-6151, 1991 WL 146233 (E.D. Pa. July 24, 1991) (list of customers not trade secret where customers were not kept confidential), Plaintiff has a protectable interest in the goodwill purchased from CPS that permits the parties to enter into a restrictive covenant for the purpose of preventing Emre Umar from manipulating the goodwill established between Emre Umar and CPS's customers and providers for the purpose of competing with Plaintiff.  SI Handling, 753 F.2d at 1258 (stating that although supplier list was not protectable trade secret, plaintiff could nevertheless protect goodwill through restrictive covenant); Multitherm Corp., 1991 WL 146233, *21 (permitting defendants use of customer list as not being trade secrets, but commenting that plaintiff could have entered into restrictive covenant).

infringement of trademark, trade name and copyrights and to enjoin misappropriation of

proprietary information) (citing Whitmyer), such reluctance has been based on the understanding

that "goodwill is not relevant in a system that is purely the direct submission of public bids,

where the only question is which applicant is the lowest responsible bidder." Laidlaw, 20 F.

Supp. 2d at 755 (citing Whitmyer; Coskey's Television & Radio Sales and Serv., Inc. v. Foti, 602

A.2d 789, 793 (NJ. Super. App.Div.1992)).

       The instant motion for injunctive relief can be distinguished from the relief sought

in Laidlaw and other cases cited by Defendants in that the contract at issue here is not subject to

mandatory public bidding where contracts must be awarded to the lowest responsible bidder.

First, the public contracts at issue in this case, i.e., contracts for providing healthcare services,

fall under a well known exemption from competitive bidding in Pennsylvania for professional

service contracts.  Malloy v. Boyertown Area School Board, 657 A.2d 915, 919 (Pa. 1995)

("Public contracts for professional services which involve quality as the paramount concern and

require a recognized professional and special expertise are exempt from the normal statutory

competitive bidding process."); Belcastro, 595 A.2d at 20 ("[P]rofessional service exemptions to

public contract bidding is common practice throughout the Commonwealth [of Pennsylvania].");

16 P.S. § 5001(d)(5) (exempting from competitive bidding county contracts for personal or

professional services in Second Class Counties).[18]

---

     [18]  Montgomery County is a second class A county, see 16 P.S. § 3210 (defining
second class A counties as ones having 500,000 or more but less than 800,000 inhabitants); see
also Wings Field Preservation Assocs. v. Commonwealth, 776 A.2d 311 (Pa. Commw. Ct.
2001); Commonwealth v. Person, 560 A.2d 761 n.3 (Pa. Super. Ct. 1989), and is therefore
governed by 16 P.S. § 5001 for purpose of awarding public contracts.

We acknowledge that even if the MCCF contract is exempt from the ordinary requirement that public contracts be competitively bid under 16 P.S. § 5001, once the county voluntarily undertook to follow a bidding procedure, it was obliged to adhere to that procedure throughout the procurement process. Lasday v. Allegheny County, 453 A.2d 949 (Pa. 1982). Nevertheless, goodwill and customer relationships play a role in whether the public entity chooses to renew the contract with the provider or decides to put the contract up for bidding. Laidlaw, 20 F. Supp. 2d at 755; see also Preferred Meal Systems, Inc. v. Guse, 557 N.E.2d 506, 513 (Ill. App. Ct. 1990) (holding that customer relationships can be important even in public bidding sector and that "lowest responsible bidder need not be the lowest bidder in terms of contract price.").

Second, even assuming that the existence of CMC and Emre Umar's connection to it had no bearing on MCCF's decision to put the contract up for bidding, goodwill and personal relations do play a role in MCCF's bidding process, primarily at the proof of qualifications stage. Although MCCF was guided primarily by price in ultimately awarding its bid to the lowest responsible bidder, it still required bidders to provide three references and demonstrate experience in the provision of correctional healthcare services. To that end, CMC submitted a Qualification Package, which contained the resume of Emre Umar, listing him as its President and CEO and outlining his experience with CPS. Qualification Package, at 28-29. Of the three references CMC provided, Warden Vaughn's clear endorsement of Emre Umar stems from the goodwill established between Emre Umar and Warden Vaughn while CPS provided correctional healthcare services to Graterford prison as part of the Pennsylvania Contract. Furthermore, in promoting itself to MCCF as a quality healthcare provider, CMC included the

30

Pennsylvania Contract and several facilities associated with the New York Contract in its list of

contracts evidencing its correctional healthcare services experience  CMC Qualification Package,

at 5-7.  MCCF relied upon these representations in qualifying CMC for the bid.  May 22 Trans. at

180.

