## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC.<br>105 Westpark Drive<br>Suite 200<br>Brentwood, Tennessee 37027 | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| EMRE UMAR<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : | |
| | : | |
| AND | : | |
| | : | |
| CORRECTIONAL MEDICAL CARE, INC.<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : | No. 02-2642 |
| | : | |
| AND | : | |
| | : | |
| MARIA UMAR<br>818 Hidden Forrest Drive<br>Collegeville, PA 19426 | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Prison Health Services, Inc. ("PHS"), by its undersigned counsel, files

this Complaint against Emre Umar ("Mr. Umar"), Correctional Medical Care, Inc.

("CMC") and Maria Umar ("Mrs. Umar") (collectively referred to as "Defendants")

seeking  injunctive relief and damages against Mr. Umar due to his breach of provisions

of his Non-Competition Agreement and Asset Purchase Agreement, and injunctive relief

and damages against Mr. Umar's newly formed company, CMC, and his wife and

business partner, Mrs. Umar, for their intentional interference with Mr. Umar's contractual obligations to plaintiff PHS.  In support hereof, Plaintiff avers as follows:

## THE PARTIES AND JURISDICTION

1.       Plaintiff,  Prison Health Services, Inc. ("PHS") is a Delaware corporation with its principal place of business in Tennessee.  PHS is engaged nationwide in the business of providing healthcare services to inmates of correctional facilities. PHS is a wholly owned subsidiary of America Service Group, Inc., which is also a Delaware corporation with its principal place of business in Tennessee.

2.       Defendant Mr. Umar resides at 818 Hidden Forrest Drive, Collegeville, PA – the same address as defendant CMC and defendant Mrs. Umar.  Mr. Umar manages, operates,  controls, consults and participates in the ownership, management, operation and control of  defendant CMC, or has in the past so controlled CMC.  More specifically, defendant Mr. Umar was a founder, President and Chief Executive Officer of defendant CMC, was responsible for corporate operations and administration, and otherwise controlled the company.

3.       Defendant Correctional Medical Care, Inc. ("CMC") is a newly formed Pennsylvania corporation with its principal place of business at 818 Hidden Forrest Drive, Collegeville, PA – the same address as defendants Mr. Umar and Mrs. Umar.  Like plaintiff, defendant CMC is engages in the business of providing healthcare services to inmates of correctional facilities in the United States.

4.       Defendant Mrs. Umar is a citizen of Pennsylvania and resides at 818 Hidden Forrest Drive, Collegeville, PA – the same address as defendant CMC and defendant Mr. Umar.  Mrs. Umar manages, operates,  controls, consults and

2

participates in the ownership, management, operation and control of defendant CMC. More specifically, defendant Mrs. Umar was a founder, is a majority-share owner, and is involved in the operation and control of the company.

5.      Non-party Correctional Physician Services ("CPS") was a corporation owned by defendant Mr. Umar, who was one of two shareholders, the other being his father, Dr. Kenan Umar.  Like plaintiff, non-party CPS was engaged in the business of providing healthcare services to inmates of correctional facilities.  Defendant Mr. Umar's position with CPS was Vice President of Operations.

6.      At issue in this lawsuit are Mr. Umar's breaches of a Noncompetition Agreement and Asset Purchase Agreement he entered into with plaintiff, ancillary to his sale of most of CPS' business to plaintiff.  Defendants CMC and Mrs. Umar, knowingly and deceptively, have aided and assisted Mr. Umar – and continue to aid and assist Mr. Umar – in his breach of the Non-competition Agreement, to the great detriment and irreparable harm of plaintiff.

7.      This Court has jurisdiction in this Civil Action by virtue of diversity of citizenship, pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $150,000.

## **RELEVANT FACTS**

### **Plaintiff's Purchase of Defendant Mr. Umar's Business**

8.      As of March 2000, and prior thereto, defendant Mr. Umar operated, managed, controlled and had an ownership interest in CPS, which provided healthcare services to inmates of correctional facilities in many states, including Pennsylvania, New York, Virginia and Florida.

3

9.      Prior to March 2000, plaintiff PHS entered into negotiations with Mr. Umar and CPS,  and their respective lawyers for PHS to purchase most of CPS' assets and CPS contracts for prison health services in Pennsylvania and New York.  Defendant Mr. Umar retained ownership of other affiliated businesses and excluded CPS contracts under the agreement, and was not barred from earning a living through these other established business operations.

