## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRISON HEALTH SERVICES, INC. | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 02-2642 |
| | : | |
| EMRE UMAR and | : | |
| CORRECTIONAL MEDICAL CARE, INC. | : | |
| and MARIA UMAR | : | |
| Defendants | : | |

## ANSWER OF DEFENDANT, EMRE UMAR, TO AMENDED COMPLAINT OF PLAINTIFF, PRISON HEALTH SERVICES, INC.

Defendant, Emre Umar, by his undersigned attorney, hereby answers the Amended

Complaint of Plaintiff, Prison Health Services, Inc. ("PHS"), seeking injunctive relief and

damages against himself, Defendant, Correctional Medical Care, Inc. ("CMC"), and

Defendant, Maria Umar as follows:

1.      Admitted.

2.      It is admitted that Defendant Umar has resided at 818 Hidden Forrest Drive,

Collegeville, PA 19426.  The remaining averments of paragraph 2 are denied.

3.      It is denied that CMC has a principal place of business at 818 Hidden

Forrest Drive, Collegeville, PA 19426.  It is admitted that CMC provides health care

1

services to inmates of correctional facilities.  The remaining averments of Paragraph 3 are denied.

4.    Admitted.

5.    It is admitted that Defendant, Emre Umar, was previously an officer in CPS, which company formerly provided medical care for inmates of prison facilities, for which he previously held a position as Vice President of Operations until March, 2000.  The remaining averments of Paragraph 5 are denied.

6.    Denied.  Paragraph 6 also sets forth conclusions of law to which no response is required.

7.    It is admitted that this Court holds jurisdiction over this matter under 28 U.S.C. § 1332.

8.    It is admitted that Defendant Umar was previously an officer and employee of CPS, which company provided health care services to prison facilities primarily in Pennsylvania and New York, until March, 2000.  The remaining averments of Paragraph 8 are denied.

9.    It is admitted that PHS conducted negotiations for the purchase of certain assets of CPS which were primarily contracts to provide prison health care services for prison facilities owned and operated by the states of Pennsylvania and New York (the "Assumed Contracts").  It is denied that Umar was personally represented by counsel in connection with any such transaction.  It is denied that Umar retained ownership of any

affiliated businesses or CPS' contracts or was capable of earning a living from any such business operations as those contracts were unprofitable and caused losses to CPS.

10.     It is admitted that CPS and PHS entered a contract for the sale of certain assets of CPS ("Asset Purchase Agreement") for sale of the Assumed Contracts for a purchase price of $14 million dollars and that said Asset Purchase Agreement, absent its voluminous schedules and exhibits, is attached to the Plaintiff's Complaint as Exhibit "A". It is denied that the Asset Purchase Agreement provided, either expressly in writing or in spirit, for PHS' acquisition of good will of CPS for purposes of continuing *CPS' business* with its customers under the Assumed Contracts or otherwise. PHS' Asset Purchase Agreement granted it the right and ability to immediately terminate *all business and operations of CPS* as a health care services company, which ceased operations shortly thereafter, following which PHS performed the Assumed prison health care contracts in its own name.

11.     Admitted.

12.     It is admitted that the Asset Purchase Agreement prohibited competition by CPS for a period of five years. It is denied that said restriction was necessary to protect the interests of PHS since CPS did not have any good will or competitive advantage over PHS in bidding prison health care contracts for facilities with which it had never done business and was essentially put out of business once PHS acquired its only two profitable Assumed Contracts.

3

13.     It is admitted that PHS demanded that Defendant Umar execute a Non-Competition Agreement containing a restrictive covenant ("restrictive covenant"), a copy of which is attached to Plaintiff's Complaint as Exhibit "B".

14.     Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.  On the contrary, said Non-Competitive Agreement expansively and incorrectly describes the "Business" acquired from CPS by PHS as "providing health care services to inmates of correctional facilities" while the Asset Purchase Agreement specifically defines the "Business" acquired from CPS by PHS as only its two profitable Assumed Contracts with the States of New York and Pennsylvania.

15.     Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.

16.     Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or

4

interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.

17.    Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.