       The marketing efforts of CMC demonstrate not only that it was trading on the

goodwill Plaintiff purchased from CPS but also that goodwill and reputation from personal

relationships were relevant in MCCF's bidding process.  See Laidlaw, 20 F. Supp. 2d at 749-51,

756 (finding that defendants drew on plaintiff's goodwill in promotional materials by outlining

defendants' prior experience with plaintiff's company, listing as defendants' customers ones

belonging to plaintiff while defendants were associated with plaintiff, and promoting itself as

providing safe school bus services).

       Defendants also argue that even if Plaintiff had a protectable interest in the

goodwill purchased from CPS which would have precluded Emre Umar from engaging in

business in the correctional healthcare services industry, such interest was nullified when

Plaintiff wrote off the goodwill it purchased.  Again, we disagree.  Even if Plaintiff was required,

under generally accepted accounting principles, to write off the goodwill purchased from CPS,

after Plaintiff learned it would not retain the Pennsylvania and New York Contracts upon their

respective expirations, the act of writing off an asset for accounting purposes does not by

necessity nullify Plaintiff's interest.  Cf. Industrial Valley Bank & Trust Co. v. Norman, 53 Pa.

D. & C.2d 691, 1971 WL 14347 (Pa. Com. Pl. Ct. 1971) (writing off of debt did not constitute

forgiveness of liability).  CMC's promotional materials demonstrate the continued value in

CPS's reputation and the personal relationships Emre Umar had cultivated while administering the Pennsylvania and New York Contracts prior to their sale to Plaintiff.

        c.     The Noncompetition Agreement was
                 <u>Supported by Adequate Consideration.</u>

       There is no doubt that the Noncompetition Agreement was adequately supported by consideration.  Plaintiffs acquired certain assets from CPS under the Asset Purchase Agreement for $14 million, which amount was based on three times the profits expected from the Pennsylvania and New York Contracts.  Of the $14 million, $500,000 was paid to Emre Umar. As a result, CPS, Emre Umar's company, was relieved of certain large liabilities, and Umar's father was relieved of personal liability on CPS's loan from First Union Bank.

       In addition, we are not persuaded by Defendants' argument that the Noncompetition Agreement is unenforceable because it was entered into under conditions of duress.  Defendants admit that the parties' transaction was negotiated and executed at arm's length with the parties represented by counsel.  <u>See</u> <u>Worldwide Auditing Services, Inc. v. Richter</u>, 587 A.2d 772, 777 (Pa. Super. Ct. 1991) (no duress defense where signatory to restrictive covenant consulted with counsel and plaintiff did not exercise economic coercion over defendant) (quoting <u>Carrier v. William Penn Broadcasting Co.</u>, 233 A.2d 519, 521 (1967) ("[T]here can be no duress where the contracting parties each consult with counsel.")).

        d.     <u>The Noncompetition Agreement Is Reasonable.</u>

       A covenant not to compete which is ancillary to a contract for the sale of a business is subjected to a less rigorous reasonableness examination than one that is ancillary to an employment contract.  <u>Worldwide Auditing Services, Inc. v. Richter</u>, 587 A.2d 772, 777 (Pa.

Super. Ct. 1991); <u>Sobers v. Shannon Optical Company, Inc.</u>, 473 A.2d 1035, 1038 (Pa. Super. Ct.

1984) (citations omitted); <u>Westec</u>, 538 F. Supp. at 121, n.19.  As above mentioned, the

reasonableness of such agreements requires the consideration of the following factors:  (1) the

types of activities embraced; (2) the geographical area; (3) the duration of the covenant (4)

hardship on the defendant; and (5) the public interest.  <u>Protocomm</u>, 1995 WL 3671, *6; <u>Westec</u>,

538 F. Supp. at 122.  There is ample case law to support the reasonableness of the instant

Noncompetition Agreement.

1)                        <u>Activities Embraced.</u>

The restrictions on Emre Umar's activities under the Noncompetition Agreement

are reasonably limited to those activities that could damages the Plaintiff's use of the assets

purchased from CPS.  Moreover, Umar was permitted to perform his obligations under the

Excluded Contracts, as defined in the Asset Purchase Agreement, for the remainder of their term,

and was permitted to compete with Plaintiff with respect to the renewal of those contracts.