10.      On March 29, 2000, PHS, CPS, Mr. Umar and his father, Dr. Kenan Umar, closed the deal for PHS to purchase certain CPS assets and  contracts for $14,000,000 (Fourteen Million Dollars).  This purchase included not only prison health services contracts, but also the goodwill of CPS, its intellectual property and its trade names. (A copy of the Asset Purchase Agreement is attached hereto as Exhibit A). Defendant Mr. Umar and Dr. Kenan Umar, as sole owners of CPS, signed the agreement on behalf of CPS and themselves.

11.      Pursuant to the Asset Purchase Agreement, plaintiff acquired the CPS correctional healthcare contracts in New York and Pennsylvania.

**Defendant Mr. Umar Signed A Non-competition Agreement
Ancillary to Sale of His Business**

12.      In order to protect the interests of PHS in the acquired business and assets of CPS, the Asset Purchase Agreement explicitly prohibited CPS from competing against PHS in any way for a period of five years.

13.      In addition, as a condition precedent to the Asset Purchase Agreement, it was required that defendant Mr. Umar and co-owner Dr. Kenan Umar  enter into

Noncompetition Agreements.   Defendant Mr. Umar signed a Noncompetition

Agreement on March 29, 2000 (copy of which is attached hereto as Exhibit B).

14.    As part of the  Noncompetition Agreement, defendant Mr. Umar

acknowledged that:

> a) Purchaser [PHS] has agreed to purchase certain assets of
> the Business... and to assume certain obligations and
> liabilities of the Business pursuant to an Asset Purchase
> Agreement, dated as of March 29, 2000... between
> Purchaser, Seller, Mr. Umar and Dr. Kenan Umar;
>
> b) Mr. Umar, is the beneficial owner of shares of the issued
> and outstanding  capital stock of seller, and as such, will
> receive a direct and significant financial benefit from the sale
> of the Assets to Purchaser;
>
> c) To protect adequately the interests of purchasers in the
> business and goodwill of Seller, it is essential that Mr. Umar
> enter into this [Noncompetition] Agreement; and
>
> d) To induce purchasers to consummate the transactions
> contemplated under the Purchase Agreement, Mr.  Umar
> desires to enter into this [Noncompetition] Agreement.

(Noncompetition Agreement at Exhibit B at p.1) (emphasis added).

15.    In accordance with Sections 1 and 3.2 of the Noncompetition Agreement,

Mr. Umar agreed not to compete against PHS in the provision of healthcare services to

inmates of correctional facilities in any way, "directly or indirectly, as an employee of any

person or entity, proprietor, partner, stockholder or officer, consultant, joint venturer,

investor, lender or in any other capacity or any substantially similar activity, to provide,

or to furnish aid or assistance to another person or entity in connection with the

provision of" services "of the type" provided by PHS or CPS.

16.     Defendant Mr. Umar agreed to refrain from competing in all "Company Activities" for five years, with Company Activities defined as:

(i)  all activities of the type previously conducted by Seller [CPS] as a part of the Business [defined as the "provision of healthcare services to inmates of correctional facilities"] and (ii) all activities of the type hereafter conducted by the Company [plaintiff PHS and its successors and affiliates] with respect to the Business during the Noncompete Period.

(Exhibit B, Sections 1 and 3.2).

The five-year term was expressly negotiated and agreed to by the parties and their lawyers.

17.     Section 3.1 of the Noncompetition Agreement provided that:

Mr. Umar hereby acknowledges that the Company [PHS] will conduct Company Activities throughout the Territory (defined as "all fifty states").  Emre Umar acknowledges that to protect adequately the interest of the Company [PHS] in the Business, it is _essential_ that any noncompete covenant with respect thereto cover all Company Activities and the entire Territory.

(emphasis supplied).

18.     The scope of the Noncompetition Agreement was consistent with PHS' nationwide operations, and defendant Mr. Umar's past involvement in the provision of prison healthcare services across much of the United States.

19.     Defendant Mr. Umar specifically acknowledged and agreed that he entered into the Noncompetition Agreement in consideration of PHS entering into the Purchase Agreement and performing its obligations thereunder, including payment of the purchase price of $14 million, with a $500,000 payment directly to Umar.  (Exhibit B at Section 4).