18.    Denied.  On the contrary, said restrictive covenant is only enforceable to protect PHS' investment in *the assets which it purchased from CPS* which were two contracts with state prison agencies in Pennsylvania and New York.  It is further denied that Defendant Umar has been involved in provision of prison health care services throughout "much of the United States."  On the contrary, CPS' only other contracts, which were excluded from the PHS Asset Purchase Agreement because they were unprofitable, were in Virginia and Florida.

19.    Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.  It is further denied that PHS paid $500,000.00 to Defendant Umar.  On the contrary, the entire purchase price for the Assumed Contracts was paid to the

Oversight Committee as his former employer CPS from whom Umar received a severance payment of $500,000.00 with PHS' consent.

20.     Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement. It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.

21.     It is admitted that the restrictive covenant was to extend for a period of five years following termination of a Consulting Agreement signed between PHS and Umar which was to extend for three years following its PHS' acquisition of CPS' assets, creating a total of eight (8) years during which Defendant Umar could be prohibited from accepting employment in the prison health care business. It is denied that said Consulting Agreement was ever terminated by PHS.

22.     It is denied that Defendant Umar participated clandestinely in the creation, ownership, management, operation and control of CMC since PHS was aware of his former role in CMC prior to its first bid for the Ulster County, NY prison contract. It is further denied that Defendant Emre Umar and Maria Umar together control the business activities of CMC. On the contrary, Umar has never held a position as owner or principal of CMC and has resigned his position as officer and employee of the company following

6

this Court's issuance of a Preliminary Injunction.  It is admitted that Maria Carpio Umar

owns a majority of the company.

23.    Admitted.

24.    It is admitted that CMC competes with PHS.  The remaining averments of

paragraph 24 are denied.

25.    Admitted.

26.    It is denied that Defendant placed ownership of CMC with Maria Carpio

Umar to conceal his involvement with the corporation and any breach of the restrictive

covenant.

27.    It is admitted that PHS made a demand upon Umar to cease any and all

business activities under the restrictive covenant in October, 2001, after it learned that he

was supporting a business with Kevin Duffy as CEO of CMC which successfully bid

against PHS for the Ulster County New York Prison contract in the fall of 2001.  It is

further averred that Umar had a lunch meeting with PHS regional vice president prior to

that bid and that said vice president later called Umar personally to congratulate him on

the award of the Ulster County contract.

28.    Denied.

29.    It is denied that Defendant Umar was directly soliciting PHS clients.  On

the contrary, all sales activities of CMC were undertaken by its Director of Marketing,

Robert Castille, and its CEO, Kevin Duffy.  Defendant Umar's name was only offered as

part of a package of resumes of persons who would be employed by the company if it was

awarded the prison health care contract prior to the issuance of an injunction in this case.

Emre Umar's name has been deleted from all company materials since that time

  30.  Admitted.

  31.  Denied.

  32.  Denied.  On the contrary, Defendant, Emre Umar disclosed his role with

CMC to a regional vice president of PHS at a lunch meeting prior to submission of the

Ulster County, New York bid in October, 2001, which led PHS to send its demand letter

to Emre Umar shortly thereafter.  Said vice president later called Emre Umar personally

to congratulate him on the award of the Ulster County contract.

  33.  Denied.

  34.  It is admitted that Montgomery County issued a request for proposal for any

new prison health care contract for the Montgomery County Correctional Facility in

Eagleville, Pennsylvania.  It is denied that said contract was to expire May 30, 2002.  On

the contrary, PHS terminated its agreement with Montgomery County after the County

refused to accept PHS' demand for more compensation under its existing agreement,

which would not have otherwise expired before July, 2003, which led the County solicit

competitive bids for a new contract.

  35.  Denied.  On the contrary, the Montgomery County prison contract was held

by EMSA until PHS acquired EMSA in January, 1999, at which time PHS assumed

performance of the Montgomery County contract.  Neither Defendant Umar nor CPS ever had any prior involvement with that facility.  It is further denied that PHS "aggressively" sought to retain the business which it expected to grow to revenues of $3 million dollars per year since it canceled its health care service contract with that agency and thereby opened it up to competitive bidding.  The remaining averments of Paragraph 35 are denied.