Noncompetition Agreement, Sections 2.2(a), 3.2 and 3.3(a).

The Noncompetition Agreement embraces the same activities covered by the

noncompetition provision in the Asset Purchase Agreement pertaining to Umar's former

company.  We are aware of the fact that the term "Business" in the Noncompetition Agreement

and the term "Restricted Business in Section 9.4 of the Asset Purchase Agreement are defined

more broadly than the term "Business" as first defined in the recitals of the Asset Purchase

Agreement. The Asset Purchase Agreement states that "[CPS] presently conducts the business

("Business") of providing managed healthcare services (i) to the Pennsylvania Department of

Corrections . . . pursuant to the [Pennsylvania Contract] and (ii) the State of New York,

33

Department of Correctional Services pursuant to the [New York Contract]." Asset Purchase

Agreement at 1. In our view, however, given the nature of the industry, competition by Emre

Umar in the providing of correctional healthcare services nationwide could affect Plaintiff's

interest in the assets purchased in connection with the Pennsylvania and New York Contracts,

including goodwill and Plaintiff's use of CPS's customer, provider and supplier lists.

2)      <u>Geographic Scope.</u>

The enforcement of a nationwide restriction on Emre Umar's ability to compete is

not unreasonable given the fact that Umar has for many years engaged in the business of

providing healthcare to prison facility inmates in many states throughout the country. <u>See</u>

<u>National Bus. Servs., Inc. v. Wright</u>, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998); <u>Kramer v. Robec,</u>

<u>Inc.</u>, 824 F. Supp. 508, 512 (E.D. Pa. 1992) (nationwide bar on competition reasonable "because

Robec and its competitors market their products in all fifty states"). In addition, the evidence

regarding the correctional healthcare services industry reveals that an individual's or company's

reputation can extend beyond the sphere of contracts administered by the company or individual,

and that CPS and Umar had favorable reputations throughout the industry for the quality of

healthcare services provided by CPS.

3)      <u>Duration.</u>

Although, on its face, the Noncompetition period in the Noncompetition

Agreement appears to span eight years, i.e., five years from the date of termination of the

Consulting Agreement, Plaintiff has maintained the position that the period ends on May 29,

2005, five years after execution of the Asset Purchase Agreement and Noncompetition

Agreement.

34

Five years is also not an unreasonable time period to permit Plaintiff to adequately ensure its ability to make use of the goodwill it purchased from Emre Umar and his former company.  See Westec, 538 F. Supp. at 122 (finding ten-year period to be reasonable); Vector Security, Inc. v. Stewart, 88 F. Supp. 2d 395 (E.D. Pa. 2000) (upholding five-year term of noncompetition clause barring former authorized dealer from soliciting plaintiff's customers, even though situation was more akin to an employment relationship); Boldt Machinery & Tools, Inc. v. Wallace, 366 A.2d 902 (Pa. 1976) (upholding five-year, post-employment restriction).

Moreover, the testimony in this case revealed that goodwill established by relationships in the correctional healthcare industry often lasts years.  See, e.g., May 22 Trans. at 251; May 23 Trans. at 10-11, 36-37; Jan. 18, 2002 Letter from Assistant Warden Dennis Molyneaux to Robert Castille (inviting Requests for Qualification from Robert Castille & Assocs. for the MCCF contract); CMC Letter dated Nov. 29, 2001 regarding Requested Information RFP 01-73, Emre Umar's reference from Warden Vaughn.

4)	Hardship.

Nothing in the record persuades us that restricting Emre Umar in accordance with the terms of the Noncompetition Agreement would impose on him a hardship outweighing that which Plaintiff would suffer were we to deny Plaintiff the relief to which the Noncompetition Agreement otherwise entitles it.  The first factor drawing us to this conclusion is that Emre Umar is a sophisticated businessman capable of anticipating future consequences of decisions such as those involved in entering a covenant not to compete.  Westec, 538 F. Supp. at 122.  More importantly, Emre Umar has a bachelor of science degree and more than ten years experience in marketing and administration of healthcare services.  Although the Noncompetition Agreement