6

20.    Defendant Mr. Umar further agreed in the Noncompetition Agreement that "any remedy at law for any breach of the provisions contained in this Agreement shall be inadequate and that the Purchaser [PHS] shall be entitled to injunctive relief in addition to any other remedy Purchaser might have under this agreement." (Exhibit B at Section 6).

21.    The Noncompetition covenant was for a term of five years following the date of the termination of a consulting agreement Mr. Umar signed.  The consulting agreement terminated within a year after the sale closed on March 29, 2000.

### Defendant Mr. Umar, By and Through Defendant CMC, Began Competition in Breach of Agreement

22.    Shortly after the sale of the assets of CPS to PHS, and directly contrary to his Noncompetition Agreement and covenant, defendant Mr. Umar began to participate clandestinely with his wife, defendant Mrs. Umar, in the creation, ownership, management, operation and control of defendant Correctional Medical Care, Inc., previously designated as "CMC."  At the present time, defendants Mr. Umar and Mrs. Umar control the business activities of defendant CMC, and defendant Mrs. Umar owns a majority of the company.

23.    Defendant CMC currently holds itself out as a "health care provider that supplies a comprehensive range of high quality fully auditable health care services to small and medium sized city and county facilities," mainly prisons and other correctional facilities.

24.    Less than 14 months after defendant Mr. Umar signed the five-year Noncompetition Agreement with plaintiff PHS, and received millions of dollars in

7

payments and consideration for the sale and covenant, he took steps to form defendant CMC, which now directly competes with PHS.

25.     Defendant CMC filed papers of incorporation with the Pennsylvania Department of Corporations on May 21, 2001. As noted above, the address listed for CMC is 818 Hidden Forrest Drive, Collegeville, PA., which is also the address of residence of defendants Mr. Umar and Mrs. Umar.

26.     Defendants placed the ownership of the firm, CMC, under the name "Maria Carpio," which is a prior name of defendant Mrs. Umar.  Defendants used this former name, on information and belief, to conceal Mr. Umar's involvement in CMC and defendants' knowing breach of the Noncompetition Agreement.

27.     In October of 2001, upon learning of the formation of CMC, plaintiff PHS wrote to defendant Mr. Umar advising him that he remained bound by his five-year Noncompetition Agreement with PHS, and warning that PHS would seek injunctive relief and damages against him and his company if he breached the agreement.  PHS received no response, disagreement or disclaimer from defendant Mr. Umar.

28.     Plaintiff also gave notice at this time to defendant CMC and its Chief Operating Officer, Kevin Duffy, that Mr. Umar was bound by a five-year Noncompetition Agreement.  Both Mr. Duffy and defendant Mrs. Umar were aware of defendant Mr. Umar's Noncompetition Agreement, and reviewed it, but nevertheless willfully proceeded with competitive activities in direct violation of the Agreement, to the detriment of plaintiff.

29.     Despite plaintiff's objection and notice to defendants about the binding Noncompetition Agreement, defendants engaged in activities to directly solicit PHS clients and potential clients through CMC at or around that time.

### The New York Bids

30.     In approximately November of 2001, defendant CMC submitted a bid to take over a PHS contract to provide prison healthcare services to inmates of the Ulster County, N.Y., jail.

31.     Plaintiff PHS also bid for this contract and would have been awarded a three-year contract worth $3,896,860 in total revenues and $462,852 in expected profits.

32.     Still, PHS was not certain of defendant Mr. Umar's involvement in CMC at this time, and inquired as to his involvement with Mr. Duffy and defendant Mr. Umar. Defendant CMC and its COO, Mr. Duffy, knowingly and with intent to mislead PHS, informed PHS employees that defendant Mr. Umar was not involved in the ownership or control of the company, CMC, or its activity in New York.

33.     If defendants had not wrongfully competed, misled PHS and intentionally interfered with and assisted in violating defendant Mr. Umar's Noncompetition Agreement, then plaintiff PHS would have been awarded the three-year contract for Ulster County and earned $462,852 in profits.  The loss of this contract and this profit was the direct and proximate result of defendant Mr. Umar's breach of contract, and defendants CMC and Mrs. Umar's intentional interference with that contract.

### The Montgomery County, Pa., Bid

9

34.     On or around February 14, 2002, Montgomery County (Pa.) Correctional Facility advertised a Request for Qualification ("RFQ") for a new contract, commencing May 30, 2002, to provide healthcare services to approximately 1,150 inmates. Responses were due on February 28, 2002.   The contract held by plaintiff PHS expired on May 30, 2002.