36.     Admitted.

37.     Admitted.

38.     It is denied that Defendant Umar, acting through CMC improperly used any information obtained from CPS or PHS to properly submit a bid for the Montgomery County Prison contract in violation of his restrictive covenant.  On the contrary, Defendant Umar had no knowledge or experience in connection with the Montgomery County contract or the facility which would be of any value or assistance to CMC.  It is admitted that CMC was the lowest responsible bidder to which Montgomery County decided to award the contract.  The remaining averments of Paragraph 38 are denied.

39.     Denied.   Paragraph 39 also sets forth conclusions of law to which no response is required.

40.     Admitted.

41.     Denied.  PHS was aware of Emre Umar's role in the company prior to its bid for the Ulster County, NY contract in November, 2001.  It is further averred that said

9

contract was solicited by CMC's director of marketing, Robert Castille and its CEO, Kevin Duffy. Defendant Emre Umar's resume of qualifications was only included in a submission package of prospective employees available to support the contract with Montgomery County.

42.    It is admitted that CMC's submission included Defendant Umar's resume. It is denied that Defendant Umar was trading upon any good will confidential information or customer relations of CPS over which PHS holds exclusive ownership or control. On the contrary, Emre Umar cannot be prohibited from disclosing his employment history and qualifications in an effort to obtain employment, which does not constitute "trading on the good will" of his former employer CPS, which has been out of business for almost three years and had never done business with Montgomery County. The remaining averments are denied.

43.    Denied.

44.    It is admitted that CMC's bid documents listed Emre Umar as an officer of CMC. It is denied that PHS learned, for the first time, that Emre Umar was President and CEO of CMC after its submission of its bid for Montgomery County or that any such information directly contradicted any earlier denials of involvement by CMC. On the contrary, Emre Umar attended a lunch meeting with a regional vice president of PHS in October, 2001, following which said vice president contacted him personally to congratulate him on the award of the Ulster County, New York contract.

10

45.     It is admitted that PHS again made demands upon Defendant, Emre Umar following which CMC submitted the lowest bid for the Montgomery County prison contract in July, 2002, after Emre Umar resigned his position with the company.

46.     It is denied that Defendants, Emre Umar, CMC and Maria Umar are "trading upon" any good will, business relations, or trade secrets acquired by PHS under the Asset Purchase Agreement.  It is further denied that the express and essential value or consideration acquired by PHS are being wrongfully appropriated by either Emre Umar, Maria Umar or CMC.  On the contrary, after PHS acquired its two income producing Assumed Contracts, CPS effectively ceased operations and existence and was no longer a viable entity that held any "business relations, good will or trade secrets."  It is further denied that Emre Umar has acted in violation of any agreements by taking business away from PHS or using any confidential information or trade secrets of CPS and PHS to solicit and compete against PHS in violation of his contractual commitments.

47.     Denied.   Paragraph 47 also sets forth conclusions of law to which no response is required.

## COUNT I - BREACH OF CONTRACT
## NON-COMPETITION - DEFENDANT, EMRE UMAR

48.     Paragraphs 1 through 47 of Defendant, Emre Umar's Answer above are incorporated herein by reference as though set forth at length.

49.     It is denied that Defendant, Emre Umar entered into an enforceable covenant not to compete with PHS which was ancillary to the sale of CPS' business. Paragraph 49 also sets forth conclusions of law to which no response is required.

50.     Said Non-Competition Agreement is a document in writing which was drafted by PHS as a requirement for CPS to enter into the Asset Purchase Agreement.  It is denied that said Agreement accurately sets forth a description of the assets, business or interests for which PHS claims it needs protection by enforcement of the restrictive covenant therein.

51.     It is denied that said covenant not to compete for a period of five years anywhere throughout the United States was supported by adequate consideration.  The purchase price of $14 million was consideration for PHS' right to take over two income producing Assumed Contracts, based upon the projected net profits which would have been earned by CPS over the duration of those contracts of three (3) years or less.  It is further denied the $500,000.00 severance paid by CPS to Emre Umar, out of those proceeds of that sale constituted adequate consideration to support the restrictive covenant which is both unreasonable and unenforceable.

52.     It is denied that the five year restrictive covenant recognized the long term nature of prison health care contracts and relationships, the terms of which would have expired less than three years or less after the Asset Purchase Agreement was entered into

which would be followed by a solicitation for competitive bidding for an award of a new

contract.