35

prohibits  Emre Umar from engaging in the business of providing correctional healthcare services until March 29, 2005, his skills and experience make him qualified to serve as a consultant to prison facilities with respect to correctional healthcare services contracts.   For example, prior to the formation of CMC, Duffy headed a consulting firm providing those very same services.  See May 23 Trans. at 10-11; CMC Letter dated Nov. 29, 2001 regarding Requested Information RFP 01-73.  In addition, Emre Umar is apparently capable of utilizing his marketing and administration skills in other sectors, including other areas of the healthcare services industry. See Laidlaw, 20 F. Supp. 2d at 762 (stating that defendant could engage in businesses other than in school bussing industry).  Finally, Emre Umar was handsomely rewarded for his entry into the Noncompetition Agreement.  Umar was making approximately $250,000 per year when Plaintiff purchased the assets from CPS and Umar entered into the Noncompetition Agreement.  As a result of the transaction, Umar received $500,000 personally, and his company, CPS, was relieved of significant liabilities which had amounted to several millions of dollars of debt.

5)    Public Interest.

Defendants argue that because the public's interest in competitive bidding is at stake, injunctive relief is inappropriate.  See Whitmayer Bros., Inc. v. Doyle, 274 A.2d 577 (N.J. 1971) (denying preliminary injunction where plaintiffs customers were mainly governmental agencies attained through public bidding); but see Wirum & Cash, Architects v. Cash, 837 P.2d 692 (Alaska 1992) (enforcing restrictive covenant, holding that public interest in enforcing covenants not to compete outweighs public interest in maintaining competitive bidding on public contracts) (citing Leff v. Gunter, 658 P.2d 740, 747 (1983) (en banc)).

As hereinabove discussed there is no requirement for public bidding of the instant contract. However, Pennsylvania courts have not yet addressed whether the public interest in competitive bidding for public contracts generally, outweighs the interest in enforcing noncompetition agreements. Although there is a "general requirement that public contracts be competitively bid" in Pennsylvania, contracts for the providing of healthcare services fall under an exemption from competitive bidding in Pennsylvania for professional service contracts. Because Pennsylvania law does not require that the healthcare services contracts at issue in this case be publicly bid, we cannot conclude that the public interest in obtaining the lowest possible price for such contracts outweighs the well recognized interest in enforcing covenants not to compete. Cf. Laidlaw, 20 F. Supp. 2d at 762.

In assessing the public interest, we must also consider the effect enforcement of the Noncompetition Agreement will have upon the public's need for correctional healthcare services. New Castle Orthopedic Assocs. v. Burns, 392 A.2d 1383, 1387-88 (Pa. 1978). Such interest is paramount to the respective rights of the parties. Id. Unlike the situation in Burns, the evidence has not demonstrated a shortage of providers of correctional healthcare services either locally or nationwide. Id. (noting considerable delay suffered by patients in receiving orthopedic treatment from plaintiffs). An injunction will not force MCCF to perform the healthcare services "in house," and there are approximately 50 providers in the privatized market nationwide.[19] At this juncture, we are satisfied that the issuance of a preliminary injunction will not have an

---

[19]   Although not a party to the case, MCCF has attended both hearings to date. Counsel for MCCF expressed the prison facilities concerns regarding the issuance of an injunction. MCCF did not express any concern that it would be unable to find a responsible provider of correctional healthcare services if CMC were ultimately enjoined from competing with Plaintiff.

adverse effect on MCCF or other prison facilities in the providing of correctional healthcare services.  See Nagaraj v. Arcilla, 20 Pa. D. & C.3d 574, 584-87, 1981 WL 627, *6-8 (Pa. Com. Pl. Ct. 1981) (enjoining physician from practicing within restricted area).

Defendants have not satisfied their burden of demonstrating that the Noncompetition Agreement is unreasonable. Protocomm, 1995 WL 3671, *5; Westec, 538 F. Supp. at 122; Bryant Co., 369 A.2d at 1169.  The restraint on Emre Umar's activities appears to be no greater than is necessary to protect Plaintiff's legitimate interest in the goodwill it purchased from CPS.  Furthermore, Plaintiff's need for protection outweighs the hardship enforcement of the Noncompetition Agreement would impose on Umar or the public interest. For these reasons, we find that Plaintiff is likely to prevail on its claim for breach of the Noncompetition Agreement by Defendant Emre Umar.

      2.      Plaintiff Is Likely to Succeed on its Claim for
                Intentional Interference with Contract.

Plaintiff is also likely to succeed on the merits of its claim for interference with the Noncompetition Agreement.  Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.  Cirvelli v. General Motors Corp., 215 F.3d 386 (3d Cir.2000).