35.     Plaintiff PHS and its predecessor companies have held the Montgomery County Correctional Facility contract since 1987, and consider this a large and important customer. PHS has aggressively sought renewal of and an increase in this contract, which has provided PHS with annual revenues of nearly $2.2 million during the past three years.  Revenues for the contract are expected to grow to roughly $3 million per year over the next three years.

36.     Subsequent to the RFQ, the Montgomery County Correctional Facility issued a Request for Proposal ("RFP") for the healthcare contract.  Proposals were due March 27, 2002.

37.     On March 27, 2002, plaintiff PHS made a timely bid to renew its contract at the Montgomery County Correctional Facility.

38.      In direct violation of the Noncompetition Agreement and improperly using information from CPS and PHS, defendant Mr. Umar, acting through and with defendants CMC and Mrs. Umar, also made a bid for the Montgomery County work. Three bids were submitted in all, including those from PHS and CMC.   The third bidder, Correctional Medical Services, was rejected by Montgomery County early in the bidding process, leaving only plaintiff PHS and defendant CMC.

39.     If defendants had not wrongfully competed and intentionally interfered with and assisted in violating defendant Mr. Umar's Noncompetition Agreement, then plaintiff PHS would have been awarded the three-year contract for Montgomery County, worth $1,096,263 in expected profits.  The loss of this contract and this profit was the direct and proximate result of defendant Mr. Umar's breach of contract, and defendants CMC and Mrs. Umar's intentional interference with that contract.

40.     The Montgomery County Correctional Facility gave a "notice of favorable consideration" to defendant CMC on or about April 11, 2002, and ultimately entered into a contract for defendant CMC to perform the services beginning in August of 2002.

41.     Around April of 2002, plaintiff PHS learned that defendant Mr. Umar had been active in communicating with Montgomery County on behalf of defendant CMC, and determined that, contrary to defendants' prior denials, Mr. Umar was in fact an active participant in the company.

42.     The first bid submitted by defendant CMC to the Montgomery County Correctional Facility contained the resume of defendant Mr. Umar.  His resume touts his ten years of experience with CPS – the company he sold to plaintiff PHS, including its good will, confidential information and customer relations –  and provided a summary of his accomplishments while he was Vice President of Operations at CPS.  The bid documents specifically stated that Mr. Umar would be responsible for the corporate administration in support of the Montgomery County contract. Prior to the submission of the bid, CMC submitted three required references, in order to qualify to bid. One of those references specifically recommended defendant Emre Umar.

11

43.    The documents submitted by defendant CMC made absolutely clear that defendant Mr. Umar intended to use his knowledge of the correctional healthcare field, which he learned as Vice President of CPS, in administering the contract between CMC and the Montgomery County Correctional Facility.

44.    As part of its April 2002 investigation of defendants' activities, plaintiff made further inquiries into the bid CMC submitted in Ulster County, N.Y.  From these inquiries, plaintiff learned for the first time that defendant Mr. Umar was in fact the President and Chief Executive Officer of CMC.  This information appeared in CMC's own documents submitted to Ulster County, N.Y., and directly contradicted earlier denials of such involvement by CMC.

45.    On April 24, 2002,  counsel for plaintiff placed defendants on notice of  Mr. Umar's breaches of the Noncompetition Agreement.  (See Letter of April 24, 2002, attached as Exhibit C).  Plaintiff also warned that it would seek immediate legal and injunctive action if defendants did not contact them and cease in the competitive activities.

46.    In soliciting business for CMC, defendants Mr. Umar, CMC and Mrs. Umar have traded on and promoted Mr. Umar's experience at CPS – the very business that he sold to plaintiff, including ongoing business relations, good will and trade secrets.  In other words, the express and essential consideration under the Asset Purchase Agreement and Noncompetition Agreement has been wrongfully used by defendants, in violation of those agreements, to compete and to take business away from PHS.  Also, on information and belief, defendants used confidential information and trade secrets

from CPS and PHS to solicit and compete against PHS, in direct violation of Mr. Umar's contractual commitments.

47.     Through CMC's activities in Ulster County, Montgomery County and elsewhere, defendants Mr. Umar, CMC and Mrs. Umar continue to breach the Noncompetition Agreement set forth above, to the irreparable harm and economic detriment of plaintiff.