53.    It is denied that the geographic span of the entire United States was

reasonable and necessary to protect PHS' interests as "consistent with the national scope

of PHS' business."  On the contrary, the restrictive covenant is enforceable only as it may

be necessary and reasonable to protect *the assets which PHS acquired from CPS*, which

were two income producing Assumed Contracts for the eastern regions of the states of

Pennsylvania and New York, and not assets or contracts which PHS acquired without any

assistance or participation by Emre Umar or CPS.

54.    It is denied that Defendant Emre Umar, as a founder and former President

and CEO of CMC, has breached and/or continues to breach the covenant not to compete

against PHS and thereby prevented it from obtaining any prison health care contracts or is

otherwise assisting CMC in soliciting and performing any prison health care contracts.

55.    It is denied that Defendant Emre Umar, acting by and through CMC is

using and trading upon the good will of CPS, which ceased operations almost three years

ago.  It is further denied that simply describing his former employment history with a

company which has been out of business for over two years constitutes "trading on the

good will of CPS" in violation of the restrictive covenant.

56.    It is admitted that former PHS employees have accepted employment with

CMC.  It is denied Emre Umar has aided and assisted CMC in recruiting those employees

or that he has done so in violation of any restrictive covenant held by Emre Umar or otherwise.

57.    It is denied that the Ulster County Jail's decision not to award its three-year contract to PHS is due to any breach of Emre Umar's restrictive covenant, unfair competition and/or the result of any aid and assistance by Defendant, Emre Umar to CMC.  It is further denied that Plaintiff has suffered any lost profits as a result of the actions of answering Defendant.

58.    It is denied that the Montgomery County Prison's decision not to award  its three-year contract to PHS is due to any breach of Emre Umar's restrictive covenant, unfair competition and/or aid or assistance by Emre Umar.  It is further denied that Plaintiff has suffered any lost profits as a result of the actions of Answering Defendant.

59.     It is denied that Plaintiff has suffered irreparable harm due to any of answering Defendant's actions.

60.    It is denied that CMC's successful bids for public contracts constitute a violation of a binding and enforceable restrictive covenant held by Defendant Emre Umar for a period of five years.

61.    Denied.

62.    Denied.

63.    Denied.

14

WHEREFORE, Defendant, Emre Umar, hereby demands judgment in his favor and against Plaintiff, Prison Health Services, Inc., for the relief demanded in Plaintiff's Complaint, together with an award in his favor and against Plaintiff for costs, reasonable attorney's fees and interest incurred by Defendant in defending Plaintiff's Complaint.

## COUNT II
## INTENTIONAL INTERFERENCE - DEFENDANTS
## CMC AND MRS. UMAR

64-72.      Paragraphs 65 through 72 are directed to Defendants, CMC and Mrs. Umar, to which no response is required by answering Defendant.

## COUNT III - BREACH OF CONTRACT
## ASSET PURCHASE AGREEMENT - EMRE UMAR

73.     Defendant incorporates herein by reference the allegations set forth in its Answer to Plaintiff's Complaint as if fully set forth herein.

74.      The averments set forth in Paragraph 74 are conclusions of law to which no response is necessary.

75.     Paragraph 75 sets forth conclusions of law to which no response is required.

76.     It is denied that answering Defendant breached any of the representations or warranties set forth in the Asset Purchase Agreement or that any of the transactions identified in Paragraph 76 were undisclosed to PHS or were in violation of the provisions of the Asset Purchase Agreement.

15

77.    Denied.

78.    It is denied that any of the transactions identified in Paragraph 76 had any bearing on the value of the assets purchased by PHS or constituted a material change in the value of CPS.

79.    It is denied that any CPS' receipts, other than the "Remaining Amount" of the proceeds from the sale of CPS assets to PHS, were required to be deposited in the Oversight Account or that any of the transactions described in Paragraph 79 were in violation of Emre Umar's obligations to PHS.

80.    Denied.

WHEREFORE, Defendant, Emre Umar, hereby demands judgment in his favor and against Plaintiff, Prison Health Services, Inc. for the relief demanded in Plaintiff's Complaint, together with an award in his favor and against Plaintiff for costs, reasonable attorney's fees and interest incurred by Defendant in defending Plaintiff's Complaint.