Under Pennsylvania law, one who intentionally interferes with an existing contractual relation, including a covenant not to compete, is subject to liability. Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, 847 (Pa. 1957). In Morgan's Home, the plaintiff, a home furnishing company, brought a suit against not only its former employees who had signed a restrictive covenant but also a competitor who was not bound by any contract with plaintiff. Id., at 841. The plaintiff's competitor admitted that he hired plaintiff's former employees with knowledge that they had signed restrictive covenants. Id., at 847. The Supreme Court of Pennsylvania affirmed an injunction preventing the competitor from further inducing the breach of the restrictive covenants. Id. See also Jacobson & Co. v. International Environment Corp., 245 A.2d 612 (Pa. 1967) (affirming enforcement of restrictive covenant against plaintiff's former employee and said employee's current employer, and requiring accounting of employee's salary and competitors profits gained as a result of interference with restrictive covenant); Ecolaire Inc. v. Crissman, 542 F. Supp. 196, 208 (E.D. Pa. 1982); Certified Labs. of Texas, Inc. v. Rubison, 303 F. Supp. 1014, 1025 (E.D. Pa. 1969). Cf. United Aircraft Corp. v. Boreen, 284 F. Supp. 428, 442-43 (E.D. Pa. 1968).

The evidence demonstrates and Defendants have conceded that CMC, through its officers and agents, knew that Defendant Emre Umar was subject to the Noncompetition Agreement and therefore was under a duty to refrain from competing with Plaintiff and soliciting Plaintiff's current and prospective clients for a period of at least five years. Despite this knowledge, Defendant CMC has, in competition with Plaintiff, actively solicited Plaintiff's current and prospective customers. In fact, Plaintiff asserts that CMC intentionally misled Plaintiff with respect to Emre Umar's involvement in CMC's business. In competing with

39

Plaintiff, CMC has utilized the goodwill Emre Umar sold to Plaintiff in the Asset Purchase Agreement. Such conduct is actionable under Pennsylvania law. In our view, therefore, CMC will not be permitted to compete with Plaintiff in the provision of correctional healthcare services as long as it remains associated with Emre Umar or receives assistance from him in any capacity.[20]

**C.**    Plaintiff will Suffer Immediate, Irreparable Harm Absent Preliminary Relief.

CMC submitted the lowest bid for the MCCF contract, and absent the issuance of injunctive relief, MCCF would likely award the contract to CMC. In fact, subsequent to the Court issuing the TRO, MCCF agreed to award the contract to CMC contingent upon CMC being able to accept the contract by May 30, 2002. On June 24, 2002 Defendant CMC filed an Expedited Motion of Defendant Correctional Medical Care, Inc. To Vacate Temporary Restraining Order Of May 8, 2002, or Alternatively To Require Posting Of A Bond, (Docket No. 20) in which Motion, CMC advises that MCCF has decided to put the subject contract out for re-bid and that RFQ's are due July 8, 2002, with the contract to be finalized and awarded on July 31, 2002.

Under Pennsylvania law, breach of a covenant not to compete resulting in loss of goodwill and interference with customer relations can result in irreparable harm and thus be the basis for injunctive relief. John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164,

---

[20] It it unclear to the Court whether Plaintiff attempts to argue that CMC may be enjoined from competing with Plaintiff simply because Emre Umar has an equitable interest in CMC as a result of his marriage to Ms. Carpio. Although citing Fidelity Bank v. Carroll, 610 A.2d 481 (Pa. Super. Ct. 1992) for the proposition that Emre Umar has an equitable interest in CMC, Plaintiff cites no cases to support a ruling that such relationship alone would be grounds to hold liable and possibly enjoin CMC. In our view, this connection is insufficient.