## COUNT I
## BREACH OF CONTRACT – NONCOMPETITION
## DEFENDANT MR. UMAR

48.     Plaintiff incorporates by reference the paragraphs 1 through 47 as though fully set forth at length herein.

49.     As set forth above, defendant Mr. Umar entered into an enforceable covenant not to compete with plaintiff PHS, ancillary to the sale of a substantial portion of his CPS business.  Defendant Mr. Umar subsequently violated both the Noncompetition Agreement and the Asset Purchase Agreement, attached hereto as Exhibits B and A, respectively.

50.     Both defendant Mr. Umar and plaintiff PHS expressly agreed and acknowledged in the Noncompetition Agreement and the Asset Purchase Agreement that the noncompetition covenant was necessary and essential  to protect PHS's legitimate interests in the acquired business, goodwill, confidential information and customer relationships of CPS,  as well as the continuing nationwide operations of PHS.

51.     The covenant not to compete was supported by adequate consideration, including a $500,000 payment directly to Mr. Umar as part of $14 million in

13

consideration and payments to Mr. Umar and to his father, Dr. Kenan Umar, for CPS, pursuant to the Asset Purchase Agreement.

52.     The covenant not to compete appropriately recognized the long-term nature of prison healthcare services contracts and relationships, and therefore had a five-year term.

53.     The covenant covers the fifty states of the United States, a term that was expressly acknowledged by defendant Mr. Umar as reasonable and necessary to protect PHS's interests, and is consistent with the national scope of PHS's business and the multi-state scope of the business acquired from Mr. Umar.  This geographic scope was reasonable and necessary to protect PHS's legitimate business interests.

54.     Defendant Mr. Umar, as founder and former President and CEO of CMC, has breached his covenant not to compete against PHS, by acting as an officer, employee and agent, and indirectly as an owner, to provide and furnish aid and assistance to CMC in connection with:

> (a)     soliciting and obtaining the business of providing healthcare services from 2002 to 2005 to the inmates of the Ulster County, N.Y., prison, thereby preventing plaintiff PHS from being awarded its proposed three-year contract with the facility;

> (b)     soliciting and obtaining a notice of favorable consideration for providing healthcare services from 2002 to 2005 to the inmates of the Montgomery County Correctional Facility, and thereby preventing plaintiff PHS from being awarded its proposed three-year contract with the facility;

14

(c)    Otherwise assisting CMC in the solicitation and provision of prison healthcare services in the United States, thereby competing with the business of PHS.

55.    Defendant Mr. Umar, by and through CMC and the other defendants, also has used and traded on the goodwill of CPS in these competitive activities by citing previous CPS experience and PHS contracts as references in marketing literature, in further breach of the Noncompetition Agreement.

56.    In addition, defendant Mr. Umar, by and through CMC and the other defendants, has assisted and aided in recruiting former PHS employees and officers to work for CMC.

57.    Due to defendant Mr. Umar's breach of contract and improper competition, and aid and assistance to defendant CMC, including *inter alia* bidding for the Ulster County, New York jail, that facility declined to award its three-year contract to plaintiff PHS in February of 2002.  This resulted in $462,852 in lost profits to plaintiff PHS.

58.    Due to defendant Mr. Umar's breach of contract and improper competition, and aid and assistance to defendant CMC, including *inter alia* bidding for the Montgomery County Correctional Facility, that facility declined to award its three-year contract to plaintiff PHS in May of 2002.  This resulted in $1,096,263 in lost profits to plaintiff PHS.

59.    In addition, plaintiff PHS has been irreparably harmed by the award and transfer and loss of business, business relationships, employment relationships, good will and reputation due to defendants' actions.

15

60.    All of these competitive activities have taken place within less than two-and-one-half  years of defendant Mr. Umar signing the binding and enforceable Noncompetition Agreement ancillary to the sale of a business, with a term of five years.

61.    At all times material hereto, defendant Mr. Umar was fully aware of his obligations under the Noncompetition Agreement, which he negotiated and freely entered into, with the advice of his own counsel.  Despite this knowledge, defendant Mr. Umar engaged in the prohibited competitive activities set forth above and knowingly breached his obligations under the Noncompetition Agreement.

62.    Defendant Mr. Umar's breach of the Noncompetition Agreement was outrageous, malicious, willful, intentional and in gross disregard for both the rights and obligations to plaintiff, as set forth in the Asset Purchase Agreement and the Noncompetition Agreement.