**COUNT IV - INDEMNIFICATION - EMRE UMAR**

81.    Defendant incorporates herein by reference the allegations set forth in its Answer to Plaintiff's Complaint as if fully set forth herein.

82.    Paragraph 82 sets forth conclusions of law to which no response is required.

83.    Denied.

84.    Denied.

85.  Denied.

86.  Denied.

87.  Denied.

88.  Paragraph 88 sets forth conclusions of law to which no response is required.

89.  Paragraph 89 sets forth conclusions of law to which no response is required.

90.  Denied.

WHEREFORE, Defendant, Emre Umar, hereby demands judgment in his favor and against Plaintiff, Prison Health Services, Inc. for the relief demanded in Plaintiff's Complaint, together with an award in his favor and against Plaintiff for costs, reasonable attorney's fees and interest incurred by Defendant in defending Plaintiff's Complaint.

## AFFIRMATIVE DEFENSES

1.  Plaintiff's Complaint fails to set forth claims on which equitable relief can be granted in this matter.

2.  Plaintiff's claims are barred by latches and estoppel.

3.  Plaintiff's claims are barred by its own unclean hands.

4.  Plaintiff's claims for equitable relief for a preliminary or permanent injunction are barred because Plaintiff holds an adequate remedy at law in the form of a claim for monetary damages.

5.  The restrictive covenant which Plaintiff seeks to enforce against Defendant was not made ancillary to the sale of a business or its good will.

17

6.     The restrictive covenant which Plaintiff seeks to enforce against Defendants was not supported by adequate consideration.

7.     The restrictive covenant which Plaintiff seeks to enforce against Defendants is not reasonably necessary to protect Plaintiff's interest in the assets which it purchased from CPS.

8.     The restrictive covenant which Plaintiff seeks to enforce against Defendants was not reasonably limited in duration and geographic location.

9.     Enforcement of the restrictive covenant as demanded by Plaintiff would create an unreasonable hardship on Defendant Umar.

10.     Enforcement of the restrictive covenant as demanded by Plaintiff would cause unreasonable injury to the public interest in open competition for prison health care contracts.

11.     Plaintiff's demand for enforcement of the restrictive covenant in this matter is for an illegal and improper purpose of restricting competition and restraint of trade.

12.     Plaintiff's attempt to enforce the restrictive covenant to eliminate competition for publicly bid contracts with governmental agencies is in violation of law and public policy requiring open competition for the award of public contracts.

13.     Plaintiff has failed to mitigate its damages.

14.    Defendant Umar had no access to or control over any of the funds held in the Oversight Account which were to be used to liquidate all of CPS' outstanding liabilities to creditors on the Assumed Contracts.

15.    PHS failed to give timely notice or demand for payment of any CPS expenses which it paid to CPS, the Oversight Committee or Defendant Umar.

16.    The schedule of payments set forth in Exhibit "E" to Plaintiff's Amended Complaint were either not for liabilities of CPS or were not necessary to maintain good will, credit or working relations of PHS.

17.    PHS' payment of any expenses of CPS was not the result of the breach of any obligation, representation or warranty made by Defendant Umar.

WHEREFORE, Defendant, Emre Umar, hereby demands judgment in his favor and against Plaintiff, Prison Health Services, Inc., for the relief demanded in Plaintiff's Complaint, together with an award in his favor and against Plaintiff for costs, reasonable attorney's fees and interest incurred by Defendant in defending Plaintiff's Complaint.

FRANCIS X. CLARK, P.C.

DATE:

BY:_____
        Francis X. Clark

Attorney for Defendant,
Emre Umar

## <u>CERTIFICATE OF SERVICE</u>

I, Francis X. Clark, hereby certify that I have served a true and correct copy of the

foregoing upon counsel for Plaintiff this date by fax and first-class mail, postage prepaid,

addressed as follows:

Michael D. Homans, Esquire
Lee Albert, Esquire
MAGER WHITE & GOLDSTEIN, LLP
One Liberty Place, 44th Floor
1650 Market Street
Philadelphia, PA 19103

Larry H. Spector, Esquire
Michael LiPuma, Esquire
WOLF, BLOCK, SCHORR
  & SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097

DATE: _____              _____
                                   Francis X. Clark

20