1167-68 (Pa. 1977) (plaintiff has protectable interest in relationship between employee and

customer, and continued interference with goodwill established between employee and customers

could be basis of irreparable harm); see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Rodger, 75 F. Supp. 2d 375, 381 (M.D. Pa. 1999) (irreparable harm found where continued

violation of restrictive covenant was likely to result in erosion to customer trust).[21]  The Supreme

Court of Pennsylvania has specifically explained the nature of the irreparable harm resulting from

a breach, or threatened breach, of a restrictive covenant:

> It is not the initial breach of a covenant which
> necessarily establishes the existence of irreparable
> harm but rather the threat of the unbridled
> continuation of the violation and the resultant
> incalculable damage to the former employer's
> business that constitutes the justification for
> equitable intervention.
>
> * * * *
>
> [A restrictive] covenant . . . is designed to prevent a
> disturbance in the relationship that has been
> established between appellees and their accounts
> through prior dealings.  It is the possible
> consequences of this unwarranted interference with
> customer relationships that is [sic] unascertainable

---

[21]  See also Boldt Machinery & Tools, Inc. v. Wallace, 366 A.2d 902, 906-07 (Pa.
1976) (holding an employer has a protectable interest in the customer goodwill developed by an
employee through customer relationships, but reducing geographical scope of covenant); Sparks
Tune-Up, Inc. v. White, 1989 WL 41321, *2 (E.D. Pa. 1989) (violation of covenant resulting in
interference with customer relations is prima facie enforceable in equity).  Accord Laidlaw, 20 F.
Supp. 2d at 766 (stating that, generally, the loss of goodwill and the interference with customer
relationships may be the basis for a finding of irreparable harm) (citing SI Handling Systems, Inc.
v. Heisley, 753 F.2d 1244, 1258-59 (3d Cir.1985) (employer's customer relationships and
goodwill protectable through covenants not to compete); American Eutectic Welding Alloys
Sales Co., Inc. v. Rodriguez, 480 F.2d 223, 227-29 (1st Cir.1973) (employer would be
irreparably harmed absent injunction prohibiting former employee from soliciting former
customers)).

> and not capable of being fully compensated by
> money damages . . . .[W]here a covenant of this
> type meets the test of reasonableness, it is prima
> facie enforceable in equity.

Bryant Co., 471 Pa. at 7-8, 369 A.2d at 1167.

In this case, Plaintiff was the second lowest bid in MCCF's original bidding process. But for CMC's bid, it is likely that a cessation of operations by Plaintiff would not occur at MCCF. As a result of the TRO issued by this Court, MCCF has decided to re-bid this contract. Obviously, if CMC with Umar as CEO is permitted to participate in the rebidding process, Plaintiff would suffer the same irreparable harm. Without an injunction, Defendants Emre Umar and CMC would irreparably harm Plaintiff's 15-year relationship with the MCCF, and the goodwill generated between Plaintiff and MCCF over the past fifteen years will be diminished. Moreover, Plaintiff will be irreparably harmed by the continuing nature of Defendants' competition. As the court held in Laidlaw:

> First, [plaintiff] would be entitled to damages not only when
> [plaintiff] lost a contract to [defendant], but also when it won a
> contract but bid lower than it otherwise would have in response to
> competition from [defendant]. Of course, it might be difficult in
> some instances for [plaintiff] to prove what it would have bid had
> [defendant] not submitted a competing bid.   Second, when a
> school chooses not to renew a [ ] contract [with plaintiff] that it
> could have renewed, it will be incredibly difficult to determine
> whether [defendant's] competition caused the school not to renew
> or the school would have done so anyway.   Third, it will be
> impossible to calculate whether [defendant's] competition will
> cause schools not to renew at some point in the future because
> [defendant] hurt [plaintiff's] goodwill.   Such problems with
> calculating damages are why the loss of goodwill generally
> constitutes irreparable harm. It is impossible to calculate the many
> subtle ways that such a loss impacts a business.   Accordingly,
> assuming that [plaintiff] has shown a likelihood of success on the

42

merits, the Court would find that the harm that would result from
[defendant's] competition is irreparable.

20 F. Supp. 2d at 767.

Defendants raise the doctrine of laches, arguing that Plaintiff delayed too long
before filing the instant action and moving for injunctive relief. "Laches is an equitable doctrine
which precludes a party from pursuing a complaint when it is guilty of a lack of diligence in
asserting its rights, such that the passage of time has caused prejudice to the opposing party." In
the Matter of Iulo, 766 A.2d 335, 338 (Pa. 2001); see also, United States v. One Toshiba Color
Television, 213 F.3d 147, 157 (3d Cir. 2000) (stating that the two essential elements of laches are
"inexcusable delay in instituting suit, and prejudice resulting to the defendant from such delay").