63.    Plaintiff has suffered and continues to suffer irreparable harm as a result of defendant Mr. Umar's breach of the Noncompetition Agreements and the Asset Purchase Agreement, and the resulting loss of business.

WHEREFORE, plaintiff requests that this Court:

(a) Issue an injunction ordering:

(1)    That defendant Emre Umar, and anyone or any entity acting in concert or participation with him, is prohibited and enjoined from competing against plaintiff PHS in the provision of healthcare services to correctional facilities, providing, soliciting or otherwise aiding or assisting in connection with the provision of prison healthcare services in the United States of America until March 29, 2005, with the

16

exception of the Excluded Contracts identified in the Asset Purchase Agreement attached as Exhibit A to the Complaint;

(2)    Defendant Emre Umar is prohibited and enjoined from disclosing, publishing or making use of any confidential information or trade secrets of Prison Health Services or Correctional Physician Services, Inc.;

(3)    Defendant Emre Umar is prohibited and enjoined from trading on the business reputation, goodwill, name or experience of Prison Health Services or Correctional Physician Services;

(b)    Issue a declaratory judgment that the Noncompetition Agreement attached hereto as Exhibit B is valid and enforceable against defendant Mr. Umar through March 29, 2005; and

(c)    Require defendant Mr. Umar to pay any and all monetary damages and costs to plaintiff PHS resulting from Mr. Umar's breach of his covenant not to compete, including without limitation lost profits in the amount of $1,559,115, as set forth above, compensatory damages, attorneys fees and costs in bringing this action, interest, and such other award and relief as the Court may deem just and proper.

## COUNT II
## INTENTIONAL INTERFERENCE WITH CONTRACT
## DEFENDANTS CMC and MRS. UMAR

64.    Plaintiff incorporates by reference the paragraphs 1 through 63 as though fully set forth at length herein.

65.    Defendant CMC, by and through its officers and owners, knew that defendant Mr. Umar was subject to a Noncompetition Agreement and was thereby under a duty to refrain from competing with PHS and soliciting PHS's prospective and

17

current clients during the period following five (5) years after the termination of Mr. Umar's Noncompetition Agreement and Consulting Agreement.

66.    Defendant Mrs. Umar likewise knew that defendant Mr. Umar was subject to a Noncompetition Agreement and was thereby under a duty to refrain from competing with PHS and soliciting PHS's prospective and current clients during the period following five (5) years after the termination of Mr. Umar's Noncompetition Agreement and Consulting Agreement.

67.    Despite this knowledge, defendants CMC (of which Mr. Umar was President and CEO) and Mrs. Umar assisted Mr. Umar in actively competing against PHS and soliciting PHS's prospective and current clients during the prohibited five-year period.

68.    As a result of CMC's and Mrs. Umar's actions and support, Mr. Umar, through CMC, did breach the Noncompetition Agreement, as set forth above, causing direct financial harm to plaintiff, including the loss of the Ulster County, N.Y., contract and the Montgomery County Correctional Facility contract, and $1,559,115 in lost profits from the two contracts. Defendants CMC's and Mrs. Umar's actions constituted intentional interference with plaintiff's contracts and agreements with defendant Mr. Umar.

69.    Defendants CMC and Mrs. Umar, through their officers and agents, intentionally misled PHS as to Mr. Umar's involvement in CMC's activities, in an attempt to conceal his wrongful competition and breach of contract, and their intentional interference with that contract.

18

70.    Plaintiff PHS suffered,  and unless defendants are enjoined by this Court will continue to suffer, irreparable harm as a result of defendant CMC's and Mrs. Umar's intentional interference with the contract.

71.    Defendant CMC's and Mrs. Umar's actions were outrageous, malicious, willful, wanton and in reckless disregard of plaintiff's rights, and constituted intentional interference with the Noncompetition Agreement between defendant Mr. Umar and plaintiff.

72.    Because of good will that CMC and Mrs. Umar have wrongfully used in founding, expanding and marketing CMC, and their relationship with and reliance upon Mr. Umar in establishing and building the company, defendant CMC's activities cannot be separated from Mr. Umar, and CMC should be prevented from moving forward with its wrongfully secured business and reputation.