"The question of laches is factual and is determined by examining the
circumstances of each case." Class of Two Hundred Administrative Faculty Members v. Scanlon,
466 A.2d 103, 105 (Pa. 1983); Anaconda Co. v. Metric Tool & Die Company, 485 F.Supp. 410,
427 (E.D. Pa. 1980) ("existence [of laches] depends on the particular equitable circumstances of
each case"). Furthermore, laches may be found even where the statute of limitations has not run.
Richards v. Mackall, 124 U.S. 183, 187-88 (1888).

Nevertheless, "[t]he allocation of the burden of proof of laches depends on the
length of the plaintiff's delay," Anaconda Co. v. Metric Tool & Die Company, 485 F.Supp. 410,
427 (E.D. Pa. 1980), and, if the delay is shorter than the applicable statute of limitations, then the
party asserting laches as a defense has the burden of proof. Id. (laches barred claim for damages
based on misappropriation and wrongful use of trade secret where plaintiff delayed filing suit for
seven years). "If laches is invoked by a defendant who is a conscious wrongdoer, he can prevail

43

only if the plaintiff's delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time." Id. (citations and internal quotations omitted).

              In the instant action, Emre Umar has competed with Plaintiff and will continue to compete with Plaintiff notwithstanding the Noncompetition Agreement. CMC has intentionally interfered with the Noncompetition Agreement by intentionally participating in its breach by Umar. Defendants are before the Court with unclean hands and, therefore, are not entitled to assert the defense of laches. See Giddings v. State Board of Psychology, 669 A.2d 431 (Pa. Commw. Ct. 1995) (party without clean hands cannot assert equitable doctrine of laches where wrongdoing is directly connected to the matter in controversy); see also McLaughlin v. McLaughlin, 187 A.2d 905, 907 (Pa. 1963). Moreover, even if we were to assume that Defendants' conduct did not bar application of the laches doctrine, the period of delay in filing suit and seeking a preliminary injunction was a matter of weeks or, at most, months, and therefore was less than the applicable statute of limitations. We are unconvinced, based on the evidence, that Plaintiff knew of Emre Umar's involvement in CMC prior to late March or early April of 2002.[22]

---

[22] Defendants argue that Plaintiff knew of Emre Umar's involvement with CMC as early as October 2001, at the time Ulster County began soliciting bids for an upcoming contract. Even if we were to assume this to be true, the period of delay would nevertheless be insufficient for an application of the laches doctrine in this situation where Defendants are conscious wrongdoers.

In sum, Plaintiff will be irreparably harmed unless an immediate injunction is issued to bar Defendant Emre Umar's competitive activities, in breach of his covenant not to compete, as well as Defendant CMC's activities in furtherance of that breach.[23]

**D.**        The Balance of Harm Weighs in Favor or Issuing a Preliminary Injunction.

Defendants are not likely to be harmed by the issuance of a preliminary injunction. CMC was only recently formed, and thus has not developed long standing relationships with MCCF or anyone else in which goodwill is likely to be damaged. Moreover, an injunction would not prevent Emre Umar from working professionally, and CMC would still be able to engage in the provision of healthcare services, provided it disassociates itself from Emre Umar completely before competing with Plaintiff.

Having once come in second to CMC in MCCF's bidding process, Plaintiff would be significantly harmed by the loss of revenue expected from the upcoming contract. This is a source of revenue that Plaintiff has had for the past fifteen years. Moreover, absent injunctive relief, Plaintiff will be forced to adjust its bid prices for all other contracts to compete with CMC

---

[23] Defendants rely on three cases in arguing that Plaintiff cannot show irreparable harm because Plaintiff could be adequately compensated with monetary damages. Dice v. Clinicorp, Inc., 887 F. Supp. 803, 810 (W.D. Pa. 1995) (holding that injury to employer from breach of noncompete would be economic injury and that contractual provision asserting the breach would constitute irreparable harm may constitute evidence in support of finding of irreparable harm, but standing alone is insufficient); First Health Group Corp. v. Nat'l Prescription Administrators, Inc., 155 F. Supp. 2d 194 (M.D. Pa. 2001); Harsco Corp. v. Klein, 576 A.2d 1118, 1121 (Pa. Super. Ct. 1990) (former employee would not be enjoined from working for competitor where former employer's products and services were neither unique nor confidential and customers were generally known to all in industry). We are not persuaded by these cases as they fail to distinguish the Pennsylvania Supreme Court's holding in Bryant Co. which we find applicable here. Furthermore, the cases do not address the breach's impact on goodwill, particularly in light of MCCF's and many other prisons's ability to renew their contracts without opening them to public bidding.