WHEREFORE, plaintiff requests that this Court rule as follows:

(a)    That an injunction be issued ordering that defendants CMC and Mrs. Umar, and anyone or any entity acting in concert or participation with any of them, be prohibited and enjoined from (1) competing against plaintiff PHS in the provision of healthcare services to correctional facilities; and (2) providing, soliciting or otherwise aiding or assisting in connection with the provision of prison healthcare services in the United States of America until March 29, 2005, with the exception of the Excluded Contracts identified in the Asset Purchase Agreement attached as Exhibit A to the Complaint; and (3) such other injunctive relief be awarded as the Court may deem just and proper.

19

(b)     That defendants CMC and Mrs. Umar be required to pay any and all monetary damages and costs to plaintiff PHS resulting from their intentional interference with the contract between defendant Mr. Umar and plaintiff PHS, including without limitation lost profits in the amount of $1,559,115, as set forth above, compensatory damages, punitive damages, attorneys fees and costs in bringing this action, interest, and such other relief as the Court may deem just and proper.

## COUNT III

## BREACH OF CONTRACT – ASSET PURCHASE AGREEMENT

## DEFENDANT MR. UMAR

73.     Plaintiff incorporates by reference the paragraphs 1 through 72 as though fully set forth at length herein.

74.     As set forth above, and embodied in Exhibit A hereto, defendant Mr. Umar entered into an enforceable Asset Purchase Agreement with plaintiff PHS, and plaintiff PHS performed all conditions precedent under the contract.

75.     Under the Asset Purchase Agreement, CPS and defendant Mr. Umar personally, as a Shareholder, jointly and severally represented and warranted to PHS that the (1) the financial information provided by CPS to PHS "did not contain any untrue statement of a material fact and did not omit to state any material fact necessary to make the statements contained therein not misleading" (§ 4.1.4); (2) that since December 31, 1999, there had not been any "material adverse change" in the business or finances of the company, except as expressly disclosed to PHS, and that there had been no material increase in compensation to any officer or employee (§ 4.1.5); (3) that

CPS was not bound by or party to any contract relating to any obligation exceeding $25,000, or requiring future payment of such amount, except as disclosed in the attached schedules (§ 4.1.13); (4) that CPS had no undisclosed liabilities that individually or in the aggregate were material to the business of CPS (§ 4.1.17); and (5) that there were no untrue statements or omissions of material fact that would make the Warranties of CPS set forth in the Agreement misleading (§ 4.1.27).

76.    Defendant Mr. Umar knowingly breached these representations and warranties by:

(a)    failing to accurately report financial information, including withdrawal of $100,000 in wire fund transfers on March 17;

(b)    failing to accurately report payment of a large amount of non-corporate expenses or payments to defendant Mr. Umar with CPS funds on or about March 29, in violation of the Asset Purchase Agreement; and

(c)    failing to state or account for an alleged $248,000 loan from Mrs. Umar to CPS, approved by defendant Mr. Umar, which was intentionally left off of the list of creditors, attached to the Asset Purchase Agreement.

77.    The failure by CPS and defendant Mr. Umar to disclose this material financial information to plaintiff PHS  at or prior to closing breached their representations and warranties under §§ 4.1.4, 4.1.5, 4.1.13, 4.1.17 and 4.1.27, inter alia of the Asset Purchase Agreement, attached as Exhibit A, and incorporated by reference into the

Asset Purchase Agreement. On information and belief, Mr. Umar also misrepresented and omitted other material information, causing still further damage to plaintiff.

78.     As a result of defendant Mr. Umar's concealment of and failure to report diversion of CPS funds prior to closing, as set forth above, the value of the assets being purchased by plaintiff PHS was reduced by at least $348,000, which constituted a material change in the value of CPS.

79.     Defendant Mr. Umar also engaged in inappropriate conduct after the closing, by failing to deposit approximately $230,000 in receipts for CPS into the Oversight Account as provided in the Oversight Agreement (attached as Exhibit D); by failing to disclose the withdrawal of $100,000 in wire fund transfers on March 31, 2000; and by paying out two checks from CPS funds in the aggregate amount of $197,167.89 to Madison Bank for non-CPS debts.

80.     As a result of this diversion of funds, among other reasons, CPS failed to pay its pre-closing debts, as required in the Asset Purchase Agreement, resulting in the need for plaintiff PHS to incur further debt, as set forth below.

WHEREFORE, plaintiff requests that this Court require defendant Mr. Umar to pay any and all monetary damages and costs to plaintiff PHS resulting from above-referenced breaches of the Asset Purchase Agreement, including without limitation the $348,000 in damages set forth above, pre-judgment interest, and such other award and relief as the Court may deem just and proper.