45

without being able to prove what it would have bid had CMC been enjoined from competing in a manner that interfered with the Emre Umar's Noncompetition Agreement.

We therefore find that the balance of harm weighs in favor of issuing a preliminary injunction against Emre Umar and against CMC while it benefits from its relationship with Emre Umar.

**E.**          The Public Interest is consistent with the Issuance of a Preliminary Injunction.

Numerous cases decided under Pennsylvania law have held that the public interest is served by enforcement of a restrictive covenant executed in connection with the sale of a business or its assets.  See, e.g., Volunteer Firemen's Ins. Servs., Inc. v. Cigna Property and Casualty Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997); Westec Security Services, Inc. v. Westinghouse Electric Corporation, 538 F. Supp. 108, 121 (E.D. Pa.1982).

We have already determined that, under Pennsylvania law, the public interest does not bar enforcement of the Noncompetition Agreement.  Before issuing a preliminary injunction, however, we must also consider how the public interest is impacted by the issuance of such relief pending a final determination of whether the Noncompetition Agreement is enforceable. Laidlaw, 20 F. Supp. 2d at 769.

The preliminary injunction does not limit the number of bids prisons, including MCCF, will receive for correctional healthcare services because the injunction here will not put CMC out of business.  CMC is prepared to disassociate itself from Emre Umar, and, under such circumstance, it will be permitted to bid on prison contracts including the MCCF contract provided it does so without assistance from Emre Umar.

46

As stated in our Memorandum & Order of May 8, 2002, we recognize that the public interest would be significantly harmed if MCCF were left without healthcare services for its inmates while a final hearing on the merits remains pending.  Likewise, the public interest might prevent this Court from issuing injunctive relief if Plaintiff were ultimately permitted to increase its bid in the new bidding process.  For that reason, Plaintiff agreed and we ordered that PHS provide services pursuant to the terms of its current contract through June 6, 2002, and match the terms of CMC's bid for through August 12, 2002.  We believe this will provide sufficient time for MCCF to rebid the contract, something that it apparently intends to do. Plaintiff has also agreed that it will not increase its bid in a new bidding process.

## VI.      CONCLUSION

For the foregoing reasons, Plaintiff's Motion For Preliminary Injunction is granted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


PRISON HEALTH SERVICES, INC.      :
                                            :
                                            :      CIVIL ACTION NUMBER
                        V.                :
                                            :
                                            :      02-CV-2642
EMRE UMAR AND CORRECTIONAL      :
MEDICAL CARE, INC.                     :


O R D E R


AND NOW, this      day of July, 2002, it is ORDERED as follows:

1.      Defendant Emre Umar is prohibited and enjoined from competing with Plaintiff in the provision of correctional healthcare services.

2.      Defendant Emre Umar is prohibited and enjoined from entering into any contract, agreement or negotiations with the Board of Prison Inspectors of Montgomery County Pennsylvania or the Montgomery County Correctional Facility for providing professional medical services or mental health care services for the Montgomery County Correctional Facility.

3.      Defendant CMC is enjoined from tortuously interfering with and/or inducing the breach of the Noncompetition Agreement between Plaintiff and Emre Umar, and is prohibited and enjoined from engaging in the correctional healthcare services industry while Emre Umar remains associated with and/or provides assistance to Defendant CMC.

48

4.     Defendant CMC is prohibited and enjoined from entering into any contract, agreement or negotiations with the Board of Prison Inspectors of Montgomery County Pennsylvania or the Montgomery County Correctional Facility for providing professional medical services or mental health care services for the Montgomery County Correctional Facility while Emre Umar remains associated with and/or provides assistance to Defendant CMC, including CMC's references to Emre Umar and his experiences as they relate to CPS in CMC's bidding, qualification, and/or promotional materials.

5.     Plaintiff shall continue to provide professional medical services and mental health care services to the Montgomery County Correctional Facility in accordance with the terms contained in the bid submitted by CMC for said medical and mental health care services at MCCF until MCCF enters into a contract for the providing of medical services and mental health care services to MCCF, but no later than August 12, 2002.

6.     In the event that MCCF renews the bidding process for providing medical services and mental health care services at MCCF, Plaintiff will submit a bid that is no higher than the bid which it originally submitted.

AND IT IS SO ORDERED.

_____
R. Barclay Surrick, Judge

49