## COUNT IV

## DEFENDANT MR. UMAR

**INDEMNIFICATION**

81.    Plaintiff incorporates by reference the paragraphs 1 through 80 as though fully set forth at length herein.

82.    Under the Asset Purchase Agreement, defendant Mr. Umar agreed to jointly and severally indemnify, defend and hold plaintiff PHS harmless against any and all claims, demands, losses, liabilities and damages, including settlements, compromises, and attorneys fees and costs, relating to (i) any inaccuracy of any of the representations or warranties of CPS contained in the Asset Purchase Agreement or any Ancillary Documents; (ii) any breach by CPS of any covenant contained in the Asset Purchase Agreement or any Ancillary Document; and (iii) any liability of CPS other than those assumed by PHS in the agreement, including without limitation CPS's failure or alleged failure to pay or satisfy any such liability.  Exhibit A, § 8.3.1.

83.    After closing, defendant Mr. Umar and CPS failed to pay hundreds of third-party pre-closing claims against CPS.  Those claims are listed by date, amount, third party, and amount paid by PHS in settlement of the claims, in the attached Exhibit E, a true and correct copy of a record of CPS' pre-closing liabilities paid by PHS.

84.    This failure by CPS to satisfy its liabilities that were not assumed in the Asset Purchase Agreement led to claims against plaintiff PHS by these third parties.

85.    Plaintiff PHS resolved these claims by making certain "adjusted" payments in the amount of $869,651.17, as set forth in Exhibit E, attached hereto.  These payments were necessary in order to maintain good will, credit and necessary working relationships with the third party claimants, most of whom provided health-care services for inmates.

23

86.    In addition, plaintiff PHS was required to defend itself in court, including but not limited to a lawsuit against Prison Health Services t/a Correctional Physician Services, settled at CCP, Philadelphia County, No. 010601750.

87.    Plaintiff PHS also incurred substantial legal fees and costs relating to the above-referenced claims and matters.

88.    Under the Asset Purchase Agreement, defendant Mr. Umar is personally, jointly and severally obligated to indemnify and repay plaintiff PHS for its losses and expenses from such claims, including all settlement costs, payments, and related costs and expenses, including attorneys' fees.  Exhibit A, § 8.3.1, et seq.

89.    In addition, under § 8.3.1(i) Mr. Umar has an obligation to indemnify and pay plaintiff PHS for all losses, liabilities, costs and expenses relating to the inaccuracy

of the representations and warranties of CPS and defendant Mr. Umar contained in the Asset Purchase Agreement, as well as any breach of contract by CPS, as set forth above in Counts I-III. Such damages total at least $2,776,766.17, as set forth above.

90.    Plaintiff PHS has incurred substantial legal fees and costs in investigating, settling and resolving these claims, including defending against the third-party lawsuit set forth above, repeated attempts to convince CPS and defendant Mr. Umar to honor their contractual duty to pay these claims, and this litigation.

WHEREFORE, plaintiff requests that this Court require defendant Mr. Umar to pay any and all monetary damages and costs to plaintiff PHS resulting from above-referenced failure to indemnify and otherwise honor the requirements of § 8.3.1 of the Asset Purchase Agreement, including without limitation the amounts set forth above, compensatory damages, attorneys fees and costs,  interest, and such other award and such other relief as the Court may deem just and proper.

Plaintiff demands a trial by jury as to Counts III and IV.

Respectfully submitted,

_____
Carol A. Mager (I.D. #17548)
Michael D. Homans (I.D. #76624)
Lee Albert (I.D. # 46852)
**MAGER WHITE & GOLDSTEIN, LLP**
One Liberty Place, 21st Floor
1650 Market Street
Philadelphia, PA 19103
(215)569-6924

Dated:  February 4, 2003

25

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing First Amended Complaint to be

served on this day as follows:

**BY HAND DELIVERY TO:**

Larry H. Spector, Esquire
Michael D. LiPuma, Esquire
**Wolf, Block, Schorr and Solis-Cohen, LLP**
1650 Arch Street
Philadelphia, PA 19103-2097

**BY OVERNIGHT MAIL TO:**

Francis X. Clark, Esquire
**Francis X. Clark, P.C.**
987 Old Eagle School Road
The Woods, Suite 705
Wayne, PA 19087

Dated:  February 4, 2003                    _____

                                            Michael D. Homans